# ORIGINAL TRANSCRIPT

### IN THE UNITED STATES BANKRUPTCY COURT

### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| In re: | ) Bankr. Case No.: |
| VS FOX RIDGE, LLC, | ) 12-28001-JTM |
| and | ) Bankr. Case No.: |
| STEPHEN LAMAR CHRISTENSEN and VICTORIA ANN CHRISTENSEN, | ) 12-28010-JTM |
| | ) Jointly Administered |
| | ) Under Case No.: |
| | ) 12-28001-JTM |
| Debtors. | ) (Chapter 11) |
| | ) |
| | ) |
| | ) Judge Joel T. Marker |
| | ) |

October 11, 2012 - 9:02 a.m.

### TRANSCRIPT OF ELECTRONIC RECORDING

Reporter:  Tamra J. Berry
Notary Public in and for the State of Utah

FILED IN THE
UNITED STATES
BANKRUPTCY COURT
DISTRICT OF UTAH
2012 OCT 24  PM 2:47



**CITICOURT**
THE REPORTING GROUP

236 South 300 East
Salt Lake City, Utah 84111

PH: 801.532.3441    FAX: 801.532.3414    TOLL FREE: 877.532.3441

299

VS v. Christensen * October 11, 2012          2

A P P E A R A N C E S

**FOR VS FOX RIDGE:**

> Matthew M. Boley
> PARSONS KINGHORN HARRIS
> Attorney at law
> 111 East Broadway, Suite 1100
> Salt Lake City, Utah 84111
> Tel:  (801) 363-4300
> Fax:  (801) 363-4378

**FOR FORGE INVESTMENTS UT, LLC:**

> Sherilyn A. Olsen
> John P. Harrington
> HOLLAND & HART
> Attorneys at law
> 222 South Main Street, Suite 2200
> Salt Lake City, Utah 84101
> Tel:  (801) 799-5800
> Fax:  (801) 799-5700

**FOR TM COMPANIES:**

> Jeffrey L. Shields
> J.D. Lyons
> CALLISTER NEBEKER & MCCULLOUGH
> Attorney at law
> 10 East South Temple, #900
> Salt Lake City, Utah 84133
> Tel:  (801) 530-7374
> Fax:  (801) 364-9127

**FOR THE UNITED STATES TRUSTEE:**

> Peter J. Kuhn
> UNITED STATES TRUSTEE'S OFFICE
> 405 South Main Street, Suite 300
> Salt Lake City, Utah 84111
> Tel:  (801) 524-5105
> Fax:  (801) 524-5628

1

2
FOR STEPHEN AND VICTORIA CHRISTENSEN:

3           David T. Berry
            BERRY & TRIPP
            Attorney at law
4           5296 South 300 West, Suite 200
            Salt Lake City, Utah 84107
5           Tel:  (801) 265-0700
            Fax:  (801) 263-2487
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VS v. Christensen * October 11, 2012                    4

<u>I N D E X</u>

| STEVE CHRISTENSEN | PAGE |
|---|---|
| Direct Examination by Mr. Shields | 7 |
| Cross-Examination by Mr. Boley | 62 |
| Voir Dire Examination by Mr. Shields | 71 |
| Continued Cross-Examination by Mr. Boley | 74 |
| Continued Cross-Examination by Mr. Boley | 81 |
| Redirect Examination by Mr. Shields | 84 |
| Direct Examination by Mr. Boley | 181 |
| Cross-Examination by Mr. Shields | 202 |
| Cross-Examination by Mr. Berry | 221 |

| BRENT MANNING | PAGE |
|---|---|
| Direct Examination by Mr. Shields | 93 |
| Cross-Examination by Mr. Boley | 118 |
| Cross-Examination by Mr. Harrington | 130 |

| BRYAN SCOTT | PAGE |
|---|---|
| Direct Examination by Mr. Shields | 141 |
| Cross-Examination by Mr. Berry | 164 |

E X H I B I T S

| NUMBER | PAGE |
|--------|------|
| O | 73 |
| G | 80 |
| R | 120 |
| Q | 122 |
| C | 124 |
| H | 158 |
| I | 158 |
| J | 158 |
| K | 158 |
| L | 158 |
| M | 158 |
| N | 158 |
| F | 175 |
| A | 175 |
| B | 175 |
| D | 201 |
| E | 201 |
| 7 | 80 |
| 8 | 80 |

1                     P R O C E E D I N G S

2

3          THE BAILIFF:  All arise.  The United

4    States Bankruptcy Court for the District of Utah,

5    Central Division, the Honorable Joel T. Marker

6    presiding, is now in session.  God save the United

7    States of America and this honorable court.

8               Please be seated.

9          THE COURT:  Good morning.  Please call the

10   calendar.

11          THE BAILIFF:  This is in the matter of VS

12   Fox Ridge.

13          THE COURT:  Can I get appearances?

14          MR. BOLEY:  Your Honor, Matthew Boley

15   appearing on behalf of VS Fox Ridge, LLC, debtor in

16   possession.

17          MS. OLSEN:  Sherilyn Olsen and John

18   Harrington on behalf of Forge Investments.

19          MR. SHIELDS:  Your Honor, Jeffrey L.

20   Shields and J.D. Lyons on behalf of the TM companies.

21          MR. KUHN:  Peter Kuhn for the United

22   States Trustee.

23          MR. BERRY:  Dave Berry for Steve and

24   Victoria Christensen, debtors.

25          THE COURT:  All right.  Mr. Shields, this

VS v. Christensen * October 11, 2012                    7

1    is your motion.

2             MR. SHIELDS:  Thank you, Your Honor.  We'd

3    call Mr. Steve Christensen as our first witness.

4             THE BAILIFF:  Please come forward to this

5    mic and raise your right hand.

6             MR. BOLEY:  Your Honor, the debtors would

7    like to make a brief opening statement before we

8    begin with evidence.

9             THE COURT:  I've read all the documents.

10            MR. BOLEY:  All right.

11

12                   **Stephen Christensen**,

13          called as a witness, being first sworn,

14             was examined and testified as follows:

15

16            THE BAILIFF:  Please take the witness

17   stand and state your full name for the record.

18            THE WITNESS:  Stephen Lamar Christensen.

19

20                   **DIRECT EXAMINATION**

21   **BY MR. SHIELDS**:

22       Q.    Mr. Christensen, you're one of the debtors

23   in this jointly administered bankruptcy case; is that

24   correct?

25       A.    I believe so.

1      Q.     You and your wife, Vicky, are debtors?

2      A.     Yes.

3      Q.     And also you're a manager of the VS Fox

4   Ridge entity which is also a debtor?

5      A.     Yes.

6      Q.     It's a Chapter 11 case, correct?

7      A.     Yes.

8      Q.     It was filed voluntarily?

9      A.     Yes.

10      Q.     Would you look at the exhibit book in

11   front of you and turn to Exhibit 1?

12           THE COURT:  Well, he's got two books.

13           MR. SHIELDS:  Oh.

14           THE COURT:  Why don't you help him out.

15   You can approach; you don't need to ask.

16           MR. SHIELDS:  And for the record, I think

17   the movants' exhibits are 1 through whatever and the

18   debtors' exhibits are A through whatever.

19           THE COURT:  Correct.

20      Q.     (By Mr. Shields)  Mr. Christensen, have

21   you seen that exhibit under tab 1?

22      A.     Yes.

23      Q.     And is that a copy of the amended

24   declaration which you filed on August 8th?

25      A.     I was looking for --

1          THE COURT:  Mr. Shields, it's stamped as

2     August 16th?

3          MR. SHIELDS:  Correct.

4          Q.    (By Mr. Shields)  Right at the top of the

5     page is says filed on August 16th.  Right by your

6     signature in the -- two-thirds the way down on that

7     first page, is that your signature?

