1      Q.     And did you ask Mr. Berry to file this

2   notice of bankruptcy?

3      A.     Well, I think it was required by law.

4   But, yeah, I consented to it.

5      Q.     Okay.

6      A.     Yes.

7          MR. SHIELDS:  Okay.  Your Honor, can I

8   have a brief break and talk to co-counsel?  I may be

9   done with this witness.

10          Thank you, Mr. Christensen.

11          That's all the questions we have of this

12   witness, Your Honor.

13          MR. BOLEY:  Morning, Your Honor.

14   Matthew Boley appearing on behalf of VS Fox Ridge,

15   LLC.

16          THE COURT:  Good morning.

17          MR. BOLEY:  Your Honor, I have some

18   questions within the scope of the direct and also

19   some additional questions I was planning to ask

20   during the debtors' case.  For convenience, do you

21   want me to cover it all now?

22          THE COURT:  Why don't you just focus on

23   your direct.

24          MR. BOLEY:  The cross-examination only?

25          THE COURT:  Right.

1              MR. BOLEY:  Okay, Your Honor.

2

3                    CROSS-EXAMINATION

4    BY MR. BOLEY:

5         Q.    Mr. Christensen, you were asked a number

6    of questions about your statements and schedules.

7    And let me have you turn to Exhibit 1.  And let's

8    turn to question number 13 on schedule B of your

9    personal schedules.  Just give me a minute and I'll

10   help you find that.  That would be page 3 of 9.  It's

11   just a few pages in.  You there?

12        A.    Yes.

13        Q.    You've listed, under question number 13,

14   that you personally and your wife own interest in VS

15   Fox Ridge, LLC and in a company called Mountain Home

16   Development Corporation; is that correct?

17        A.    Yes.

18        Q.    And you've identified that your wife is

19   the owner of 12.5 percent-ish of Mountain Home

20   Development Corporation?

21        A.    Yes.

22        Q.    I think during your earlier testimony you

23   referred to the Traverse companies or the Traverse

24   entities.  Can you tell us what those are?

25        A.    Well, primarily -- the primary --

1    primarily the companies are Triumph Commercial

2    Investments 3, which they changed that name from --

3    previously it was Fox Ridge Investments.  When I say

4    "they," I mean the Traverse Mountain -- I don't even

5    know if it was the board but the CEO and corporate

6    counsel changed that name.  It's Mountain Home

7    Development and Land Com.  And some dispute over

8    Solitude, whether it's part of those companies.  And

9    then there's so many subsidiaries that they've

10   formed, I don't know all the names of them.  And I

11   don't know how many they've done and I've never been

12   informed as to how many of these companies have been

13   broken of the main parent companies.

14        Q.    Let me ask it this way:  Is Mountain Home

15   Development Corporation, is that one of the three

16   entity that is you commonly refer to as the Traverse

17   entities?

18        A.    Yes.

19        Q.    Okay.  And then let's turn probably about

20   18 or so pages forward to page 13 of 31 of the VS Fox

21   Ridge schedules.  I apologize, there's not numbering

22   at the bottom, but it will be 13 of 31 at the top.

23        A.    Yes.

24        Q.    And you've listed here Land Com Financial

25   Group with a 25.5 percent interest?

VS v. Christensen * October 11, 2012          **64**

1      A.     Yes.

2      Q.     And Fox Ridge Investments, LLC with a

3  16.728 percent interest?

4      A.     Yes.

5      Q.     Land Com, Fox Ridge, and Mountain Home,

6  are those the three companies you commonly refer to

7  as the Traverse entities?

8      A.     Yes.  And their related entities.

9      Q.     Tell us what those three entities

10  collectively own and what their business is.  Well,

11  actually, let me --

12          MR. BOLEY:  Your Honor, may I approach?

13          THE COURT:  Yes.

14          MR. BOLEY:  I have an exhibit that's not

15  marked.  It'll be used for demonstrative purposes

16  only.

17      Q.     (By Mr. Boley)  I've just handed you a

18  document.  Just what is the document I've handed you?

19      A.     It's an aerial photo of Lehi and the

20  Traverse Mountain project --

21      Q.     Right.

22      A.     -- and some of Suncrest and the

23  surrounding properties.

24      Q.     And will you describe to the Court what

25  the assets, at least to your knowledge, what the

VS v. Christensen * October 11, 2012          65

1    assets and business of the Traverse entities are.

2         A.    It's approximately a 2,700-acre master

3    plan community on the 1-15 freeway. And it entails

4    -- did entail about 8,000 residential homes or lots

5    and approximately 3,600,000 feet of commercial

6    shopping center property that was entitled, that we

7    entitled. And today I think it's been reduced down

8    to about 6,000 residential lots. But it's still

9    about 3,400,000 square feet of shopping, much of

10   which is under development right now and ongoing.

11        Q.    Tell us what, other than ground that's

12   potentially entitled, what is actually being

13   developed out there?

14        A.    Right now, where this pink area is, I

15   negotiated -- well, our company negotiated the

16   Cabela's agreement. And they're open and running and

17   have been for many years now. Being attached to it

18   is the Steve Craig factory outlets. Those are one of

19   the larger factory outlet builders in the nation, and

20   he's building right next-door to Cabela's in this

21   pink area.

22        Q.    And when is that slated to open?

23        A.    It's slated to open before Christmas of

24   this year.

25        Q.    Okay.

VS v. Christensen * October 11, 2012          66

1        A.      It's about -- with Cabela's, it's about --

2    close to the size of the Gateway shopping center, the

3    Gateway downtown Salt Lake City shopping center.

4    There's enough to put probably two more Gateway-sized

5    shopping centers on the commercial property.

6            Also, in the pink aerial on the freeway,

7    Adobe is just -- it was Omniture that sold out to

8    Adobe.  But my son and I brought that Omniture

9    proposal, and then they were bought out by Adobe to

10   the company's board several years ago.  And they're

11   building and getting ready to open right along the

12   freeway as well on about approximately 20 acres or

13   so.  And that's just -- they're just about ready to

14   have their grand opening.  I don't know what the

15   exact date is.

16       Q.      The three things you've identified, the

17   Adobe building, the Cabela's, and the factory

18   outlets, are those all projects that you were

19   involved in while you were managing the Traverse

20   entities?

21       A.      Yes.

22       Q.      Are you aware of any development that's

23   occurred other than the development that you started

24   while you were managing the entities?

25       A.      I'm not aware of anything that's broken

VS v. Christensen * October 11, 2012                67

1    ground or been built besides these entities.

2        Q.    Okay.  What do you believe to be the

3    income potential for your share of the stock, so this

4    estate's share of the stock in those entities based

5    on the development that's there?

6        A.    I really don't know that answer because

7    they -- Traverse Mountain entities aren't sharing

8    enough information with us to know.  But I can only

9    estimate.  I mean, I've estimated in these reports

10   the range that it could be in, and it would be

11   somewhere within that framework.  But we need more

12   information from the Traverse Mountain entities.

13       Q.    Let me ask you a question about your

14   schedule B in your personal case.  You don't need to

15   turn to it.  But when you listed the 12.5 percent

16   interest your wife holds in Mountain Home Development

17   Corporation, you didn't put a value.  You put

18   unknown.

19       A.    Yes.

20       Q.    Why did you put an unknown value?

21       A.    There's a lot of reasons.  They just --

22   there have been so many things that have happened

23   with the property since they're involved.  The

24   litigation explains much of it that it has -- what

25   the charges are and why we don't know.

1    Q.    Let me see if I can speed this up.  Did

2   you put unknown because you don't know what assets

3   have been sold, what assets have been pledged to

4   different lenders, and what assets have been lost to

5   foreclosure?

6    A.    Yes.

7    Q.    And so you knew what the assets were and

8   what the balance sheet of the companies, the Traverse

9   companies looked like in 2009 when you handed over

10   the reins, right?

11    A.    Yes.  It was a pretty bad economy but, I

12   mean --

13    Q.    You don't know what the balance sheet of

14   the entities that you own stock in is today?

15    A.    No.

16    Q.    Okay.  And the only way to determine the

17   value of that stock is to probably do some discovery

18   to find out what assets and liabilities those

19   companies have; is that fair?