8          A.    Yes.

9          Q.    Does that say it was signed on August 8th?

10         A.    Yes.

11         Q.    Okay.  And is that your wife's signature

12    as well?

13         A.    Yes.

14         Q.    Did she also sign that on August 8th?

15         A.    Yes.

16         Q.    And did you review these amendments before

17    you filed them with the Court?

18         A.    I did.

19         Q.    And are they accurate to the best of your

20    knowledge?

21         A.    To the best of my knowledge, yes.

22         Q.    Would you go to the second page.  Up at

23    the top it says docket 42.  It's page 2 of 9.  Do you

24    see that?

25         A.    Yes.

VS v. Christensen * October 11, 2012                10

1        Q.      It's called Summary of Schedules?

2        A.      Yes.

3        Q.      Amended?

4        A.      Yes.

5        Q.      Now, of that $77 million in assets, how

6   much of that involves claims in litigation?

7        A.      I believe it was about approximately $50

8   million, but I am looking at this to see.

9        Q.      Isn't it 75 million?  Didn't you list some

10  claims at 50 and another set of claims at 25 for a

11  total of 75 million?

12               MR. BOLEY:  Perhaps Mr. Shields can turn

13  his attention to the relevant pages.

14               THE COURT:  I was thinking the same thing.

15       Q.      (By Mr. Shields)  All right.

16  Mr. Christensen, let me take you then to page 4 of 9.

17       A.      Okay.

18       Q.      See paragraph 21, other contingent and

19  unliquidated claims?

20       A.      Yes.

21               THE COURT:  I'm sorry, Mr. Shields, I

22  don't mean to interrupt you.  But let's back up.  Do

23  you have an agreement with Mr. Boley about the

24  admission of these exhibits?

25               MR. SHIELDS:  Yes, we do, Your Honor.

1        MR. BOLEY:  We had a stipulation regarding

2   admission of a number of exhibits.  Perhaps we

3   should --

4        THE COURT:  Okay.  And I apologize,

5   Mr. Christensen, for interrupting your testimony.

6        THE WITNESS:  Oh no, that's fine.

7        THE COURT:  But let's go through that and

8   see if we can get that done first.

9        MR. SHIELDS:  Okay.  Yes, I believe we

10  have agreement with the debtor that Exhibits 1, 2 --

11       I can't remember, Mr. Boley.  Do we have

12  an agreement on 3?

13       MR. BOLEY:  Maybe I can describe what I

14  understand our agreement to be --

15       MR. SHIELDS:  Okay.

16       MR. BOLEY:  -- and Mr. Shields could tell

17  me if I'm wrong.

18       The debtors stipulate to 1 and 2.  The

19  debtors stipulate to 3, subject to the caveat that my

20  copy at least of Exhibit 3 had some additional

21  documents at the end.

22       MR. SHIELDS:  Agreed.

23       MR. BOLEY:  That appeared to be not --

24  that shouldn't have been there.  So with the

25  exception of those.  So I think it's a document that

VS v. Christensen * October 11, 2012          **12**

1    says Exhibit 5 on it and then an e-mail.  Other than

2    those, Exhibit 3.

3             Exhibit 4, the debtor stipulates if

4    Exhibits H through N of our exhibits were also

5    received.  And I believe that's the agreement.

6             MR. SHIELDS:  Yes.

7             MR. BOLEY:  Exhibit 5, the debtor

8    stipulates to.  Exhibit 6 the debtor stipulates to

9    with these caveats:  It's for the limited purpose of

10   describing proposed new allegations against the

11   debtor, not received for the truth.  The exhibits to

12   Exhibit 6 are not to be received.  And Exhibit E will

13   also be received subject to the same condition that

14   it's allegations and not for the truth.

15             Exhibit E, you mean the debtors' Exhibit

16   E?  Debtors' Exhibit E which is the TM parties'

17   answer and counterclaim in the Toomey case.

18             MR. SHIELDS:  Okay.  Agreed.

19             MR. BOLEY:  Debtor is not stipulating to

20   Exhibit 7.  The debtor is not stipulating to

21   Exhibit 8.  Would have if Mr. Preston was present.

22   Debtor stipulates to 9 and 10.  Debtor stipulates to

23   Exhibit 11 if Exhibit C is also received, which is

24   the motion that preceded the order.

25             MR. SHIELDS:  Okay.

VS v. Christensen * October 11, 2012          **13**

1          MR. BOLEY:  Debtor stipulates to 12 and

2     13.  Debtor stipulates to 14 if Exhibits E, Q and R,

3     our pleadings from the Toomey case are also received.

4          MR. SHIELDS:  Okay.

5          MR. BOLEY:  And then as long as we're

6     going through exhibits.  The debtors' exhibits, my

7     understanding is that the movant stipulates to the

8     admission of all the exhibits with exception of F, G,

9     O and P.

10          MR. SHIELDS:  And Your Honor, I'd ask that

11     we have during the break -- I didn't have a chance to

12     talk to my client completely about this proposal.  It

13     came in this morning.  So I'd just ask that during

14     the break I have an opportunity to look at the

15     debtors' exhibits more carefully and respond to that.

16          MR. BOLEY:  I served them two days ago,

17     but...

18          THE COURT:  All right.  Well, we're not to

19     that point yet either so.

20          MR. SHIELDS:  Thank you, Your Honor.

21     Q.     (By Mr. Shields)  So Mr. Christensen, we

22     were on page 4 of 9 in Exhibit 1.  Do you see

23     paragraph 21 called other contingent and unliquidated

24     claims?

25     A.     Yes.

1        Q.      And you see that you have a lot of

2    unknowns on the value of those claims, except when

3    you get down to the bottom where it says rights of

4    contribution and/or indemnity.  The last entry on

5    that page; do you see that?

6        A.      Yes.

7        Q.      And you put a value of how much to that?

8        A.      Said that it -- the value's uncertain.  It

9    may range from 25 million to 100 million.

10       Q.      Okay.  But the number you put in the

11   right-hand column is how much?

12       A.      I put down 25 million.

13       Q.      But it could be as much as 100 million

14   then?

15       A.      Yeah.

16       Q.      Okay.

17       A.      It could be less because it's uncertain,

18   or it could be more than the 25.

19       Q.      Okay.  Then would you go to the next page,

20   page 5 of 9.  This is a continuation of paragraph 21,

21   your contingent unliquidated claims.

22       A.      Yes.

23       Q.      What value have you put on that claim?

24       A.      It shows $50 million.

25       Q.      And that also has a range between 50 to

VS v. Christensen * October 11, 2012          15

1    100.

2         A.     Yeah.  It says value is uncertain and may

3    range from 50 to 100.

4         Q.     So this is the low value you think?

5         A.     It's just the number that we settled on.

6    There's so much unknown that I couldn't really

7    represent a final number.

8         Q.     And then the next entry is a potential

9    cause of action against Bank of America.  And you've

10   got that listed as unknown; is that correct?

11        A.     Yes.  We're still in negotiations with

12   them, our attorneys are.

13        Q.     So would you go back to page 2 of 9.  Does

14   that help refresh your recollection the 77 million

15   that's the total assets.  Isn't the total that --

16   isn't 75 million of that those unliquidated and

17   disputed claims we just talked about on page 4 of 9?

18             MR. BOLEY:  Your Honor, the schedules

19   speak for themselves.

20             THE COURT:  I'm sorry.  I was making a

21   note.  Would you restate the question please?

22             MR. SHIELDS:  Yes.

23        Q.     (By Mr. Shields)  Mr. Christensen, back on

24   page 2 of 9 where you show total assets in the amount

25   of $77,938,550.52, isn't 75 million of that the

1    contingent unliquidated claims we just discussed on

2    pages 4 and 5 of 9?