20    A.    Discovery would be essential --

21    Q.    Okay.

22    A.    -- for Traverse Mountain companies to

23   share that with us.

24    Q.    You were also asked -- and I'm going to

25   have you turn back to early in Exhibit 1, back to

1  schedule B of your Steve and Vicky amended schedules.

2  You were asked, and you gave some testimony about

3  this member loan.  And I don't know that it was

4  altogether clear to me, so I just want to ask some

5  clarifying questions.  The member loan you've listed

6  here, is this the money you borrowed from Key Bank

7  and then you turned around and loaned it to the

8  companies; is that right?

9         A.     That's part of it.

10        Q.     What else is it?

11        A.     There's money that I didn't take in the

12  way of salary and at interest and other sums owed to

13  me that I didn't take for a great deal of time that

14  were added on as part of the debt to go along with

15  the loan that I made to the company.

16        Q.     And when you were asked about whether this

17  claim was a disputed claim, you made reference to a

18  settlement agreement.  The settlement agreement

19  doesn't say this is a disputed claim, does it?

20        A.     No.

21        Q.     The settlement agreement says that the

22  Traverse entities will pay you this amount of money,

23  right?

24        A.     Yes.

25        Q.     They just haven't done it yet?

VS v. Christensen * October 11, 2012          **70**

1        A.     Yes.

2        Q.     You were also -- on that same page you

3  were asked a question about the second entry under

4  question 16 that says points and fees due from

5  Traverse Mountain companies.  Do you see that?

6        A.     Sorry, I'm --

7        Q.     It's on page 3 of 9.

8        A.     Okay.

9        Q.     Of docket number 42 at the top.

10       A.     Yes.

11       Q.     Okay.  You're with me?

12       A.     Yes.

13       Q.     You have a second exhibit binder that has

14  lettered tabs in it.  If you could grab that and turn

15  to tab O, please.

16       A.     In this same bind -- in the same --

17       Q.     In the binder with letters.

18       A.     Okay.  Okay.

19       Q.     What is Exhibit O?

20       A.     It's a copy of the resolution approving

21  compensation of owners of the Traverse Mountain

22  companies who guarantee loans.

23       Q.     How did you come to have a copy of Exhibit

24  O?

25       A.     Traverse Mountain sent this copy to me.

1    There was another one, but they sent this particular

2    one to me.

3          Q.    Did they send you copies of the

4    resolutions that are passed?

5          A.    No, they don't.  I very rarely get them.

6    This one just happened to be sent at the end of the

7    year.

8          Q.    Okay.

9                MR. BOLEY:  Your Honor, I offer Exhibit O.

10               MR. SHIELDS:  Your Honor, may I voir dire

11   the witness?

12               THE COURT:  Yes.

13

14               **VOIR DIRE EXAMINATION**

15   **BY MR. SHIELDS**:

16         Q.    Mr. Christensen, this resolution,

17   Exhibit O, your counsel referred to you, did you

18   draft this?

19         A.    No.

20         Q.    Do you know who did?

21         A.    I believe Mark Rinehart, corporate counsel

22   did.

23         Q.    Do you know when?

24         A.    There was one -- there's two of these.

25   The first one was drafted, I think, in September,

VS v. Christensen * October 11, 2012          **72**

1    October.  I don't know, something like that.  And

2    then I think it was amended to this one maybe in

3    November.  And then I was sent it in December,

4    something -- or December, January 1st.  I don't know

5    the exact date.

6          Q.    Were you in the meeting when this

7    resolution passed?

8          A.    No.

9          Q.    Where did you get this?

10         A.    This I got sent to me by Ted Heap, CEO and

11   corporate counsel, at the end of the year.  It's also

12   been used in previous litigation and depositions.

13         Q.    End of what year?

14         A.    Of 2009.  I believe it was 2009.  Maybe it

15   was -- no, excuse me.  It might have been -- if they

16   sent it in January, I believe it would have been

17   2010.  If they sent it -- gave it to us in -- earlier

18   than that, I don't know.

19         Q.    And you believe Exhibit O is the current

20   resolution or the outdated resolution?

21         A.    Well, I don't know that it's outdated.  I

22   know they amended it.  But I don't know.

23         Q.    Okay.  Is O --

24         A.    I suspect --

25         Q.    Just a minute.  Is O the amended then or

1    is it the pre-amended?

2         A.    I'm not quite certain without reading it

3    all the way through.  I think it is the amended one.

4         Q.    Okay.

5              MR. SHIELDS:  Thank you, Your Honor.  We

6    have no objection.

7              THE COURT:  Well, I do.  It's not dated,

8    it's not signed, and he didn't draft it.  I don't

9    know what it is.

10             MR. BOLEY:  Your Honor, we offer it as a

11   resolution that was transmitted to Mr. Christensen by

12   officials of the company as official board action.

13   It's offered for that.

14             THE COURT:  All right.  Well, there's no

15   objection so it's received.

16        **(EXHIBIT O IS RECEIVED.)**

17

18        **CONTINUED CROSS-EXAMINATION**

19   **BY MR. BOLEY:**

20        Q.    Now, if you look at the bottom of

21   Exhibit O, there's a resolution and then there's some

22   lettered paragraphs.  And lettered paragraph A says

23   "For guaranteeing the loan at closing, a onetime

24   guarantor's fees paid in cash out of the proceeds of

25   the loan in the amount of 10 percent."

1              Do you see that?

2        A.    Yes.

3        Q.    Is this the basis upon which you're

4   claiming the $250,000 in points and fees that you've

5   listed on schedule B of your personal schedules?

6        A.    Yes.  And I don't have the previous one,

7   but I think the resolutions under A would provide me

8   with that, those points and fees, yes.

9        Q.    And if you'll turn to the second page of

10  Exhibit O, subparagraph D states, "In addition to the

11  foregoing if there is a default at any time for any

12  reason under any document related to the loan," so

13  that's a loan you've guaranteed, "any guarantor shall

14  be entitled but not required to acquire a lender's

15  position and/or to buy the loan from the lender of

16  the loan on any terms agreeable to the guarantor and

17  the lender and then to enforce the terms of the loan

18  so acquired without any conflict of interest or

19  breach of fiduciary duty."

20             Do you see that?

21       A.    Yes.

22       Q.    What did you understand this to authorize

23  you to do?

24       A.    Just what it says, that if the loans -- if

25  I'm a guarantor on the loan and the loan goes into

VS v. Christensen * October 11, 2012            75

1    default, then I have the rights that are outlined

2    here in order to protect my family and our family's

3    guarantee under any terms agreeable to the guarantor

4    and the lender and then enforce the terms. I could

5    go out and acquire financing to pay off this loan to

6    protect myself. And actually, the way they passed

7    this resolution, "they" meaning the Traverse Mountain

8    companies, I could then turn around and enforce it

9    against them. And of course they could also do it

10   against us. I might add we didn't vote for this; my

11   family. I know -- we just -- I know we didn't vote

12   for this. The Traverse Mountain companies did.

13            Q.    Why don't we stop there. I want to stay

14   within the scope of the direct examination. So let

15   me move on.

16            You were asked some questions and Forge

17   was listed on both your personal schedules and on VS

18   Fox Ridge's schedules; is that correct?

19            A.    Yes.

20            Q.    That's because us personally and VS Fox

21   Ridge, LLC signed guarantees of the two U.S. Bank

22   loans?

23            A.    Yes.

24            Q.    Now, you marked those as disputed, right?

25            A.    Yes.

VS v. Christensen * October 11, 2012                    76

1          Q.     And you testified about that.  And I just

2    want to make sure that the record's clear.  The

3    reason you marked those as disputed is because

4    although you don't dispute you owe the money, you

5    don't know the correct amount?

6          A.     Yes.

7          Q.     Okay.

8                 MR. SHIELDS:  Your Honor, I'm going to

9    object.  I let it go for a while, but he's leading

10   the witness.  This is his witness, he should ask --

11                MR. BOLEY:  This is cross-examination,

12   Your Honor.

13                THE COURT:  He's your witness.

14                MR. BOLEY:  Let me ask the question again.

15                THE COURT:  Well, no, he's already

16   answered.  I understand the answer, and that's the

17   way he testified before.  There's no need to.  He's

18   just --

19                MR. BOLEY:  Oh.  Sorry, Your Honor.

20                THE COURT:  No.

21                MR. BOLEY:  I didn't know it was as clear

22   before.