3            MR. BOLEY:  And Your Honor, the objection

4    was that the schedules speak for themselves.

5            THE COURT:  They do.  But I'll overrule

6    the objection and let Mr. Christensen respond.

7            THE WITNESS:  Yes.  I think that it's

8    conditioned upon the two previous statements I made

9    about that it's uncertain and it may be those

10   numbers.  It's our best estimate with so much

11   unknown.

12       Q.    (By Mr. Shields)  And if you went with

13   your higher values, it'd be another 100 million more,

14   right?  Because you've gone from 25 to 100 and 1

15   and --

16       A.    Subject to the same conditions that I

17   stated earlier that it's unknown and it may be.

18       Q.    All right.  Would you go to page 3 of 9 of

19   Exhibit 1.  Paragraph 16 has your accounts

20   receivable; is that correct?

21       A.    I'm sorry.  Let's see, I'm trying to look

22   for --

23       Q.    Page 3 of 9 up at the top.

24       A.    Okay.

25       Q.    Paragraph 16 says accounts receivable.

1      A.    Yes.

2      Q.    And you've listed an account in the amount

3  of until $1,714,846.58; is that correct?

4      A.    Yeah.  It was our best estimate.

5      Q.    Could you explain to the Court what that

6  account receivable is?

7      A.    It's a member loan that the Traverse

8  Mountain entities owe me, owe us for -- it was in the

9  settlement agreement.

10      Q.    And that --

11      A.    It may not be accurate because there's

12  interest accruing and so on, and I don't know that it

13  was completely calculated in its totality at that

14  time.

15      Q.    That claim is disputed though, right?

16      A.    I'm not sure.

17      Q.    The TM companies don't agree they owe you

18  that, do they?

19      A.    Well, it's in the settlement agreement

20  that we have that the amount's owed.

21      Q.    But does TM companies agree with that?

22  Have they agreed to pay that?

23      A.    Well, they signed it, signed the

24  settlement agreement.

25      Q.    I know that.  Have they agreed to pay that

1   amount?

2        A.     Well, that's what the settlement agreed to

3   do, that they would have to pay it back.  It's a

4   member loan.

5        Q.     It's disputed though, correct?  You don't

6   have the money, do you?

7        A.     No, I don't have the money.

8        Q.     And why not?

9        A.     They haven't paid it.

10       Q.     And why not?

11       A.     Well, it gets into all the different

12   litigation, all the different cases.  And there's --

13   there may be a lot of reasons for why they haven't.

14   I don't know all of them.

15       Q.     Okay.

16       A.     I think that they have had the cash at

17   various times where they could have paid it and might

18   have, should have paid it.

19       Q.     Okay.  And the next entry, points and fees

20   due from Traverse Mountain company, is 250,000.  Does

21   that derive from the settlement agreement as well?

22       A.     It's part of the settlement agreement.  I

23   think this is with regards to the Satori loan where I

24   was the sole guarantor.  And under the resolutions

25   they were supposed to pay me that plus interest; that

1    amount.

2         Q.    And you've asked them to pay that, haven't

3    you?

4         A.    Pardon me?

5         Q.    You've asked them to pay that, haven't

6    you?

7         A.    Yes.

8         Q.    And they haven't, have they?

9         A.    No.

10        Q.    Do you know why?

11        A.    Well, I know they just don't want to.

12        Q.    Is it tied up in the litigation as well?

13        A.    I don't know that that -- I don't know if

14   it is or not.  I can't remember if that's part of it,

15   but.

16        Q.    Okay.  How about the next entry, deposit

17   funds held by the company.  Principle balance of

18   100,000 plus interest in damages.  Where's that money

19   on deposit?

20        A.    This -- let's see.  I'm not sure.  I think

21   that this was -- I think this may have been the

22   deposit that was done in litigation.  I don't know.

23   Without going back and reviewing it with my

24   attorneys, I can't quite remember which one that was

25   -- which that would be applied to.  I don't remember.

VS v. Christensen * October 11, 2012          20

1        Q.     Do you know which title company deposited
2    it?
3        A.     I don't remember.
4        Q.     Does it involve the litigation with TM
5    company?
6        A.     I don't remember that.  I'd have to go
7    back and check with the attorneys on that and our
8    accountants.
9        Q.     Okay.  How about services rendered with a
10   $4,000 value.  Who were those services to and why
11   have they not paid?
12       A.     Those were just -- I believe those were
13   amounts that were owed to me for properties that are
14   owed to VS Fox Ridge and Stephen and Vicky.  It might
15   have been a little bit more than that with regards to
16   consulting fees that were still owed to me on
17   unrelated projects to Traverse Mountain.
18       Q.     And for whom did you perform the
19   consulting fees?
20       A.     It was on a -- it was for some work that
21   I'd done for my brother-in-law.  And then I think
22   some of it was -- I think most of it might have been
23   for my brother-in-law.
24       Q.     And so he is the one that owes you that
25   money?

VS v. Christensen * October 11, 2012          21

1          A.     Yeah.  He paid -- he's since paid it, I

2     believe.  And I've reported it, I think, in the

3     bankruptcy.

4          Q.     Oh, your brother-in-law has paid the

5     4,000?

6          A.     I think part of it.  I think he -- it was

7     for some services that I helped my son with on

8     consulting fees and my brother-in-law.

9          Q.     Okay.  And so --

10          A.     And it seems to me like that that amount

11     has been paid for those consulting services for a

12     project my son was working on.

13          Q.     And where's the money?

14          A.     I believe it was reported to the --

15          Q.     Where is the money?  Not where was it

16     reported.  Where is the money?

17          A.     It would have been deposited into our

18     bankruptcy account.

19          Q.     Have you spent it?

20          A.     I don't know.

21          Q.     Okay.

22          A.     I don't think so.

23          Q.     The 25,000 owing from VS Fox Ridge, what's

24     that for?

25          A.     This explanation is so brief I'm trying to

VS v. Christensen * October 11, 2012          22

1    test my memory on.  I believe that might have been --

2    I'd have to go back and check, but I -- it might have

3    been with regards to the small subdivision that I did

4    in front of our home called Apple Creek Farms.

5           Q.    And VS Fox Ridge owes you money for that?

6           A.    I'd have to go back and look at our notes

7    and when we put this together.  Sorry.

8           Q.    And VS Fox Ridge owes you money for that?

9           A.    I believe so.

10          Q.    And why don't you just go collect that?

11          A.    Pardon me?

12          Q.    Why don't you just go get that money from

13   VS Fox Ridge?

14          A.    Because they don't have it to pay right

15   now.

16          Q.    Okay.  The last entry is reimbursement

17   from the LDS church.  Have you been paid that?

18          A.    Not yet.  Oh, yes, I have.  And it was

19   reported in our case.

20          Q.    So it's in your account?

21          A.    Yes.

22          Q.    When did that take place?

23          A.    Several months ago, maybe July or early

24   August.

25          Q.    So the 4,000 has been paid, the 763 has

1    been paid, and the other hasn't been paid either

2    because the obligor can't pay it or they're in

3    dispute; is that correct?

4         A.    I believe that's correct.

5         Q.    Okay.  Would you go to the next page,

6    schedule B.  You've listed claims against Key Bank,

7    Penga, Stokes, Howcroft as unknown.  Do you have a

8    range of value in those claims?

9         A.    We're working on that with regards to our

10   plan, but I don't have it finalized.  We're working

11   on it presently.

12        Q.    And that's true for all -- there's four

13   other entries that all say unknown -- three other

14   entries.  You don't have any better estimated value

15   today than you did when you filed these schedules?

16        A.    We're working on trying to put that

17   together with regards to the plan, but I don't have a

18   final number on that.