23                THE COURT:  It was clear to me.

24                MR. BOLEY:  Because you just pierced right

25   through it.

VS v. Christensen * October 11, 2012                77

1           THE COURT:  Yeah.

2           Q.    (By Mr. Boley)  Let me move on then to

3    some questions.  And let's turn to the VS Fox Ridge

4    schedule B.  Remember we turned about 20 or so pages

5    ahead.  And I'll get there and then help direct you

6    to the right page.  So this would be page 14 of 31

7    with docket number 44 at the top.

8           A.    Okay.  Is this -- could I -- I'm sorry, is

9    this water I can just --

10          THE COURT:  Yes.

11          THE WITNESS:  Okay.  Is it all right if I

12   --

13          THE COURT:  Would you like a break, Mr.

14   Christensen?

15          THE WITNESS:  No.  Actually, I'm doing

16   okay.  I just need a little sip here.

17          MR. BOLEY:  Does Your Honor want to take a

18   brief break?  May I approach?

19          THE COURT:  If it would be helpful to you,

20   it would be helpful to me, yeah.

21          MR. BOLEY:  Let's take --

22          THE COURT:  So why don't we take a

23   ten-minute break.

24          THE BAILIFF:  All arise.

25          (Break was taken from 10:26 to 10:29 a.m.)

VS v. Christensen * October 11, 2012          78

1              THE BAILIFF:  All arise.  The Court

2     resumes its session.

3              Please be seated.

4              THE COURT:  All right.  Thank you.  Go

5     ahead, Mr. Boley.

6              MR. BOLEY:  Your Honor, before we resume

7     this testimony I ask the Court's indulgence.

8     Mr. Lavar Christensen was one of our witnesses on our

9     "may call" list and he's popped in.  He's here in the

10    courtroom from another hearing.  He's got to leave.

11    And I would ask the opportunity just to offer one

12    exhibit for him and make a one sentence proffer of

13    his testimony so that we can excuse him.

14             THE COURT:  Any objection, Mr. Shields?

15             MR. SHIELDS:  Which exhibit is that,

16    Counsel?

17             MR. BOLEY:  That would be Exhibit G which

18    is an e-mail that Mr. Lavar Christensen authored.

19             MR. SHIELDS:  Your Honor, I have no

20    problem.  But that's our Exhibit A to which Mr. Boley

21    has objected to, so...

22             MR. BOLEY:  I don't think so.

23             MR. SHIELDS:  Our Exhibit 7, is it?

24             MR. BOLEY:  I don't think they're the

25    same.

VS v. Christensen * October 11, 2012          79

1          MR. SHIELDS:  I think it's one of the same

2   ones you've objected --

3          MR. BOLEY:  I don't think they're the

4   same.  I may have mistaken it with this.  Did I

5   already stipulate to that one?

6          UNIDENTIFIED SPEAKER:  No, you objected to

7   it.  And now you're trying to get it in as --

8          MR. BOLEY:  No.  I made a mistake.  I

9   mistook, Your Honor, Exhibit 7 for Exhibit 8.  I

10  don't have an objection to Exhibit 8, obviously.

11  It's one of our exhibits.  So I would offer

12  Exhibit 8, which is the movants' exhibit.  And then

13  I'll have just a one sentence proffer.

14         MR. SHIELDS:  No objection, Your Honor.

15         THE COURT:  I'm sorry.  Go back.  So --

16         MR. BOLEY:  So Exhibit G in the debtors'

17  exhibits and Exhibit 8 in the movant's exhibits are

18  the same.  I got mistaken.  I didn't realize they

19  were.

20         THE COURT:  Okay.

21         MR. BOLEY:  So I offer Exhibit 8.

22         THE COURT:  And G?

23         MR. BOLEY:  I suppose it wouldn't hurt.

24  Although, they're the same thing.

25         THE COURT:  All right.  Exhibits 8 and G

VS v. Christensen * October 11, 2012          **80**

1    are received.

2              **(EXHIBITS 8 AND G ARE RECEIVED.)**

3              So do you need Mr. Lavar Christensen to

4    testify about anything else?

5              MR. BOLEY:  Just one sentence, Your Honor.

6    If called to testify, Mr. Lavar Christensen would

7    testify that McKay Christensen was ready, willing and

8    able to appear for deposition on Wednesday, June

9    27th.  And that was communicated to Mr. Preston, and

10   Mr. Preston chose to cancel the deposition.  Just

11   that one sentence.

12             MR. SHIELDS:  Your Honor, I have no

13   objection to that.  But we'd also ask that the

14   exhibits -- our Exhibit 7 be admitted.  That is an

15   exhibit with Lavar Christensen being on the sender

16   line.  And since he's here, we'd ask that that also

17   be admitted and that we call him to get that into

18   evidence now.

19             MR. BOLEY:  So stipulated, Your Honor.

20             THE COURT:  All right.  Exhibit 7 is

21   received as well.

22             **(EXHIBIT NUMBER 7 IS RECEIVED.)**

23             MR. BOLEY:  With that, Your Honor, may

24   Mr. Lavar Christensen be excused?

25             THE COURT:  Mr. Shields?

VS v. Christensen * October 11, 2012          **81**

1          MR. SHIELDS:  No objection, Your Honor.

2          THE COURT:  All right.  Mr. Lavar

3    Christensen's excused.

4          MR. BOLEY:  Thank you, Your Honor.

5

6               <u>CONTINUED CROSS-EXAMINATION</u>

7    <u>BY MR. BOLEY</u>:

8          Q.    Mr. Christensen, I just have a couple more

9    questions to finish cross-examination.  And I lost

10   the page, but when we broke I think you were --

11   excuse me, Your Honor.  When we broke I believe you

12   were looking at page 14 of 31 of docket number 44

13   which lists claims.

14         A.    Yes.

15         Q.    Okay.  You previously testified about what

16   the first item under question number 21 is.  I

17   believe you were confused.  And I'd ask you at this

18   point to clarify what it is you were referring to

19   when you identify rights of contribution and/or

20   indemnity arising under organizational documents.

21         A.    Yeah.  I believe this applies to the

22   operating agreement, the Traverse Mountain companies

23   operating agreements.  There's a provision that says

24   that if I have a personal guarantee, or any of us,

25   anybody who personally guarantees a loan and list --

VS v. Christensen * October 11, 2012          82

1   the lender forecloses or comes against us for any
2   kind of an action like a deficiency judgment, then I
3   have the right to, in the operating agreement in my
4   case and the other guarantors would have it as well,
5   but I have a right to turn and ask -- or demand from
6   all of the shareholders and all of the partners in
7   the operating agreement, there's a provision that
8   says anyone owning more than 4 percent would pay up
9   to 150 percent of the amount that I have to pay as a
10  guarantor to reimburse me.  I can look to them to
11  reimburse me for my damages and my losses as a
12  guarantor on the loan.
13       Q.     So as an example, if you paid a million
14  dollars to Forge on your personal guarantee, you
15  would have the right to turn to shareholders owning 4
16  percent or more of the Traverse entities in column M
17  to indemnify you and hold you harmless?
18       A.     Up to 150 percent, yes.
19       Q.     And you previously said that this claim
20  that we've identified was involved in litigation;
21  that's incorrect?
22       A.     Yeah.
23       Q.     Because to this point you've not paid on
24  any guarantee.
25       A.     Correct.

VS v. Christensen * October 11, 2012          **83**

1      Q.     So you've never asserted this claim in any

2    state court litigation anywhere?

3      A.     Not to my knowledge.

4      Q.     The second claim that's identified starts

5    claims for converse breach of fiduciary duty and goes

6    on.  Would you tell the Court which court and which

7    judge that case is pending in front of?

8      A.     I'd like to just read through this for

9    just a moment.

10     Q.     Sure.

11     A.     I believe all of these -- I believe all of

12   these are in the Toomey, the Judge Toomey case.