19        Q.    Are those numbers independent and above

20   the 25 million listed on the last entry of page 4 of

21   9?

22        A.    Well, because they're unknown, that's why

23   we had that statement down at the bottom that it said

24   it may -- it's uncertain what the total was.  It

25   could be in between the bottom number or below or

VS v. Christensen * October 11, 2012          24

1  above.

2      Q.    I see.  The unknowns are not included in

3  the 25, but they may be within the range of between

4  25 and 100?

5      A.    I'm not saying that.  I think the

6  statement -- let me just go back here.  I'm sorry.

7  It'll just take one minute.

8          Yeah.  Where it talks about the value is

9  uncertain, it may range from 25 to $100 million.

10  It's just -- that statement was put in there because

11  I don't know.  There's so much I don't know that

12  Traverse Mountain hasn't disclosed to me or has

13  concealed from me.  They haven't been holding board

14  meetings and properties have been transferred, moved

15  around.

16      Q.    No.  The question is is the 25 million --

17  the range between 25 and 100, that 75 million

18  unaccounted for, is that included with the five

19  unknown categories that are identified above the 25

20  million?

21      A.    It could be.  I just don't know what those

22  amounts are at this time.

23      Q.    You don't know.

24          All right.  Let's go to the next page,

25  page 5 of 9.  This is where you have the $50 million

1   number on the right-hand column for current value.

2   Do you see that?

3        A.    Yes.

4        Q.    And then underneath that you have a

5   potential cause of action against Bank of America for

6   failure to timely process loan modification

7   applications.

8        A.    Yes.

9        Q.    And you have a range of value for that

10  now.  You did not at the time.  It was unknown.  How

11  about now?

12       A.    No.  Well, I think that -- I mean there's

13  ongoing negotiations with them but they're not final.

14       Q.    They haven't paid you?

15       A.    Huh?

16       Q.    They haven't paid you any money?

17       A.    No.

18       Q.    Do they agree they owe you?

19       A.    They're not saying that they owe me.  But

20  they're talking about discounting the amounts of --

21  the interest amounts on the loan.

22       Q.    So that's a disputed claim.  It's in

23  negotiation?

24       A.    It's in negotiations, yes.

25       Q.    All right.  Would you go to page 7 of 9 on

VS v. Christensen * October 11, 2012          26

1   this same Exhibit 1.  The first entry on the top of

2   your schedule F is the Forge Investment claim; is

3   that correct?

4          A.     Yes.

5          Q.     And you put amount of claim of 22.5

6   million; is that correct?

7          A.     Yes.

8          Q.     And you've also checked the disputed box;

9   is that correct?

10         A.     Yes.

11         Q.     And why is that?

12         A.     Because I don't know exactly what the

13  amount is.  I've never been told by -- never been

14  given the amounts by Traverse Mountain.

15         Q.     So you dispute the amount but you don't

16  dispute the liability?

17         A.     Well, I -- we're disputing it -- we're

18  disputing whether we owe that amount and some of our

19  litigation.

20         Q.     You dispute that you owe Forge anything?

21         A.     No.  I know that I signed on the loan.

22         Q.     Do you dispute that you them any money?

23         A.     No, I'm not disputing it.  We are -- I'd

24  have to turn to my attorneys on that.  I know that

25  we're litigating against the amount, the full amount

1   that --

2          Q.     That claim's also in litigation?

3          A.     Yes.

4          Q.     Okay.  Would you go to the next page, the

5   schedule F, page 8 of 9.  It's entitled Current

6   Income of Individual Debtors Amended.

7          A.     Yes.

8          Q.     Do you see that?  Is that accurate?  The

9   total income that you and your wife have is $3,008

10  per month?

11         A.     Yes.  But we've been negotiating -- I

12  mean, are you saying as of the time I signed this?

13         Q.     And today.  Is it any different today?

14         A.     We're negotiating consulting fees and

15  management fees.  And I've received some small

16  amounts and believe that that'll increase with each

17  coming month and be part of the plan.

18         Q.     And how much have you received since the

19  date of filing these amended schedules?

20         A.     I believe I have been getting about

21  $1,500.  Well, not since this date.  It would have

22  been starting last month.  So it would have been

23  September, $1,500 in addition --

24         Q.     That's since -- this was filed on August

25  16th, right?

VS v. Christensen * October 11, 2012          28

1      A.     Yes.

2      Q.     So that's since that date.

3      A.     Since that time.

4      Q.     And you receive --

5      A.     And this was filed on August 8th I think

6  you said on the --

7      Q.     Well, it was filed on August 16th.  As the

8  Court points out, it was signed on August 8th.

9      A.     Okay.  All right.

10      Q.     So you've received $1,500 in consulting

11  fees since August 16th?

12      A.     Yes.

13      Q.     And who was that from?

14      A.     That was from my son.

15      Q.     From your what?

16      A.     My son.

17      Q.     What's your son's name?

18      A.     McKay Christensen.

19      Q.     What'd you do for him?

20      A.     Helped him with some of the -- one of the

21  projects that he's been working on and has part

22  ownership in; not related to the Traverse Mountain

23  entities.

24      Q.     Okay.  And he's actually paid you that?

25      A.     Yes.

VS v. Christensen * October 11, 2012          29

```
1          Q.     And where'd that money go?

2          A.     It went into our bankruptcy debtor in

3     possession account.

4          Q.     Have you spent it?

5          A.     Not all of it.  But I think a big portion

6     of it.

7          Q.     Okay.  Other than the social security and

8     this consulting fee with your son, do you have any

9     other source of income?

10         A.     I have sources, but I'm not receiving the

11    payments.  I'm over in litigation with Traverse

12    Mountain.  For three and a half years I haven't

13    received a penny, but I believe I'm owed money.

14         Q.     The claims of those we just discussed.

15    Those disputed claims that we just covered, right?

16    The 75 million?

17         A.     Yeah.  That's -- yeah.

18         Q.     Okay.

19         A.     It would be part of that.

20         Q.     All right.  Would you go to two pages

21    further.  We've got the cover sheet for the amended

22    schedules in the VS Fox Ridge case.  Do you see that

23    at the top it says docket 44, page 1 of 31?

24         A.     Yes.

25         Q.     Okay.  And you're a manager of VS Fox
```

VS v. Christensen * October 11, 2012            30

1    Ridge, correct?

2         A.    Yes.

3         Q.    And did you sign this amendment or

4    authorize it to be signed?  It's got an e-signature

5    right in the middle of the page.

6         A.    Yeah.  Where the attorneys signed.

7         Q.    Yeah.  Actually it's an electronic

8    signature, but it's dated August 7th of 2012?

9         A.    Yes.

10        Q.    And you reviewed these amendments before

11   they were filed?

12        A.    Yes.  This -- yes.

13        Q.    And would you go to the next page?  This

14   is page 2 of 31.  Question 1 asks for income of VS

15   Fox Ridge over the last three years.  Do you see

16   that?

17        A.    Where it says income from employment or

18   operation of business?

19        Q.    Correct.

20        A.    Yes.

21        Q.    And what did you put as the income of VS

22   Fox Ridge in 2010?

23        A.    I think we have down the $93,000.

24        Q.    That's negative, isn't it?

25        A.    Yes.

VS v. Christensen * October 11, 2012          31

1       Q.      So it had a loss in 2010?

2       A.      Yeah.  I think we took this off our tax

3    return.

4       Q.      And then on 2011 you have zero; is that

5    correct?

6       A.      Yeah.  That's -- the taxes aren't quite

7    done for 2011.

8       Q.      Do you have cause to believe that there

9    will be income in 2011 or not?

10      A.      I don't know.  We're just working on that

11   right now trying to get it finished with our

12   accountant.