13     Q.     And to your knowledge these claims are not

14   pending in the actions before Judge Taylor and

15   Laycock, correct?

16     A.     Not to my knowledge.

17     Q.     Finally, the claim that you've identified

18   as a claim against RR Penga and Ross Stokes, that's

19   not a claim that's been previously filed with any

20   court?

21     A.     No.

22            MR. BOLEY:  Your Honor, that's all I have

23   for purposes of cross-examination.  The debtors may

24   call Mr. Christensen in their case in chief.

25            THE COURT:  Mr. Shields, any further

1   questions?

2             MR. SHIELDS:  Yes, just a couple, Your

3   Honor.

4

5                 **REDIRECT EXAMINATION**

6   **BY MR. SHIELDS**:

7       Q.    Would you look at Exhibit O, Mr.

8   Christensen?  This is the debtors' Exhibit O.  It's

9   in the other book.  The resolution you testified

10  about in response to questions from your counsel.

11      A.    Yes.

12      Q.    Now, you're not sure if this is the

13  original or the amended, are you?

14      A.    I'm not sure.  Excuse me, I'm not sure.

15      Q.    Would you look at subparagraph D on page 2

16  that your counsel had you read.

17      A.    Do you want me to read it again?

18      Q.    No.  Just look at it.  Is this the

19  paragraph you relied upon when you negotiated with

20  Forge to buy the U.S. Bank debt?

21            MR. BOLEY:  Objection, assumes facts not

22  in evidence.

23            MS. OLSEN:  Same objection, Your Honor.

24            THE COURT:  I'm sorry, Mr. Shields, where

25  are we?  I was making notes from the last questions

VS v. Christensen * October 11, 2012            85

```
1    about --
2              MR. SHIELDS:  Paragraph D.
3              THE COURT:  -- paragraph 21.
4              MR. SHIELDS:  Okay.  Paragraph D of
5    Exhibit O, the debtors' Exhibit O, which Mr. Boley
6    asked the witness to read.  And it says, "In addition
7    to the foregoing, if there is a default at anytime
8    for any reason under any doctrine relating to the
9    loan, any guarantor shall be entitled but not
10   required to acquire the lender's position and/or to
11   buy the loan from the lender of the loan or any terms
12   agreeable to the guarantor and the lender.  And then
13   to enforce the terms of the loan so acquired without
14   any conflict of interest or breach of fiduciary duty
15   to any TM companies or any owner of any TM companies
16   that might otherwise arise -- otherwise apply."  The
17   question I asked Mr. Christensen:  Is this the
18   paragraph he relied upon when he negotiated with
19   Forge?
20             MR. BOLEY:  I objected that that assumes
21   facts not in evidence.
22             MS. OLSEN:  Same objection, Your Honor.
23             THE COURT:  Like what?
24             MR. BOLEY:  It assumes there was
25   negotiates with Forge.  There's no evidence of
```

VS v. Christensen * October 11, 2012          86

1   negotiations with Forge.  I read this to the witness

2   and asked him his understanding.  That was the prior

3   testimony.

4            THE COURT:  Okay.

5            MR. BOLEY:  This question assumes facts.

6            THE COURT:  All right.

7            MR. BOLEY:  That have not been

8   established.

9            THE COURT:  Which is an invitation to you,

10  Mr. Shields, to back up and lay a few --

11           MR. SHIELDS:  Yeah.

12           THE COURT:  -- questions before you get

13  there.

14           MR. SHIELDS:  Okay.

15       Q.   (By Mr. Shields)  Okay.  Remind me what

16  did you respond to your counsel's question when he

17  asked you about paragraph D?  What's your

18  understanding?

19       A.   Well, I said that the resolution -- there

20  was one resolution that was done around September,

21  October.  And it was amended in November.

22       Q.   No.  Let's focus on paragraph D, not the

23  -- paragraph D.

24       A.   Okay.  And then this was one of the facts

25  that went into consideration for me trying to project

VS v. Christensen * October 11, 2012          87

1   my guarantees when this was passed by the board.  But

2   there were many other considerations that went into

3   it after advising with our attorneys and sitting down

4   and talking with them.  And I don't remember all of

5   the reasons.  But this was one of the reasons and one

6   of the examples of me knowing that I needed to be

7   able to project my guarantees.  Because the other

8   side of this is they passed this and it meant they

9   could go on out, meaning the board, the CEO, the CFO,

10  they could go on out and get loans, get somebody to

11  come in and sue me for the damages.

12      Q.    So what have you done since they passed

13  this to protect your guarantee?

14      A.    I've tried to go out and talk to different

15  people to see if I couldn't find someone to help pay

16  this loan off.

17      Q.    Did you talk to U.S. Bank?

18      A.    I talked to U.S. Bank.  U.S. Bank would

19  call me and we'd talk about -- we were in

20  foreclosure.  And they were talking to all of the

21  guarantors at different times.  And they were

22  pursuing the foreclosure and they were talking to our

23  attorneys on a regular basis about the foreclosure.

24      Q.    Did you talk to representatives of Forge?

25      A.    At some point in time I did.

VS v. Christensen * October 11, 2012          **88**

1          Q.     And did you rely upon this paragraph in
2     doing so?
3          A.     I wouldn't say that I relied solely upon
4     this.  It was just a factor in trying to --
5          Q.     I didn't ask solely.  Did you rely upon
6     this paragraph, partially?
7          A.     I think to some degree I did.
8          Q.     Okay.
9          A.     But there were many other factors that
10    came into play as well.
11         Q.     Like what?
12         A.     Just wanting to protect my guarantee.  I
13    was talking to many people.  And I didn't know if it
14    would be able to -- if it would apply solely under
15    this or if it would just be something that --
16         Q.     Did you --
17         A.     -- came under the operating agreements of
18    some of the other documents that exist.
19         Q.     Did you look to the settlement agreement
20    to see if this type of conduct was prohibited?
21         A.     Our attorneys did.
22         Q.     Did you?
23         A.     I mean, generally, yeah, I understood some
24    of the terms of the settlement agreement.
25         Q.     Isn't it true that it is prohibited?

VS v. Christensen * October 11, 2012          89

1        A.    No.

2        Q.    So the way you read the settlement

3   agreement, you could buy loans of the company?

4        A.    I'd like to -- I'll share -- in the Toomey

5   case, Judge Toomey found that Steve Howcroft, the

6   independent fifth board member, had made drastic

7   changes because of his prior relation -- she left the

8   door open for the fact that he had a prior

9   relationship of 15 years with the CEO and CFO and

10  corporate counsel, that they were all friends, which

11  I didn't know.  And in there Mr. Howcroft signed that

12  settlement agreement that you're referring to.  He

13  was required to sign it as the independent fifth

14  board member.  And he did away with provisions that

15  were in that agreement.  There was supposed to be a

16  $250,000 cap in the ordinary course of business and a

17  $500,000 cap in the ordinary course of business from

18  Mr. Heap.  He couldn't go beyond that without coming

19  to the board.  Mr. Howcroft voted to do away with all

20  of that and gave him carte blanche complete authority

21  to go off and do whatever he needed to do and many

22  other things.  He voted to alter and amend the

23  settlement agreement and change it drastically.

24       Q.    We're getting off base here, though.

25       A.    Well, you asked me about the settle -- I'm

1    sorry.

2         Q.     The question is -- your review of the

3    settlement agreement, did it allow you to negotiate

4    with Forge and U.S. Bank to buy that debt against the

5    company?

6         A.     I believe because of all the changes that

7    Mr. Howcroft made as the independent board member to

8    the original settlement agreement and increasing the

9    authority of the independent -- I mean, of the CFO to

10   go off and do whatever he wanted to do and not come

11   back and even clear it with the board, contrary to

12   what the settlement agreement said, that, along with

13   these resolutions -- and I can't -- there are many

14   other resolutions and there were many other things

15   that were done.  I know it's part of our Toomey

16   litigation.  And I can't remember all of the

17   instances, but I know our attorneys know --

18        Q.     Okay.

19        A.     -- that I didn't --

20        Q.     Let me summarize.  And what you're saying

21   is that because the settlement agreement, in your

22   mind, was amended because of conduct by Howcroft and

23   others, that you were authorized to negotiate with

24   Forge and U.S. Bank?

25        A.     Well, and I'm also saying because of the

VS v. Christensen * October 11, 2012          **91**

1    resolutions.  Maybe not just --

2         Q.    And this resolution, Exhibit O?

3         A.    Yeah.

4         Q.    Okay.

5         A.    Partly because of that as well.

6         Q.    Okay.  Anything else besides this

7    resolution and the amendments that you think --

8         A.    The things that I've listed.  I mean, it's

9    in our litigation with -- in all of our litigation

10   that's been filed and the actions that were taken by

11   the companies, Traverse Mountain companies.