13      Q.      In 2012 you show zero income; is that

14   correct?

15      A.      Yes.  Because we don't have any of the tax

16   information.  It hasn't been provided to us so that I

17   can do it.

18      Q.      And that's part of the reason VS Fox Ridge

19   hasn't paid you the 25,000 that's shown as an account

20   receivable on your schedule; isn't that correct?

21      A.      That's part of the reason.

22      Q.      Okay.  Question 2, you have none; is that

23   right?  You've got the none box checked in there,

24   filled in.

25      A.      Yeah.  It says during the two years

1    preceding.  And that was because for 2012 and 11

2    we're trying to pull that information together and

3    get the information from the Traverse Mountain entity

4    so that I can do my taxes and then make a fair

5    representation on here what needs to be done.  I was

6    just afraid to make a representation without all of

7    those informations going through the accountant.

8         Q.    On the next page there's paragraphs A, B

9    and 3.  Paragraph 3, payment to creditors A, B and C.

10   You've checked the none box on all of those; is that

11   correct?

12        A.    Yeah.  For the same reasons.

13        Q.    So Fox Ridge hasn't been paying anybody?

14        A.    No.  No, not -- I don't think in the last

15   two years, except as it might relate to that four

16   lots that were subdivided in front of my home --

17        Q.    Okay.

18        A.    -- on the piece of ground that we own that

19   I referred to that's called Apple Creek Orchards --

20   Apple Creek Farms.

21        Q.    Page 3 of 31 the question number 4, suits

22   and administrative proceeding.  You do have some

23   entries there, correct?

24        A.    I'm sorry.  I'm not quite sure where

25   you're at on this.

1        Q.      Paragraph 4.

2        A.      Okay.

3        Q.      Page 3 of 31.  It's the same page we were

4    just on.

5        A.      All right.

6        Q.      You do have seven lawsuits identified

7    there; is that correct?

8        A.      Yes.

9        Q.      Okay.  And those are all active or they

10   were active before your bankruptcy case?

11       A.      Yes.  I believe they were.

12       Q.      Okay.  Go to the next page.  This is 4 of

13   31.  Questions 4B, 5, 6 A and B, 7, 8.  You've

14   checked the none box in all of those; is that

15   correct?

16       A.      Yes.

17       Q.      Next page you have question 9 as payments

18   to attorneys.  You disclose that you've paid to your

19   attorneys $25,000; is that correct?

20       A.      Yes.

21       Q.      What's the source of those funds?

22       A.      That was some water shares that I owned,

23   my wife and I owned.

24       Q.      And did you sell those water shares and

25   then pay the money to your debtors counsel?

VS v. Christensen * October 11, 2012          34

```
1        A.    Yes.

2        Q.    And was that done after Judge Kennedy

3   issued the injunction against you liquidating any

4   assets?

5        A.    I don't remember right --

6        MR. BOLEY:  Objection, relevance and

7   assumes facts not in evidence.

8        THE COURT:  Well, I'll overrule the

9   objection.

10        Mr. Shields, you want to back up and see

11   if you can lay some foundation?

12        MR. SHIELDS:  Yes.

13        Q.    (By Mr. Shields)  At the first meeting of

14   creditors you'll recall the attorney for Howcroft

15   appeared and asked you questions, didn't he?

16        A.    Could you please repeat that?  I'm sorry.

17        Q.    Eric Olson --

18        A.    Yes.

19        Q.    -- the attorney for Howcroft --

20        A.    Yes.

21        Q.    -- appeared at the first meeting of

22   creditors; is that correct?  Do you remember that?

23        A.    Yes, he was there.

24        Q.    Do you remember him asking you questions?

25        A.    I do.
```

VS v. Christensen * October 11, 2012          35

1      Q.     Do you remember him asking you where'd you

2  get the 25,000 to pay your debtors attorney.  Do you

3  remember that?

4      A.     I vaguely do.

5      Q.     And didn't you say, well, we sold this

6  water stock and paid it.  And then he said, well,

7  wasn't that a violation of Judge Kennedy's order, and

8  you said --

9           MR. BOLEY:  Your Honor, instead of doing a

10  colloquy of answers and questions that happened in

11  another proceeding, why don't we just ask questions

12  here and have answers.  I object to this line of

13  inquiry.

14           THE COURT:  And that's overruled.  He's

15  just trying to get Mr. Christensen to remember what

16  happened at the 341.  If you can just answer in a

17  narrative fashion, that'd be fine.

18           MR. SHIELDS:  It'd be easier, yes.

19           THE WITNESS:  Yeah.  I don't remember Eric

20  Olson ever saying to me -- there's a court record, a

21  tape recording.  But I don't remember him ever saying

22  that -- talking about Judge Kennedy's case and about

23  any sanctions there and what was happening with

24  regards to these water shares.  I don't remember him

25  ever asking me that.

VS v. Christensen * October 11, 2012          36

1        Q.      (By Mr. Shields)  You don't remember him

2   -- I'll ask you now.  Do you remember now that Judge

3   Kennedy had issued an injunction against you to

4   liquidate any assets?

5        A.      Yeah.  That --

6                MR. BOLEY:  Objection, best evidence.

7                THE COURT:  Overruled.

8                THE WITNESS:  Yes, separately, unrelated

9   to Eric Olson.  He's the attorney in that other case.

10  Yeah, there is that sanction that was placed -- in

11  place because we --

12       Q.      (By Mr. Shields)  And again, I don't want

13  to put words in your mouth.  But I recall you saying

14  that you had forgotten that you had this water stock

15  when you were examined by Mr. Howcroft just like two

16  weeks before the bankruptcy.  Do you remember

17  testifying to that?

18       A.      I vaguely do, yes.

19       Q.      Okay.  And is that your testimony today --

20       A.      You're talking about -- you're talking

21  about a deposition that was taken?

22       Q.      Yeah.  It was an asset exam, right?

23       A.      With Eric Olson.

24       Q.      Yeah.  And he asked you what assets do you

25  have.  And you never mentioned this water stock, did

VS v. Christensen * October 11, 2012                    37

1   you?

2        A.     No.  I disclosed it to Eric Olson.

3        Q.     In the first meeting but not in the

4   debtors exam, did you?

5        A.     I don't remember the dates of the two.  I

6   don't remember the dates that you're referring to.

7        Q.     All right.  Let's go to question 10.  You

8   show in other transfers that you have transferred

9   some shares.  I assume that's membership interest in

10  VS Fox Ridge?

11       A.     Yes.

12       Q.     It's not really shares, is it, because

13  they're not a corporation LLC membership interest?

14       A.     Yes.

15       Q.     And you've transferred those to Staph

16  Investment, Richard Staph and Sherrie Staph.  Who is

17  Richard and Sherrie Staph?

18       A.     They're friends of ours and people who had

19  loaned us some money.

20       Q.     So you transferred these shares in lieu of

21  repaying the debt?

22       A.     Not in lieu of repaying it.  It's just

23  part of the terms of the debt.

24       Q.     So the debt -- is it collateral for

25  repayment or is it actually satisfaction of the debt?

VS v. Christensen * October 11, 2012          38

1        A.     No.  It was a loan that was made with

2    collateral.

3        Q.     And what was the collateral?

4        A.     It was my home.

5        Q.     So they had a loan secured with your home,

6    and then you transferred these shares as partial

7    payment of that debt?

8        A.     Yeah.  As partial payment I did.

9        Q.     So is that the only transfer that VS Fox

10   Ridge has been involved in in the last three years is

11   the share -- or membership interest --

12       A.     In the last how many years?

13       Q.     Three years.

14       A.     No.  There was a transfer to McKay

15   Christensen.  He had an option to exercise to

16   purchase or to acquire some of a percentage of VS Fox

17   Ridge.

18       Q.     Okay.  So you also transferred some

19   membership interest to your son, McKay?