12        Q.    Let me just ask you one other question.

13   The next paragraph on page 2 of Exhibit O says

14   "Further resolved."  Do you see that?  Exhibit O,

15   page 2, right after the paragraph D we've been

16   referring to.

17        A.    I'm on page 2.

18        Q.    The last paragraph on page 2 of Exhibit O.

19        A.    D?

20        Q.    After paragraph D.

21        A.    Oh, okay.

22        Q.    It says, "Further resolved" in all caps.

23   Do you see that?

24        A.    Yeah.  Excuse me, I'm sorry.  Yes.

25        Q.    "Further resolved that all guarantors of

1    loans shall enter into a contribution agreement as

2    described above on terms determined necessary or

3    proper by Ted Heap, the CEO of the TM companies, in

4    his sole discretion as a condition to having the

5    rights and benefits described above."  Do you see

6    that paragraph?

7         A.    Yeah.  That's what they --

8         Q.    Do you understand -- just a minute.  Do

9    you understand that?

10        A.    That's an example of how they altered the

11   settlement agreement.

12        Q.    Let me ask you, did you ever sign --

13        A.    It didn't give -- it didn't give Ted Heap

14   that authority until Mr. Howcroft turned and swept

15   that aside in the settlement agreement and gave him

16   this --

17        Q.    Let me ask the question.  Did you ever

18   sign such a contribution agreement?

19        A.    I haven't.

20        Q.    Okay.  Thank you.

21        A.    Well, in the original operating agreements

22   I did.

23             MR. BOLEY:  That's all the questions we

24   have, Your Honor.

25             THE COURT:  All right.  Thank you.

VS v. Christensen * October 11, 2012          **93**

```
 1              Mr. Christensen, you may step down.

 2              Mr. Shields, do you have other witnesses?

 3              MR. SHIELDS:  Yes, Mr. Brent Manning,

 4     please.

 5              THE BAILIFF:  Please come forward to this

 6     mic and raise your right hand.

 7

 8                     Brent Manning,

 9          called as a witness, being first sworn,

10            was examined and testified as follows:

11

12              THE BAILIFF:  Please take the witness

13     stand and state your full name for the record.

14              THE WITNESS:  Brent V. Manning.

15

16                  DIRECT EXAMINATION

17     BY MR. SHIELDS:

18          Q.   And Brent, you're an attorney licensed to

19     practice in the State of Utah; is that correct?

20          A.   I am.

21          Q.   How many years?

22          A.   Have I been an attorney or in Utah?

23          Q.   Yeah.

24          A.   I've been an attorney for more than 37

25     years.  I started out in Colorado, and I've been in
```

1    Utah since the early '80s.

2         Q.     And what's the nature --

3         A.     Probably 1980, '81.

4         Q.     What's the focus, the nature of your

5    practice?

6         A.     I'm a commercial litigator.

7         Q.     And have you been involved in representing

8    the Traverse Mountain companies including Ted Heap

9    and affiliated companies referred to as the TM

10   companies in this case?

11        A.     I have.

12        Q.     How long?

13        A.     I was first engaged to represent the

14   companies in the defense of the claims brought by

15   Mr. Christensen and the other debtors here, as well

16   as his sister and her family.

17        Q.     So and that's -- I think that's been

18   referred to as the Judge Toomey litigation.  She's

19   the judge in that case now?

20        A.     That's correct.

21        Q.     Could you give the Court just a brief --

22   we don't want to go through the whole history.  But

23   give the Court a brief background to how that case

24   started, how it ended up before Judge Toomey, and the

25   role you played in representing the TM companies.

VS v. Christensen * October 11, 2012          95

1        A.     The litigation was originally filed in

2   Utah County.  That was the wrong venue under the

3   settlement agreement.  We moved to dismiss.  They

4   brought a claim under the settlement agreement.  The

5   -- to try to evade that, they dropped the claim under

6   the settlement agreement from their compliant; they

7   amended it.  The court in Utah County, I guess,

8   didn't appreciate that tactic; transferred the case

9   to Judge Toomey.  A reasserted claim under the

10  settlement agreement in Judge Toomey's case, and that

11  case has been pending before Judge Toomey since --

12  until the stay was entered.

13       Q.     The bankruptcy stay?

14       A.     That's correct.

15       Q.     And so she's been the judge most of the

16  case just early on because it was filed in Utah

17  County.

18       A.     Only the motion to change venue was heard

19  in Utah County.

20       Q.     Okay.  And who brought the case?  The TM

21  companies are the defendants in that case; is that

22  correct?

23       A.     That's right.  It was Mr. Christensen, all

24  of the debtors, McKay Christensen, Mr. Christensen's

25  son, all of the Christensen family essentially.

VS v. Christensen * October 11, 2012                    96

1          Q.     And what were the core allegations?

2          A.     Well, they're pretty much described in the

3     schedule here.  It was a claim for entitlement to

4     information, claim for breach of fiduciary duty,

5     claim for conversion, waste of corporate assets; a

6     laundry list of essentially everything that one could

7     imagine.

8          Q.     And what --

9          A.     Procedurally at the outset, we filed --

10    instead of answering, we filed a motion to dismiss

11    for summary judgment.  Because although the claims

12    were, I think it was the -- like a 60-page complaint,

13    the complaints on their face didn't state claims, we

14    didn't think, or were contradicted by undisputed

15    documents.  So right at the very outset we moved to

16    dismiss or alternatively for summary judgment as to

17    some claims.  We put the evidence before the Court.

18    Judge Toomey considered it, denied the motion

19    initially and said that they would be allowed to go

20    forward, and reserved ruling, essentially, on it.

21    And asked that -- after they did the discovery they

22    sought to amend their complaint.  During that hearing

23    Mr. Benevento, who was then representing the debtors

24    and others --

25         Q.     The plaintiffs?

1      A.    Yes.  Said that he could take all of the

2   depositions within two months, have the case

3   essentially trial-ready within four months.  Because

4   we had told the Court that the pendency of this

5   litigation, the cost associated with the litigation,

6   the impact on the company's ability to function,

7   would destroy the company.  And it had -- this case

8   had to be addressed early for the very -- and that's

9   the reason that we moved at the outset to dismiss it

10  for summary judgment.

11      Q.    So you wanted a prompt resolution?

12      A.    Absolutely.

13      Q.    And this case was filed in 2009?

14      A.    I think January 2009.

15      Q.    Would you look at Exhibit 14, I believe,

16  is the docket for the Toomey case.  It's in the --

17      A.    I need my glasses.

18      Q.    Get your glasses, yeah.  It's in the book

19  with the --

20      A.    Frankly, they're not strong enough.

21      Q.    It's with the numbered depositions, not

22  the lettered depositions.  Exhibit 14.

23      A.    Yes.

24      Q.    Is that, in fact, the docket for the

25  Toomey litigation?

1        A.     Yes.   It appears to be so.

2        Q.     And would you go to the first entry where

3    there's a date?  I think that'll show the actual date

4    of the complaint.  Yeah.  On page 5 it shows filed

5    complaint on October 26th of '09.

6        A.     I stand corrected.

7               Yes.   The judge gave them leave to amend

8    the complaint and ordered that they would filed an

9    amended complaint forthwith.  And you'll see there

10   that they did not do so.  Rather than move the case

11   along and do all of the discovery on an expedited

12   basis, nothing happened in the case until we --

13   except its impact on the ability of the company to

14   continue.  We ultimately moved to dismiss for failure

15   to prosecute.  At that point --

16       Q.     Well, let me just get it straight.  So

17   although Mr. -- was it Benevento you said was --

18       A.     Yes.

19       Q.     He represented he'd have all discovery

20   done in two to three months, and he didn't do

21   anything?