20       A.     Yes.  But it was before this time period.

21       Q.     Okay.

22       A.     I think it was 2009.

23       Q.     And then question 10B and question 11

24   you've checked the none box, correct?

25       A.     Yes.

1      Q.    On the next page every question, 12

2   through 17A you've checked the none box?

3      A.    Yes.

4      Q.    Next page paragraphs 17B and C you've

5   checked the none box?

6      A.    B and C?  Yes.

7      Q.    And then question 18, nature, location and

8   name of business.  You've disclosed that the debtor,

9   VS Fox Ridge, has an interest in three entities; is

10  that right?

11     A.    Yes.

12     Q.    And that's Fox Ridge Investments, LLC,

13  Land Com Financial Group, LLC and Solitude

14  Investments, LLC; is that correct?

15     A.    Yes.

16     Q.    And is your interest -- is VS Fox Ridge's

17  interest in those three entities, are they a majority

18  controlling interest or a minority noncontrolling

19  interest?

20     A.    It has a minority -- a minority interest

21  subject to terms of agreement and operating

22  agreements and some on settlement agreements.

23     Q.    Question 18B, you've checked the none box;

24  is that correct?

25     A.    Yes.

VS v. Christensen * October 11, 2012                 **40**

1      Q.      Question 19, you've identified White &

2   Rasmussen as your bookkeepers/accountant?

3      A.      Yes.

4      Q.      And then questions 18B, C, D, question 20A

5   and B you've checked the none box?

6      A.      Yes.

7      Q.      And then question 21, are the membership

8   interest holders in VS Fox Ridge; is that correct?

9      A.      Yes, I believe it is.

10     Q.      Okay.  We've already talked about Staph

11  Investment and Richard Staph.  They own four and a

12  half percent.  Your son, McKay, owns 27.1767 percent?

13     A.      Yes.

14     Q.      And you and your wife own the balance?

15     A.      Yes.

16     Q.      On the next page questions 21B through 25

17  you've checked the none box in every case, right?

18     A.      Yes.

19     Q.      And then on the last page, that is your

20  signature?

21     A.      Yes, it is.

22     Q.      And is there any cause to believe that

23  these schedules would be any different today than

24  they were when you signed them on August 7th?

25     A.      There's -- as I mentioned earlier, there

1   are some things that have transpired and happened

2   since we filled these out.

3        Q.    The 4,000 you received -- well, no, that

4   was in your personal case.  As to VS Fox Ridge, has

5   there been any changes?

6        A.    No.  Well, no.  Just as -- with regards to

7   what we're doing and putting together the plan and

8   hiring law firms to represent us and things like that

9   that are taking --

10        Q.    But no change in the questions -- answers

11   to the questions here that -- the Court wants to be

12   fully informed, and I want to be fully informed.  Are

13   there any changes to questions that we've just gone

14   through that would be different today than they were

15   on August 7th?

16        A.    Well, just the ones that we've talked

17   about that I've mentioned here.

18        Q.    Okay.  Next page, 11 of 31.  You put for

19   schedule A you own no real estate, correct?  We're

20   talking about --

21             THE COURT:  Mr. Shields, when you say you,

22   what's --

23        Q.    (By Mr. Shields)  I'm talking about VS Fox

24   Ridge.  The debtor, this VS Fox Ridge debtor?

25        A.    No.

1      Q.     And on the next schedule B, page 12 of 31,

2   you've checked none all except you have two bank

3   accounts with a total of $103.28; is that correct?

4      A.     As of this date.

5      Q.     Right.  As of this date.

6      A.     Yes.

7      Q.     And that balance may have gone down or up

8   depending -- actually, it's gone down, hasn't it, or

9   has it changed?

10      A.     No.  It's had -- the balances have been

11   slightly higher.

12      Q.     And where did they get higher from?  What

13   income caused them to go higher?

14      A.     Just the amounts that I've talked about

15   here today.

16      Q.     That was to you personally, right, to --

17      A.     Excuse me.  With regards to VS Fox Ridge,

18   yes, you're correct.  I'm sorry.

19      Q.     On the next page, 13 of 31, questions 11,

20   12, 13, 15, 16, 17, 18, 19, 20 you've checked the

21   none box in all of those; is that correct?

22      A.     Yes.

23      Q.     Question 14, you've identified your

24   ownership interest in Land Com, Fox Ridge Investment

25   and Solitude, and you've valued that at $20,600,000;

VS v. Christensen * October 11, 2012          **43**

1   is that correct?

2         A.    Yes.  With the same -- it's an estimate

3   with the same explanation that we said earlier on

4   when I talked about it may be between -- I mean, this

5   is our best estimate with the knowledge that we had

6   at the time is what I'm saying, as far as the value

7   goes.

8         Q.    These are the three entities that you

9   earlier said you have a minority interest in all

10  three of these companies?

11        A.    No.  I think it's in dispute whether or

12  not we have a minority interest in Land Com Financial

13  Group.

14        Q.    It's in dispute?

15        A.    Yeah.  And Solitude, I think, is in

16  dispute as well.

17        Q.    So you think you have a majority interest

18  in those companies?

19        A.    I believe that that's something that the

20  attorneys can address better.  But I believe that

21  that's what we're --

22        Q.    I see.

23        A.    -- alleging, yes.

24        Q.    Because clearly the percentages you put

25  here, 25.5 for Land Com, that's the minority

1   interest, isn't it?

2        A.    No.   Well, excuse me, for VS Fox Ridge.

3   I'm sorry, you're right.   I was thinking in terms of

4   the collective interests of the Christensens.   But

5   the 25.5 would be a minority interest.

6        Q.    And the same for Fox Ridge Investments,

7   16.728?

8        A.    Yes.

9        Q.    And the same for Solitude, 25.5?

10       A.    Yes.

11       Q.    Are we straight now?   So you say as to the

12  VS Fox Ridge, those are the percentages you claim to

13  own?

14       A.    Yeah.   Those are our best estimates, yes.

15       Q.    If you go to the next page, paragraph 21.

16  This is page 14 of 31.   It's the same category claims

17  we looked at in your personal case.   You've shown

18  contingent unliquidated claims.   First you have a

19  value of 25 million.   Do you see that?

20       A.    Yes.

21       Q.    And I'll just quote what you say here,

22  "Rights of contribution and/or indemnity arising

23  under organizational documents of Fox Ridge

24  Investments, LLC and Mountain Home Development

25  Corporation."

1              Now, is that the same claim that's

2    identified in your personal bankruptcy schedules?

3         A.    I believe that they both a took place in

4    VS.  Both of those claims are in VS and in my

5    personal.  But there may be some overlap there.

6         Q.    Okay.  And those entities, Fox Ridge

7    Investments and Mountain Home, they don't agree they

8    owe you 25 million, do they?

9         A.    No.  They're disputing it.

10        Q.    They're disputed.

11             How about the next claim, Fifty million,

12   claims for conversion, breach of fiduciary duty,

13   fraud, conspiracy, breach of duties of good faith,

14   disillusion, theft of assets.  Is that also a

15   disputed claim?

16        A.    Yes.

17        Q.    Those companies have identified.  They

18   don't agree that they owe you 50 million, do they?

19        A.    No.  It's being disputed.

20        Q.    And then your last entry there is a claims

21   against RR Penga.  You've listed $5 million.  What's

22   the source of that claim?