22       A.     Yes.   He went through a long list of all

23   the people he was going to depose before the Court

24   and why he needed to do that.  Nothing happened.

25       Q.     So after things didn't happen for several

VS v. Christensen * October 11, 2012          99

 1    months and because of the impact it was having on the

 2    company, you moved to dismiss?

 3         A.    We moved to dismiss again, this time for

 4    failure to prosecute.  The Court -- and for failure

 5    to file an amended complaint because they had not

 6    filed the amended complaint.  They filed the amended

 7    complaint.  The Court gave them additional time to

 8    conduct discovery.  We had a very expensive and very

 9    detailed discovery process thereafter, including

10    taking the deposition of Mr. Freeman, the person who

11    acts for Forge now.  And --

12         Q.    But he didn't represent Forge in that

13    case.  You didn't know about Forge then?

14         A.    Mr. Freeman is a close family friend.

15         Q.    Okay.

16         A.    And after the completion of that we

17    renewed other motion for summary judgment.  The --

18         Q.    Before we leave that, did you spend quite

19    a bit of money in discovery?

20         A.    Lawyers never spend money on discovery.

21         Q.    Was money spent on discovery?  Was time

22    and energy spent in doing discovery?

23         A.    A great deal.

24         Q.    And is there a sanction award against the

25    plaintiffs in favor of the defendants in that case?

VS v. Christensen * October 11, 2012          **100**

1      A.     There is a sanction.  The judge awarded

2   sanctions for discovery abuses.  The amount of the

3   fee has not been awarded.

4      Q.     I see.  So the liabilities have been

5   determined but the amount has not yet?

6      A.     Yes.  And in addition to that, after we

7   obtained summary judgment dismissing all of the

8   plaintiffs' claims, the -- we're entitled to our

9   fees.  We submitted a fee application.  The hearing

10  on that was also pending at the time the --

11          THE COURT:  Sorry, Mr. Manning, back up.

12  You said summary judgment was granted dismissing all

13  of the plaintiffs' claims?

14          THE WITNESS:  Absolutely.  And --

15          THE COURT:  And so what remains in the

16  case?

17          THE WITNESS:  Well, we have cross-claims

18  in that case; cross-claims and counterclaims.  During

19  the course of that litigation, the debtors here were

20  doing a number of things to frustrate the ability of

21  the companies to engage in profitable activity.  For

22  example, there was a project called Cresthaven where

23  they had secured HUD financing, nonrecourse

24  financing.

25          MR. BOLEY:  Your Honor, I'm going to

VS v. Christensen * October 11, 2012          **101**

1   object.  We're having an attorney testify as fact as

2   to what his claims allegations are.

3               THE WITNESS:  I'm --

4               THE COURT:  Well, I asked him what was

5   going on with the case.  Because, I mean, obviously

6   when he testifies that all the plaintiffs' claims

7   have been dismissed and yet they're listed on

8   schedule B as being viable claims with a value of $50

9   million, I think that's relevant.

10              MR. SHIELDS:  And on cross-examination

11  we'll clarify that statement, which is not entirely

12  correct.  I think they're -- I think -- I don't think

13  the question was objectionable or his answer was

14  objectionable.  I think part of what the evidence

15  needs to be, Your Honor, is what is the status of

16  that Toomey litigation.  And you know, one of the

17  things we're asking for is to proceed with relief of

18  that protective order.  And so I think it's very

19  relevant.

20              THE COURT:  But just with a protective

21  order or to finish up that litigation?

22              MR. SHIELDS:  No, Your Honor, if you look

23  in our reply memo, we have made the decision,

24  partially because of the debtors' objection saying

25  they want to do litigation in all these forums.

1   We've agreed to limit our relief -- our request for

2   relief in the Toomey case to just having the

3   protective order hearing held.  And if that is

4   successful, which we expect it to be, it's all

5   briefed.  Then we would be able to use the documents

6   that have been under protective order in the Toomey

7   case in the Forge case.  We've also agreed that we

8   would consolidate the two Forge litigations, the

9   Judge Laycock and the Judge Taylor, into one case so

10  that if the stay relief is granted as we've

11  requested --

12           THE COURT:  Right.

13           MR. SHIELDS:  -- there'd only be one case.

14  I'm sorry, Your Honor.  It's probably beyond the

15  question.  Mr. Boley didn't object, so I --

16           THE COURT:  No, I just can't write as fast

17  as you can talk.

18           MR. SHIELDS:  So I will talk a little

19  slower.  The bottom line, in our reply memo we have

20  agreed to limit and narrow the relief from stay we're

21  asking for.  In the Toomey litigation we're asking

22  just that the stay be lifted such that Judge Toomey

23  can rule on the motion to modify the protective

24  order, which we'll hear in just a minute by this

25  witness.  It's fully briefed and ready for a hearing.

1    We also agree that we will not oppose --

2              THE COURT:  I'm sorry.

3              MR. SHIELDS:  Okay.

4              THE COURT:  The motion to, which has

5    already been filed, a motion to --

6              MR. SHIELDS:  Amend the protective order.

7              THE COURT:  Amend the protective order to

8    allow the documents to be used in the other

9    litigation?

10             MR. SHIELDS:  Correct.

11             THE COURT:  Okay.

12       Q.    (By Mr. Shields)  And why don't we go

13   there.  Would you just testify about the status of

14   that motion and when it was heard and whether it's

15   all briefed and those type of things?

16       A.    We had obtained a summary judgment order

17   dismissing all of the debtors' claims and the claims

18   of McKay Christensen and the other family members.

19   They dismissed all the claims that were both included

20   in the complaint and all claims that were included in

21   the additional briefing that they did in opposition

22   to our motion for summary judgment.  They made a host

23   of additional allegations.  You heard Mr. Christensen

24   say, repeat a number of those here today.

25       Q.    In fact he's listed them as exhibits -- or

1    as assets in schedule B, right?

2        A.    That's correct.

3            THE COURT:  And when was that order

4    entered, Mr. Manning?

5            THE WITNESS:  The final order -- and I

6    have my own file here.  It -- the judgment signed by

7    Judge Toomey was January 17, 2012, in relevant part.

8    And perhaps Mr. Boley is referring to this is -- as

9    to certain defendants, in that all of the Traverse

10   Mountain defendants -- one of the things that they

11   did in opposition to our last summary judgment motion

12   was to seek to make Mr. Howcroft, who had not

13   previously participated in the litigation, a

14   defendant.  And they -- after we had obtained our

15   summary judgment in our favor dismissing all claims,

16   Mr. Howcroft moved on a piggyback motion.  The judge

17   said, as to two of the claims that they had asserted

18   against Mr. Howcroft, that there were fact issued on

19   that.  So there are two potential claims against

20   Mr. Howcroft.

21           But in relevant part, I'm looking at the

22   judge's order, January 17, 2012.  She had previously

23   issued it.  It's a significant memorandum decision.

24   The Court has carefully considered all of the

25   arguments and allegations made by plaintiffs, debtors

VS v. Christensen * October 11, 2012          **105**

1    here, in their joint memorandum in opposition to

2    defendants' motion for partial summary judgment and

3    in support of plaintiffs' motion for Rule 56(f)

4    relief and in their omnibus memorandum in opposition

5    to summary judgment; including the allegations of

6    conduct occurring after the filing of their second

7    amended complaint, and find them to be without

8    factual or legal basis.

9         She then grants summary judgment in favor

10   of Traverse Mountain companies, Mr. Heap, and

11   Mr. Sandlin.  And as I say, Mr. Howcroft had only

12   recently been added.  He did not participate in that

13   initial summary judgment motion.

14        THE COURT:  And other than the appeal that

15   was filed by the Christensens, Mr. Howcroft is the

16   only remaining defendant?

17        THE WITNESS:  Yes.  But that -- there was

18   an appeal filed.  It was entirely improper because

19   there had not been a final judgment entered because

20   we had our pending cross-claims and counterclaims.

21   And they filed a notice of appeal.  We told them that

22   it was improper and we would seek sanctions if it

23   wasn't withdrawn, and they withdrew it.