23        A.    Do you want me to -- do you want me to --

24   those are claims that we anticipate bringing against

25   RR Penga.  This Ross Stokes and Traverse Mountain,

1   he's been a lender to Traverse Mountain, hard money

2   lender to them.  And under the terms of this

3   settlement agreement, Traverse Mountain was supposed

4   to repay me and Ted Heap and Kinnon Sandlin, we all

5   loaned money to the company.  Traverse Mountain was

6   supposed to pay us all back about $2 million.  I

7   loaned about $800,000 to Traverse Mountain companies,

8   the entities.  And they were supposed to pay me back

9   in our settlement agreement, and they never did.  The

10  terms are outlined in there.  And RR Penga came in

11  and bought by note from Key Bank and tried to

12  foreclose me out, which led me to this bankruptcy.

13  But he did not -- Traverse Mountain did not honor the

14  terms of the settlement agreement or have Penga pay

15  off their debts for Kinnon Sandlin.  And they still

16  haven't paid off their debts, but they're foreclosing

17  me out of my debt and they're all identical notes.

18  Ted Heap and Kinnon Sandlin and I have identical

19  notes.  The CEO, the COO are still sitting there with

20  their notes unpaid.  We all borrowed them at the same

21  time from the same bank.  But --

22      Q.    Mr. Penga --

23      A.    -- they sold this note.  They sold this

24  note to him or he purchased this note from Key Bank,

25  and he was a hard money lender for the Traverse

1    Mountain companies.  And he came after me to

2    foreclose me out and get our family's ownership in

3    the Traverse Mountain companies.  And that's what led

4    to this case.

5         Q.    NOW, this claim was not identified in your

6    initial schedules.  This claim was added when you

7    amended in August, correct?

8         A.    Yes.

9         Q.    Why was it not listed in the first

10   schedule?

11        A.    Because we've been trying to unfold the

12   story of what went on.  This has all been concealed.

13   It's never been brought to the board.  It's never

14   even to this day been brought to the board.

15        Q.    So it came to your attention after the

16   initial schedules were filed and before the August

17   7th date when you signed the amended --

18        A.    Well, after they served me with a

19   sheriff's notice to sell -- or to foreclose out all

20   of my interests or my family's interest in Traverse

21   Mountain --

22        Q.    But that was --

23        A.    We only knew a little bit --

24        Q.    Wait just a minute.  That was

25   prebankruptcy, right?

1      A.     Yeah.

2      Q.     My question is --

3      A.     But I only knew -- I only knew a little

4    bit of information.  They blindsided us with this

5    because I thought all three notes were going to be

6    taken care of together according to the settlement

7    agreement.  Only I was being foreclosed on and only

8    my note got paid.  Traverse Mountain is sitting on

9    millions of dollars and could have paid this off like

10   they were supposed to under the terms of the

11   settlement agreement; even now could still do it.

12   But there's been no board meeting.  There's about no

13   notice.  Nobody's explained this to me to this day.

14   So I'm still trying to figure out what happened and

15   what's been going on.  And that's why I had to come

16   back and amend it.

17     Q.     Okay.  So we --

18     A.     That's why I'm here in bankruptcy is

19   because of this -- well, it's this and many other

20   things.  But it's just part of the -- sorry, but it's

21   just part of the squeeze out, freeze out, collapse my

22   family's interest and take over our assets in the

23   company.

24     Q.     Mr. Penga does not agree that he owes you

25   $5 million, does he?

```
1         A.     Well, I'm sure he may not.

2         Q.     In fact, he recently filed a claim for

3    $971,000 in your case, didn't he?

4         A.     I just got served with that.

5         Q.     Okay.  So this claim is disputed as well,

6    correct?

7         A.     Yes, it is disputed.

8         Q.     Go to the next page, 15 of 31, paragraphs

9    28 through 35, you checked the none box on all of

10   those, correct?

11        A.     Yes.

12        Q.     Next page, schedule D, page 16 of 31,

13   you've checked the none box as the secured creditors?

14        A.     Yes.  Where it says check this box if

15   debtor has no creditors holding secured claims?

16        Q.     Yes.

17        A.     Okay.  Yes.

18        Q.     So even through Mr. Penga claims to be a

19   secured creditor, you don't acknowledge him as a

20   secured creditor, do you?

21        A.     No, I borrowed that money from Key Bank,

22   and it was unsecured.

23        Q.     Okay.

24        A.     And I loaned it to Traverse Mountain, and

25   Traverse Mountain was supposed to pay it off.  Never
```

1   did, and then he came in and bought my note, like I

2   said, and sought to take over, foreclose us out.  And

3   he did not do it to Ted and Kinnon who -- the CEO and

4   the COO.  And we were all bound by the same terms for

5   the same settlement agreement.

6        Q.   Okay.

7        A.   So...

8        Q.   Go to the next page, page 17 of 31.  This

9   is schedule E, creditors holding unsecured priority

10  claims.  You've also checked that you have no

11  creditors in this category; is that correct?

12       A.   I'm sorry.  Which -- page 18?

13       Q.   Page 17 of 31, schedule E.

14       A.   Okay.

15       Q.   Creditors holding unsecured priority

16  claim.

17       A.   Yes.

18       Q.   You've checked the box saying I have no

19  creditors in this category?

20       A.   Yes.

21       Q.   What about taxing authorities?  Don't you

22  -- do you claim you don't owe -- VS Fox Ridge does

23  not owe any taxes?

24       A.   No, I don't think I -- I don't know if I

25  represented that.  But I think that we could owe a

1    small amount.  I just don't have all the information

2    I need from the Traverse Mountain entities.

3            Q.      So this may not be accurate.  It depends

4    on what your taxes show?

5            A.      Yeah.  And I have to get all the

6    information from the Traverse Mountain companies.

7            Q.      All right.  Go to schedule F.  This is the

8    amended unsecured creditor list.  This is page 18 of

9    31.  It's the next page.

10           A.      Yes.

11           Q.      You've listed a lot of creditors with a

12   zero balance, and it says notice only; is that

13   correct?

14           A.      Yes.

15           Q.      And why is that?

16           A.      I think I just did that as I reviewed it

17   with your attorneys.  I felt like that was the best

18   way to fill this out at this time when I filed these

19   papers.

20           Q.      So you don't acknowledge you owe them any

21   money, but you want to be aware of your bankruptcy?

22           A.      Yes.

23           Q.      Okay.  So page 18 of 31, all the creditors

24   on that page have notice only, zero claim balance,

25   right?

1      A.     Yes.  These are --

2      Q.     Same thing on page 19 of 31, all the

3  creditors have notice only, zero claim balance?

4      A.     Yeah.  These are -- most of them are

5  Traverse Mountain entities creditors.  And I haven't

6  been given enough information from the companies to

7  be able to accurately answer all of these.

8      Q.     Next page, 20 of 31.  This is the first

9  entry in your amended schedule F where you

10  acknowledge a dollar amount of the claim; is that

11  right?

12      A.     I don't know if it's the first time.

13      Q.     And that's Forge Investments?

14      A.     You're saying it's the first time I've

15  acknowledged Forge Investments?

16      Q.     In these schedules, yeah.

17      A.     No.  I think we talked about Forge

18  earlier.

19      Q.     No.  I don't want to confuse you.  On this

20  -- we've looked at two pages.  All the other two

21  pages have notice only zero --

22      A.     Of this section, yeah.  Okay.

23      Q.     Right.  This is the first page that has a

24  dollar amount for a creditor, correct?

25      A.     Yes.

1      Q.    And that creditor is Forge Investments,
2  LLC?
3      A.    Yes.
4      Q.    And in that paragraph you allege that --
5  or you state that they have the a claim of 2.5
6  million in the top entry and 22.5 million in the next
7  to the top entry, correct?
8      A.    Yes.
9      Q.    So you think that Forge has a claim in the
10  amount of 25 million if you add those two together?
11      A.    I don't -- like I said earlier, I don't
12  know what the exact amount is.
13      Q.    And you've checked the disputed box there,
14  correct?  See that column that says disputed?
15      A.    Yes.
16      Q.    You put an X in there.  So at least you
17  acknowledge they have a claim, but you dispute the
18  claim?
19      A.    Yes.
20      Q.    Okay.  The last three entries on that page
21  are notice only with a zero claim, right?
22      A.    Yes.
23      Q.    Go to the next page.  Same as the first
24  two, every creditor on that list is notice only with
25  no -- with zero amount of claim?