24        THE COURT:  All right.  So I was looking

25   on the --

VS v. Christensen * October 11, 2012          106

1        THE WITNESS:  There is no pending appeal.

2        THE COURT:  -- on the docket sheet.

3   There's no pending appeal.

4        THE WITNESS:  They did succeed in causing

5   a delay of motions before Judge Toomey, the

6   attorneys' fees and other motions, by filing that

7   appeal.  But we were successful in convincing them

8   that they needed to abide by the rules and withdraw.

9        THE COURT:  And the motion to modify the

10  protective order, in your view, has been briefed by

11  both parties?

12       THE WITNESS:  Yes.  We had a hearing set

13  for the motion for modify the protective order.  A

14  motion for -- to award -- we sought approximately

15  $450,000 in fees and costs in defense of the claims

16  brought.  And we also sought an additional award

17  pursuant to the sanction award.  All of that was teed

18  up to be argued before the Court.  And then the

19  bankruptcy happened.  They asserted that going

20  forward with any of that would constitute a violation

21  of the automatic stay.

22       THE COURT:  When you say "they"?

23       THE WITNESS:  The debtors.

24       THE COURT:  Okay.  Because at some point

25  your clients are saying the same thing in one of the

1    other actions.  So I've been a little confused about

2    who's trying to use the automatic stay as a shield in

3    this case.

4            THE WITNESS:  Well, the -- our request for

5    attorneys' fees -- and we filed a motion for relief

6    from the protective order.  And the relevant

7    provision of the protective order prohibited the use

8    of evidence gained in that case in any other

9    proceeding.

10           Now, the debtors and their family members

11    filed a separate lawsuit, Land Com, that's also

12    included on the schedules.  And they asserted

13    essentially the same claims that were resolved in the

14    Toomey litigation, in both of the Forge, what are now

15    Forge litigations in the U.S. Bank.

16           And those were all dismissed and sanctions

17    awarded in some of them.  And we had discovery

18    sanctions pending in the Land Com case because they

19    were trying to relitigate claims made and resolved by

20    Judge Toomey.  All of those were stayed at the

21    insistence of the debtors.  And so those sanctions,

22    motions, the awards for attorneys' fees, the awards

23    for attorneys' fees in Judge Toomey's case were all

24    stayed.  We sought to be able to assert the

25    cross-claims that were asserted in Toomey, or use

1   that evidence in defense of the Forge litigation and

2   needed relief from the protective order to do so.

3                THE COURT:  I understand.

4                THE WITNESS:  And that was also stayed.

5                THE COURT:  Thank you.

6        Q.    (By Mr. Shields)  And would you just give

7   the Court a little bit of information about the fact

8   that it was fully briefed.  The hearing was

9   scheduled, right, on July 5th?  And you had filed

10  supporting motions.  Plaintiffs had filed opposing

11  motions, and you'd filed reply memorandum, I mean.

12       A.    Yes.  And that was not the only motion but

13  that motion was teed up and ready to go.

14       Q.    And the other motion was the sanction --

15  or excuse me, the protective order?

16       A.    The attorney's -- we had sought attorneys'

17  fees in that case and an award of attorneys' fees for

18  the discovery sanction.

19       Q.    Okay.

20                THE COURT:  And you're not seeking -- your

21  clients aren't seeking relief from stay on those two

22  issues?

23                MR. SHIELDS:  No.  Just the relief from

24  the protective order.

25                THE COURT:  The attorneys' fees and the

1    sanctions.

2              MR. SHIELDS:  We'll leave those --

3              THE WITNESS:  Although, I hope that at

4    some point we --

5              MR. SHIELDS:  At some time they'll have to

6    be resolved.

7              THE COURT:  I bet you do, yes.

8              MR. SHIELDS:  Yeah.  At some point they'll

9    have to resolve it.  But in order to detract a little

10   bit from the debtors' opposition we're trying to

11   litigate everywhere we said, hey, we'll leave that

12   stay.

13             THE COURT:  All right.

14             MR. SHIELDS:  It needs to be resolved, but

15   we need that motion for protective order to be heard

16   so that we can use that evidence in the Forge

17   litigation.

18             THE COURT:  All right.  Thank you.

19       Q.    (By Mr. Shields)  Give the Court some idea

20   of the amount of dollars involved.  Maybe you did and

21   I missed it.

22       A.    Well, we were seeking -- with regard not

23   to -- with regard to our claim against -- our

24   cross-claims and counterclaims against the plaintiffs

25   in that case, we were seeking, I think 409 plus

VS v. Christensen * October 11, 2012          **110**

1   change in attorneys' fees for defense of the

2   counterclaim.  And about -- I think it was about

3   $39,000 in costs for deposition and such things.  In

4   defense of the claims that had been brought, I don't

5   know how much of that precisely would be allocated

6   between the briefing on the summary judgments and the

7   motion to dismiss, but that whole effort cost

8   something approaching $450,000 in fees and costs.

9          Q.    Okay.  And is -- will the TM parties be

10   prejudiced if they're not able to use the evidence

11   that's under the protective order in the Toomey case?

12          A.    I can't imagine why anyone in their right

13   mind would say it is efficient or makes wise use of

14   anybody's resources to go back and do that discovery

15   that I've already done once.  It's all there.  It's

16   all available.  All of the claims are entirely

17   applicable to the Forge litigation.  Mr. Freeman has

18   been deposed.  We know all about his efforts to

19   cooperate with Mr. Christensen.  Not just with regard

20   to Forge but with multiple other people where they

21   were out trying to find people who would buy up the

22   note and then go after the companies and try to get

23   all of the company's assets.  All of that discovery

24   is there.

25          MS. OLSEN:  Your Honor, I'm going to

1  object to this testimony on the lines of summarizing

2  and giving their side of what they believe the facts

3  to be through discovery that we haven't had access

4  to, nor can we validate.  We move to strike that

5  testimony, Your Honor.

6          THE COURT:  Motion is denied.  I

7  understand Mr. Manning's testimony simply to be his

8  client's position, his legal opinion and not fact.

9      Q.    (By Mr. Shields)  Okay.  Thank you,

10  Mr. Manning.

11          Let me ask you a couple other questions

12  here.  Could you -- we have attached as Exhibit

13  Number 11 the protective order.  Could you just

14  briefly describe for the Court what is involved --

15  what issues the Court was scheduled to hear on July

16  5th and what we'll ask the Court to give us relief

17  from stay to hear in the Toomey litigation?

18      A.    Sure.  If you turn to page 3, Your Honor,

19  scope of the protective order.

20      Q.    This is Exhibit 11, right?

21      A.    Yes.  Exhibit 11.  At the bottom of page

22  3, section 2.1.

23      Q.    Yes.

24      A.    "Except as the parties may otherwise agree

25  or the Court may order, material produced in this

VS v. Christensen * October 11, 2012          **112**

1    litigation, whether or not designated confidential or

2    confidential attorneys' eyes only, including any

3    excerpt, analysis, summary or description about

4    material, shall be used solely for the prosecution or

5    defense of the above referenced action including

6    appeals."

7              We sought to modify that provision of the

8    protective order so that the materials obtained in

9    the Judge Toomey litigation could be used in any

10   other litigation in which the Christensen parties

11   were involved, including the Forge litigation.  And

12   I'm not certain, but I believe we sought a somewhat

13   generic -- any other litigation in which these

14   parties were involved.

15        Q.    And who opposed the motion to modify the

16   protective order?

17        A.    The debtors.

18        Q.    Okay.  Any --

19        A.    Well, I said -- I'm conflating the

20   debtors.  It's not all the debtor.  It was all of the

21   defendants --

22        Q.    Defendants.

23        A.    -- including --

24        Q.    Excuse me, plaintiffs.  They were the

25   plaintiffs?

VS v. Christensen * October 11, 2012          **113**

1       A.      They were the plaintiffs, yes.  All of the

2   plaintiffs, including the debtors.

3       Q.      Mr. Howcroft did not though, did he?

4       A.      No.

5       Q.      Why was the protective order put in place

6   in the first place?

7       A.      Well, there are a number of confidential

8   business documents that were being used and exchanged

9   in the litigation.  It was important that those

10  documents, we have a means of preserving them.  Many

11  of the documents that had been made available we

12  found in the possession of third-parties who were --

13  although it's not clear that they were produced in

14  the litigation, but many of those kind of

15  confidential documents were ultimately in the

16  possession of third parties.