1        A.     Yes.

2        Q.     And you've checked the disputed box on all

3    those too, correct?

4        A.     Yes.

5        Q.     On the next page, 22 of 31, there's one

6    entry with a dollar amount.  That's to your son,

7    McKay, for a million-five; is that right?

8        A.     Yes.

9        Q.     And that claim is not disputed?

10       A.     No.  And it's -- the boxes that are

11   checked as we're going through here are almost all

12   the individuals that are involved on the other side

13   of the litigation against us in the Heap case.  And

14   the Howcroft case.

15       Q.     Well, let's focus on McKay here.

16       A.     Okay.

17       Q.     So McKay has a claim of a million-five

18   that you don't dispute?

19       A.     No, I don't.

20       Q.     And the other creditors on that page, 22

21   of 31, all of them have zero claims with a disputed

22   check box?

23       A.     Yes.  I'm in litigation -- we're in

24   litigation with all these individuals.

25       Q.     Yeah.  Next page, 23 of 31, the first

1    entry is Mitchell and Barlow -- or it says Mitch and

2    Barlow.  I think it's a typo.  It should be Mitchell

3    and Barlow.  Isn't that your attorney in one of the

4    litigation?

5          A.    Yes.

6          Q.    And you admit you owe them $100,000?

7          A.    Yes, I do.

8          Q.    The other creditors are a notice only with

9    zero claims, right?

10          A.    Pardon me, could you repeat that?

11          Q.    Zero claims.  Notice only with zero

12    claims, that's how you've identified them?

13          A.    Yes.

14          Q.    And that includes other people you're in

15    litigation?

16          A.    Yeah.  No, it includes people that we're

17    in litigation with.

18          Q.    Okay.

19          A.    And we just listed everybody even though I

20    may not owe them any money, so.

21          Q.    Sure.  Next page, 24 of 31, four of the

22    five creditors you put notice only, zero claims,

23    disputed, correct?

24          A.    On that page it's all the other partners

25    that we're in litigation with --

VS v. Christensen * October 11, 2012                    56

```
 1        Q.      Okay.

 2        A.      -- in the Traverse Mountain companies.

 3        Q.      And Richard Staph you've identified as the

 4   $250,000 claim that's undisputed?

 5        A.      Yes.   That's the loan that I talked about

 6   against my home.

 7        Q.      Okay.   That loan is no longer secured,

 8   right?

 9        A.      Pardon me?

10        Q.      That loan is no longer secured?

11        A.      Yes.

12        Q.      Okay.   Go to the next page, 26 of 31.

13   There's five creditors listed.   All five of those

14   you've checked the disputed box, correct?

15        A.      No.

16        Q.      Which one have you not checked the

17   disputed box?

18        A.      Oh, excuse me.   Yes, all five of them are

19   disputed.

20        Q.      And all of them have notice only with a

21   zero except for the RR Penga claim where you've put a

22   value -- an amount of 925,000; is that correct?

23        A.      Yeah.   That's the money that I borrowed

24   and loaned to the companies.   The rest of these

25   people are all on this side of the litigation in the
```

1   Heap case.

2        Q.    Okay.  Let's go to the next page, 26 of

3   31.  Again, four of the five creditors you've checked

4   the disputed box but notice only; is that correct?

5        A.    Four -- you're saying four of five?

6        Q.    Yeah.  There's five creditors on the list.

7        A.    Yes.

8        Q.    Four of them notice only --

9        A.    Yes.

10       Q.    -- zero disputed?

11       A.    Yes.

12       Q.    The one that isn't is the claim to you and

13  your wife, Stephen and Victoria Christensen.  And

14  you've alleged that you --

15       A.    Yes.  And all the others are in the Heap

16  litigation.

17       Q.    And this $25,000, that's the same dollar

18  amount that's identified in your personal schedules

19  as a receivable; is that correct?

20       A.    I believe it is.

21       Q.    Okay.  Go to the next page, 27 of 31.

22  Every creditor on that page is listed as zero --

23  everyone except White & Rasmussen is listed as

24  disputed.  And under the White & Rasmussen claim, you

25  state "White & Rasmussen, LLC has agreed to waive

VS v. Christensen * October 11, 2012          58

1  claims of any balance due." Is that correct?

2        A.     Yes.

3        Q.     Is that in writing?

4        A.     No. It's verbal.

5        Q.     How much did they waive?

6        A.     I think it was about $7,000.

7        Q.     Okay. So you've listed your total

8  unsecured -- excuse me. Your total -- yeah, total

9  claims here of $27,800,000, right?

10       A.     I'm sorry. Maybe you could point me to --

11       Q.     It's right at the bottom of page 27 of 31.

12       A.     Yes.

13       Q.     Okay. Page 28 of 31, schedule G,

14  executory contract. You've checked the we have no

15  executory contract.

16       A.     Yes.

17       Q.     Okay. We'll pass on pages 29 and 31, your

18  list of codebtors. Go to page 31 of 31. This is

19  your signature; is that correct?

20       A.     Yes.

21       Q.     And it's dated August 7th of this year?

22       A.     Yes.

23       Q.     And the next page, 1 of 1, that's your

24  summary for the VS Fox Ridge?

25       A.     Yes.

VS v. Christensen * October 11, 2012          59

1      Q.     And that total assets is $100,600,103.28,
2  right?
3      A.     Yes.  Subject to those -- I can't put an
4  exact value on it.  So it's subject to the same thing
5  that I listed earlier when I talked about that --
6      Q.     Okay.
7      A.     It may be that number.  It could be more
8  or less.
9      Q.     And the $103.28, that's the amount in your
10  bank account, correct?
11     A.     Yes.
12     Q.     And the other amounts are your disputed
13  claims of 80 million and the value of your minority
14  interests in those three companies at 20.6 million;
15  is that correct?
16     A.     I apologize.  I'm not finding that right
17  now.  Are you on page 1 of 1 still?
18     Q.     Yeah.  Just trying to get the makeup of
19  that 100 million.  $103 is cash, the other are the
20  claims that are disputed, and the -- your alleged
21  value of the three companies you have a minority
22  interest in?
23     A.     And the shares?
24     Q.     Yeah.
25     A.     Yeah.

VS v. Christensen * October 11, 2012                    60

1        Q.      Okay.  And go to the next page, 1 of 2 in

2     docket number 46.  That's your list of 20 largest

3     unsecured creditors.  In fact, that's all the

4     creditors in this case that you acknowledge, right?

5     All the other creditors that you've listed you have a

6     zero and a disputed claim.

7        A.      I believe, to the best of my ability, I

8     worked on this with our attorneys on putting together

9     a list.  This is the best that we could put together

10    at the time.

11       Q.      And even some of these claims, Forge and

12    Penga are disputed.  So the only undisputed ones are

13    to yourself, to Mitchell & Barlow, to your neighbor,

14    Richard Staph, and it your son; is that correct?

15       A.      I believe that's correct.

16       Q.      Those are the only four creditors you

17    acknowledge?

18       A.      Correct.

19       Q.      Okay.  Would you go to tab 2.  This is a

20    document number 4 in the Stephen and Victoria

21    Christensen case.  That's a document filed by your

22    attorney.  It's dated June 20th by your attorney,

23    David Berry.  He's counsel in your personal case; is

24    that correct?

25       A.      Yes.