17      Q.      And do you believe Judge Toomey will give

18  you a prompt hearing if this Court grants relief from

19  stay?

20      A.      Well, if you've been in state court

21  recently --

22      Q.      It calls for speculation.

23      A.      -- prompt is relative.  I'm hopeful that

24  we will have a prompt hearing.

25      Q.      Okay.

1          A.      We will certainly seek one.

2          Q.      Were you and your office and your clients

3    anxious to proceed with the hearing on July 5th?

4          A.      Absolutely.

5          Q.      And who said that if you went forward it

6    would violate the stay?

7          A.      Why I believe that was communicated

8    through Mr. Christensen, Lavar Christensen.

9          Q.      In fact --

10         A.      Who is -- the counsel for the sister had

11   been permitted to withdraw just before this case was

12   scheduled to -- these were scheduled to be heard.

13   Mr. -- the counsel for the debtors, Mitchell Barlow,

14   had just been permitted to withdraw.  And Lavar

15   Christensen came in, resulting in delays.  But he at

16   that point was representing at least the Christensen

17   -- McKay Christensen, the debtors, and the

18   Christensen family.  I don't believe anybody --

19   although there was a notice to appear, as to the

20   sister and her family, I don't believe they -- I

21   don't believe that they participated in that.

22         Q.      Okay.  Would you look at Exhibit 7.  It's

23   now been admitted by stipulation.  But just so the

24   Court gets some context, who is Sammi Anderson?

25         A.      Sammi is one of my partners.  She's the

1  brains in the operation.

2       Q.     Have you seen this e-mail before, an

3  e-mail exchange between Lavar and Sammi?

4       A.     Yes.

5       Q.     Okay.  And did you eventually make the

6  decision to not force the issue, not proceed with the

7  hearing?  You deferred to Lavar's request and said,

8  okay, let's assume the stay applies at not proceed?

9       A.     Well, it's probably not accurate that we

10 deferred to Lavar's request as opposed to we deferred

11 to an interpretation of the stay in fear of Judge

12 Marker that we didn't want to be violating the stay.

13      Q.     Did you consider going against parties

14 other than debtors in bankruptcy?

15      A.     Yes.

16      Q.     And why did you decide not to do that?

17      A.     It wouldn't be sufficient relief in that

18 if the -- we don't have the debtors bound by an order

19 that permits us to use evidence from one case in

20 another case.  It's not effective.

21      Q.     Okay.  Now, you've heard the debtor

22 testify.  You were here in court when Mr. Christensen

23 testified this morning?

24      A.     I was.

25      Q.     And you've looked at those bankruptcy

VS v. Christensen * October 11, 2012          116

1    schedules where he identifies those 50 million and

2    those $25 million claims?

3         A.    I have.

4         Q.    And are those -- as you read the complaint

5    and as you read and hear his description, have those

6    claims been dismissed as against my client?

7         A.    Well, his claims are generic.  And I don't

8    know why he has -- his description of his claims are

9    generic.  I don't know why he has two separate

10   litigations with -- one with 50 and one with 25

11   million.  But as I read from Judge Toomey's order,

12   she dismissed -- he had a claim that he wasn't

13   receiving information.  And you heard him repeat that

14   claim today.

15        Q.    She dismissed it?

16        A.    She dismissed that, absolutely.  We

17   demonstrated that he had received everything to which

18   he was entitled and more.  And she dismissed that

19   claim.  She dismissed everything that was included in

20   the complaint and everything -- their response to our

21   second summary judgment motion was to throw in the

22   kitchen sink about all sorts of additional

23   allegations, most of which you heard today.  She

24   dismissed all of those.

25        Q.    And that was after discovery, depositions,

1   production of documents?

2        A.    More than two years of discovery on a case

3   that they represented at the outset would be

4   trial-ready within four months.

5              THE COURT:  What happened to

6   Mr. Benevento?  He withdrew early on?

7              THE WITNESS:  Yes.  They've gone through a

8   number of lawyers.

9              THE COURT:  All right.

10       Q.    (By Mr. Shields)  How many counsel have

11   represented the plaintiffs in that case?

12       A.    They started off at Snell & Wilmer.  Then

13   they went to -- well, Kirton McConkie also

14   co-counsel.  Then they went through -- then they went

15   to Mitchell Barlow.  Then they were permitted to

16   withdraw.  And Kirton McConkie was permitted to

17   withdraw.  And Lavar Christensen entered an

18   appearance.

19       Q.    Current counsel is Lavar Christensen?

20       A.    Yes.

21       Q.    Okay.

22              MR. SHIELDS:  Could I have just one

23   minute, Your Honor?

24              That's all the questions we have for

25   Mr. Manning.  Thank you.

VS v. Christensen * October 11, 2012          **118**

1          THE COURT:  Mr. Boley.

2          MR. BOLEY:  Thank you, Your Honor.

3

4                    CROSS-EXAMINATION

5    **BY MR. BOLEY:**

6          Q.    Mr. Manning, I'm Matt Boley.  I represent

7    VS Fox Ridge, LLC.

8          A.    Nice to meet you.

9          Q.    The water's still here.

10         A.    I actually got confused (inaudible).

11         Q.    I just want to clarify so that -- there is

12   a partial summary judgment ruling in the Toomey case

13   that was entered at the end of 2011 that dismissed

14   the claims against your clients; is that correct?

15         A.    Close.  The final order was entered in --

16   I believe in January of 2012.  The judge issued a

17   memorandum decision dismissing all the claims, making

18   -- essentially, filing the actual order.  I got it

19   right here.  It was filed with the district court on

20   January 17, 2012.

21         Q.    And that resulted in dismissal of the

22   claims against your clients but not the claims

23   against Mr. Howcroft; is that right?

24         A.    Yes.  Mr. Howcroft had only recently been

25   added.  That was one of the things that they did in

1   opposition to the summary judgment, they sought to

2   add him at the last minute after the discovery had

3   taken place.  The judge allowed them to add him and

4   then allowed them to continue to proceed.  She

5   dismissed most of the claims asserted against

6   Mr. Howcroft but reserved on two, I believe.

7        Q.    And I believe you testified --

8        A.    I don't represent Mr. Howcroft, sorry.

9        Q.    I understand that.  Thanks for that

10  clarification for the Court.

11             So I understand that the debtors and maybe

12  the other Christensen parties initially attempted to

13  appeal Judge Toomey's ruling.  And you let them know

14  that that ruling wasn't right for appeal because it

15  was interlocutory?

16       A.    Well, they didn't seek to do it as an

17  interlocutory appeal.  They filed a notice of appeal

18  of the non-final judgment.

19       Q.    And that -- the debtors' right to appeal

20  is not yet right.

21       A.    That's correct.

22       Q.    They still have the right to appeal it if

23  they either get leave to take an interlocutory appeal

24  or a final judgment's entered in the case; is that

25  right?

VS v. Christensen * October 11, 2012          120

1        A.     That's correct.

2        Q.     Now, if you'll turn to Exhibit R.  There's

3   a lettered binder there.  Exhibit R is a memorandum

4   decision entered by Judge Toomey in June of this

5   year.  And this addressed Mr. Howcroft's motion, a

6   motion you weren't involved in; is that correct?

7        A.     That's correct.  We had already obtained

8   our summary judgment in full.

9        MR. BOLEY:  Your Honor, I offer Exhibit R.

10       MR. SHIELDS:  No objection.

11       Q.     (By Mr. Boley)  And Exhibit R -- we won't

12  go through all of the Judge's reasoning --

13       THE COURT:  Exhibit R is received.

14       **(EXHIBIT R IS RECEIVED.)**

15       MR. BOLEY:  Sorry, Your Honor.  I

16  apologize for being too fast.

17       Q.     (By Mr. Boley)  Exhibit R, without going

18  through all the reasons, essentially the Court denied

19  Mr. Howcroft's motion for summary judgment.

20       A.     I believe that's to two counts only.

21       Q.     Claims 1 and 7 remain, is that --

22       A.     Yeah.  Just looking at the conclusion, for

23  the foregoing reason that the Court grants in part

24  and denies in part Mr. Howcroft's motion for summary

25  judgment.  Summary judgment is granted as to all