VS v. Christensen * October 11, 2012          121

1   claims against Mr. Howcroft except claims 1 and 7.

2        Q.    If you turn one exhibit earlier in your

3   binder to Q.  Q is a second amended complaint that

4   was filed by the plaintiffs.

5        A.    I'm afraid I'm going to make a mess here.

6              THE COURT:  I'm sorry.  What exhibit?

7              MR. BOLEY:  Q, Your Honor.

8              THE WITNESS:  I have that.

9        Q.    (By Mr. Boley)  And Exhibit Q is the

10  current pleading of the plaintiffs --

11       A.    I'm having --

12       Q.    -- subject to whatever's been dismissed;

13  is that accurate?

14       A.    I'm having difficulty reading.  Is this

15  2010?

16       Q.    Let me -- look at the last page.  The

17  certificate of service shows it was signed in

18  November of 2010.

19       A.    That --

20       Q.    This is the current pleading of the

21  plaintiffs in the case, correct?

22       A.    Oh.  Yeah.  The reason that I'm confused

23  is Steve Howcroft is identified here.  I think that

24  what happened is they didn't serve him with this

25  complaint until we moved -- we renewed our summary

1   judgment motion.  So he, although his name does

2   appear in this, he was not part of the litigation

3   until they finally served him on the eve of the

4   summary judgment motion.  So to the extent that I was

5   talking about Mr. Howcroft being reasonably added,

6   that appears to be wrong that he was included on this

7   one, but he just wasn't served.

8              MR. BOLEY:  Your Honor, I offer Exhibit Q.

9              MR. SHIELDS:  Your Honor, not for the

10   truth of the matter stated but as the fact that it is

11   a complaint on file, we have no objection.

12              THE COURT:  Exhibit Q is received.

13              **(EXHIBIT Q IS RECEIVED.)**

14        Q.   (By Mr. Boley)  And I -- so the first

15   cause of action and the 7th cause of action,

16   according to your understanding in this complaint,

17   those are on pages 27 and 33, are what remain against

18   Mr. Howcroft, although not against your clients; is

19   that accurate?

20        A.   That's my understanding.  But as I say, I

21   don't represent Mr. Howcroft so I'm only relying on

22   this document.

23        Q.   I understand that Mr. Howcroft was added

24   in the Toomey case, perhaps joined by service after

25   the discovery, much of the discovery had been

1    undertaken.  And that he hasn't had an opportunity to

2    undertake discovery in this case; is that fair?

3          A.    That's correct.  I don't recall him

4    participating in a single deposition in the case.

5          Q.    And if his counsel told me he thinks that

6    case is at least a year out from going to trial,

7    would you have any reason to disagree with that?

8                MR. SHIELDS:  Objection, Your Honor.

9    Speculation and hearsay.

10         Q.    (By Mr. Boley) Let me ask this, do you

11   have any reason --

12               THE COURT:  Well, Mr. Boley, they're not

13   asking for relief from stay to pursue dismissal of

14   the claims against Mr. Howcroft.  So what's the

15   point?

16               MR. BOLEY:  The point's well taken, Your

17   Honor.  Let me move on.

18         Q.    (By Mr. Boley)  If you turn to Exhibit C,

19   that's a motion, stipulated motion for a protective

20   order in the Toomey case.

21         A.    Exhibit C?

22         Q.    Exhibit C.

23         A.    Yes, I'm there.

24         Q.    This is a motion you prepared; is that

25   correct?

1        A.     Yes.

2               MR. BOLEY:  Your Honor, I offer Exhibit C.

3               MR. SHIELDS:  No objection.

4               THE COURT:  Exhibit C is received.

5               **(EXHIBIT C IS RECEIVED.)**

6        Q.     (By Mr. Boley)  So the protective order

7    and the order sealing proceedings and sealing

8    documents and depositions transcripts was entered at

9    your request or the request of your clients, correct?

10       A.     No.  This is stipulated.  We prepared it.

11   But the parties agreed to -- and it's not sealing the

12   case.  The case is not sealed.  But under the

13   provisions of the protective order, if there are

14   confidential documents you can designate them and

15   file them under seal.

16       Q.     Now, I understand --

17              THE COURT:  Excuse me.  I'm going to make

18   sure I understand.  The pleadings in the case are not

19   sealed.

20              THE WITNESS:  That's correct.

21              THE COURT:  This is not like that Nu Skin

22   litigation that's been in the paper lately?

23              THE WITNESS:  No.  No.

24              THE COURT:  Okay.

25              THE WITNESS:  No.

1        THE COURT:  All right.

2        MR. HARRINGTON:  Your Honor, excuse me.

3   The docket, for clarification of the Court, the

4   pleadings are private.  They are not accessible to

5   the public.  So as to the difference, we can't get in

6   and see the Toomey litigation pleadings.

7        THE WITNESS:  That -- if that is the case,

8   that shouldn't be because the case itself is not

9   filed under seal.  Although because so many documents

10  are attached to pleadings, that probably most of the

11  pleadings are filed under seal.

12       MR. HARRINGTON:  Well, Your Honor, I can

13  only address you.  In Exhibit 14, which is the docket

14  (inaudible) Mr. Manning --

15       THE COURT:  Right.

16       MR. HARRINGTON:  There was in court

17  (inaudible) that start on page 6.  You will see that

18  once it's transferred, this is February 19, 2010, you

19  will see all of that as being private.  Do you see

20  that?  So none of this of what you've testified with

21  respect to this is available to, for example, Forge,

22  my client.

23       I've interrupted his testimony, Your

24  Honor, I apologize.

25       THE COURT:  No, I appreciate the

1    clarification.  Thank you.

2         Q.    (By Mr. Boley)  Now, I understand,

3    Mr. Manning, that at at least one time or perhaps at

4    more than one time the debtors sought the opportunity

5    to use the discovery that they had taken in the

6    Toomey case and use it in other cases; is that

7    correct?

8         A.    Can you refresh my recollection?  Do you

9    have a document that would assist me?

10        Q.    I don't have a document.  I'm asking for

11   your recollection.  Your recollection is that they

12   did ask --

13        A.    That is not my recollection.  But I just

14   don't have a firm recollection on that point.

15        Q.    Let me ask this:  Do you recall opposing

16   the debtors' efforts to limit or lift the protective

17   order so they could use the documents.  For example,

18   in the Kennedy -- case before Judge Kennedy.

19        A.    Judge Kennedy is where the Howcroft

20   litigation is?  I don't recall that.  But if you can

21   show me something to refresh my recollection.  My

22   recollection is just not -- it's just -- I just don't

23   have a recollection there.

24        Q.    Let me ask this then:  It is true that the

25   debtors under the current stipulated discovery, or

1    the stipulated protective order, haven't had and

2    don't have the right to use any of that information

3    in the case pending before Judge Kennedy.

4          A.    Well, Mr. Howcroft is a party to this

5    litigation.  To the extent that Mr. Howcroft is a

6    party to this litigation, he has access to that.  I

7    don't know what his lawyer has done in that regard.

8          Q.    Maybe I misspoke.  Certainly the debtors

9    have access to the information.  But this protective

10   order won't let the debtors use that information in

11   the case pending in front of Judge Kennedy; is that

12   correct?

13         A.    That would be my interpretation of the

14   protective order, which is why we had to go to Judge

15   Toomey to get relief from the protective order so

16   that we could use this in the Forge litigation.

17         Q.    So when you talked earlier about prejudice

18   by not being permitted access to the information that

19   are subject to the protective order, your clients and

20   the debtors both have suffered prejudice from that

21   limitation; is that correct?

22         A.    Well, my understanding is that the debtors

23   don't want the other litigation to go forward so the

24   existence of the protective order actually is a

25   shield for them in the present posture.  But if they

1   wanted to use and not duplicate discovery, yes, it

2   would prejudice them because they should be able to

3   use the discovery in this case in the Forge

4   litigation as well.  If -- but my understanding is

5   they --

6        Q.    I'm just asking --

7        A.    My understanding --

8        Q.    The prejudice has been equal, right?

9        A.    Say what?

10        Q.    The prejudice has been equal.  Both

11   parties have been prohibited from using the the

12   information.

13        A.    Well, you know, that's like saying don't

14   throw me into the briar patch because that will be

15   prejudicial to me, when that's exactly what you want.

16   It appears to me that the debtors want to stop the

17   litigation against my clients and Forge.  And they

18   are opposing relief from this protective order so

19   that that information cannot be used there.  So if

20   they think that they're being prejudiced by the

21   existence of this protective order, then they

22   shouldn't oppose our motion to get relief from this

23   so that it can be used.

24        Q.    Well --

25        A.    I don't know how you can say that they're

1   being prejudiced by having the very result they seek.

2          Q.     They have to go to trial in November.

3   They don't get to use any of this information in the

4   Kennedy case.  They've got to go to trial in November

5   with their hands tied behind their back.

6          A.     They could stipulate, and we would

7   stipulate.  We tried to get this relief from them and

8   they opposed it.

9          Q.     Okay.  Let me move on.  I understand that

10  you personally have loaned moneys to the Traverse

11  Mountain entities; is that correct?

12         A.     Me?

13         Q.     Yeah.

14         A.     No.  No way.

15         Q.     Your law firm?

16         A.     No way.

17         Q.     Any entity that you're affiliated with?

18         A.     No way.

19         Q.     Okay.  Perhaps I was misinformed.

20         A.     I suspect I know the source of your

21  misinformation, but...

22         Q.     Now, when you testified about the amount

23  in fees that your clients were going to seek in the

24  Toomey case, it approached a half million dollars?

25         A.     Yes.

VS v. Christensen * October 11, 2012          130

1        Q.     And costs of a half million to a million

2    dollars are common in complex commercial litigations

3    cases like this; is that fair?

4        A.     You used the word "costs."

5        Q.     Well, attorney's fees and costs.

6        A.     Attorney's fees and costs.

7        Q.     Half a million to a million is common in a

8    commercial litigation case pending in state court.

9        A.     Well, it depends on how much is at stake.

10   My clients typically don't want to invest that much

11   if they don't have a prospect to recover or their

12   claim is for less than that.  But if you have the

13   prospect of a significant recovery in complex

14   commercial litigation, you bet.  Fees and costs are

15   going to be more than half a million dollars.

16            MR. BOLEY:  I tender the witness, Your

17   Honor.

18            THE COURT:  Mr. Shields, anything further?

19            MR. HARRINGTON:  Your Honor, if I might

20   ask a few questions.

21

22            **CROSS-EXAMINATION**

23   **BY MR. HARRINGTON**:

24       Q.     Mr. Manning, my client is Forge

25   Investments, Inc. who has become a party in interest

1   in this matter of lifting the stay.  Let me ask you a

2   couple questions.  A great deal of testimony about

3   the Toomey case, but just some singular questions.

4   Do you know if Forge is a party to the Toomey

5   litigation?

6         A.    To my knowledge, they are not.

7         Q.    Well, would there anybody else that would

8   know about?  You're the attorney of record on that,

9   right?

10        A.    That's right.  And I'm not trying to

11  evade.  It's just if they've done something to try to

12  intervene there, I am not aware of it.

13        Q.    No, they have not.

14        A.    Okay.  To my knowledge Forge is not and

15  has never been a party, nor was U.S. Bank.

16        Q.    Okay.  All right.  Now, with respect to

17  that, has a -- was Forge party to any negotiations

18  about the protective order in the Toomey litigation?

19        A.    No.

20        Q.    Did Forge participate in any of the

21  discovery in the Toomey litigation?

22        A.    Well, I'm not sure what the relationship

23  is between Forge and Mr. Freeman.  Certainly we did

24  -- and had very extensive efforts to get discovery

25  from Mr. Freeman, who is the principal of Forge.  I

1   took his deposition.  We have been in extensive

2   battles trying to get him to turn over documents.

3        Q.     Well, let me do a better job of asking

4   that question.  Did Forge participate, Forge -- and

5   again, let's be clear with the Court.  Mr. Freeman is

6   the member, the managing member of Forge.  Did Forge

7   participate in any discovery in the Toomey case other

8   than your having taken Mr. Freeman's deposition?

9   Were they present at the depositions, a

10  representative?

11       A.     Forge, as -- Forge was not.  But that's

12  sort of like asking did Mr. Heap participate in the

13  litigation.  Mr. Heap is a manager of a defendant.

14  In that case he's also a party.  But Mr. Freeman, as

15  a manager of Forge, was not deposed in his capacity

16  as a manager of Forge.  He was deposed as an

17  individual.  He was doing things with any number of

18  other entities, trying to --

19       Q.     My question is simply is this:  Does Forge

20  -- all this discovery that went on here, did they

21  participate, did they have an attorney participate in

22  that discovery?  And the answer is no, right?

23       A.     The answer to your last question is did

24  they have an attorney participate in it?  They did

25  not.

1          Q.      Okay.  They weren't a party.  They didn't

2     participate.  Save and except for the deposition you

3     took of Mr. Freeman, Forge did not participate in any

4     of that discovery?

5          A.      We received a few -- I don't know if it's

6     hundreds or if it crossed over to thousands of

7     documents from Mr. Freeman.

8          Q.      They were subjects of your discovery

9     request?

10         A.      That's correct.

11         Q.      With a deposition and --

12         A.      That's correct.  That's correct.

13         Q.      I'm asking if they participated in that

14    discovery as a party.

15         A.      Forge?

16         Q.      And the answer is no.

17         A.      Forge was not a party.

18         Q.      Very good.

19         A.      Mr. Freeman was not a party.  Forge did

20    not have an attorney participate in the litigation.

21    I am just trying to tell you --

22         Q.      And they did not participate in the

23    formulation of the protective order in the Toomey

24    case --

25         A.      That's correct.

VS v. Christensen * October 11, 2012          134

```
1        Q.     -- did they?

2        A.     That's what I --

3        Q.     They haven't been given a copy of the

4   protective order in the Toomey case.

5        A.     I believe that a copy was attached to one

6   of the filings.

7        Q.     Okay.

8        A.     And I know that Mr. Freeman has a copy of

9   it because in connection with his deposition I made

10  it available.

11       Q.     And so what your position is, you want to

12  pick up all of this discovery (inaudible) in the

13  Toomey case in which Forge did not participate as a

14  party.  And you say you want to use it in the Forge

15  litigation in Fourth District?  Is that your

16  position?

17              THE COURT:  That's what he wants to ask of

18  Judge Toomey.

19              THE WITNESS:  I want to ask Judge Toomey

20  to --

21              MR. HARRINGTON:  To do.

22              THE WITNESS:  -- allow us to do that.  And

23  I assume that Forge, to the extent that they

24  cross-examine or have objection to documents or want

25  to redo that -- those -- that discovery, they will be
```

CITICOURT, LLC
801.532.3441

1   advantaged because they will be able to see what is

2   already there.  And they won't have to start from

3   scratch.

4        Q.    (By Mr. Harrington)  Let me ask in just

5   some, again, simple questions.  This is you and your

6   law firm, Manning Curtis.  I'm trying to figure out

7   who you represent.  Do you represent any party

8   involved in the Forge litigation?

9        A.    No.

10       Q.    Okay.  Do you -- are you involved in the

11  remaining claims 1 and 7 with Mr. Howcroft?  Are you

12  involved in that litigation?

13       A.    Only that it is taking place in a

14  litigation where we will be asserting counterclaims

15  and cross-claims.  I do not represent Mr. Howcroft

16  and never have.

17       Q.    Okay.  Now, there's other Traverse

18  Mountain litigation that you represent parties at, do

19  you not?

20       A.    Yes.

21       Q.    Okay.  That is the NCP litigation,

22  National Capital Partners litigation?

23       A.    The Traverse Mountain litigation against

24  NCP was settled.

25       Q.    Okay.  When was that settled?

VS v. Christensen * October 11, 2012          136

1        A.     Shortly after it was filed.

2        Q.     Okay.  But there have been other ones

3   involving Mr. Heap and others involved that you

4   concurrently are involved with?

5        A.     Not involving Mr. Heap, no.

6        Q.     You're not?

7        A.     No.

8        Q.     You're not involved.  You're involved in

9   no lawsuits in which Pia Anderson is representing

10  NCP?

11       A.     I am involved in defending other clients

12  in cases in which Pia Anderson is representing

13  representing NCP.

14       Q.     Okay.  And that involve --

15       A.     They do not involve Traverse Mountain

16  company.

17       Q.     They don't involve Traverse?

18       A.     No.

19       Q.     All right.  Now, your position here is

20  that these documents, delineated on page 6 of Exhibit

21  Number 14, those would all -- or should have been

22  made available to Forge.

23       A.     I'm sorry?

24       Q.     On page 6, Exhibit 14 they are designated

25  as private.  Do you see those?  It continues to the

VS v. Christensen * October 11, 2012          137

1   very end.

2          A.    I see some designated as private.

3          Q.    Well, those designated as private, are

4   those available now to Forge?

5          A.    I don't know why some of these things are

6   designated as private.  I have my own pleading file

7   here, and I can tell you whether we filed things

8   under seal.

9          Q.    Well, let me ask you this question:  Would

10  you make your litigation -- excuse me, your pleadings

11  file available to us?

12         A.    Sure.  Except to the extent you would have

13  to -- we would have to have relief from the

14  protective order.  But all of the pleadings -- most

15  of the pleadings are filed under seal because of the

16  -- they're confidential documents attached to it.

17         Q.    And that's why I'm troubled here today.

18  You freely testify as to the content of these various

19  pleadings, but they're not available for us to enable

20  us to ask you questions.

21              MR. SHIELDS:  Objection, Your Honor.

22  That's argument not a question.

23              THE WITNESS:  I think --

24              THE COURT:  I'm not sure -- what documents

25  are you talking about, Mr. Harrington?

VS v. Christensen * October 11, 2012          138

1                THE WITNESS:  What document do you want

2       to --

3                MR. HARRINGTON:  All those --

4                THE WITNESS:  I --

5                MR. HARRINGTON:  All those marked as

6       private.

7                THE COURT:  But help --

8                THE WITNESS:  I will --

9                THE COURT:  Mr. Manning --

10               THE WITNESS:  I will ask --

11               MR. HARRINGTON:  Your Honor.

12               THE COURT:  Mr. Manning, just hold on a

13      second.

14               What's the focus of your questions?

15               MR. HARRINGTON:  The focus, Your Honor, is

16      not having been made privy to these private pleadings

17      with respect to what is transpiring with the

18      protective order.  In other words, we quite frankly

19      are -- we are not sure that they may not have some

20      impact on the lifting of the stay with the protective

21      order.  We don't have a dog in the fight as to what

22      happens with respect to the debtor and that.  But it

23      does have -- it does bear on us that they have

24      explicitly wanted to bring it into our Fourth

25      District.  We'd like to know what's going on with

1   that.  And not having had it, we think that

2   Mr. Manning's testimony here is a characterization

3   that we have been denied an opportunity to

4   cross-examine.

5           THE COURT:  All right.  I missed the last

6   point.  I'm sorry.  Denied --

7           MR. HARRINGTON:  When we can't see what is

8   going on with the protective order and what has

9   transpired in these documents, we don't know what the

10  implications of lifting the stay for the debtor is

11  going to be on us.  All we know is they want to pick

12  up a bunch of discovery that we haven't participated

13  in and shove it into our case.  We want to know what

14  that protective order is and what the implications

15  are --

16          THE COURT:  Right.

17          MR. HARRINGTON:  -- for both ourselves and

18  the debtor.

19          THE COURT:  Yeah.  You don't know what's

20  in there.  I don't know what's in there.  And that's

21  a question for you to raise either by intervening

22  with Judge Toomey or by raising it in the actions

23  before Judge Laycock and Judge Kennedy.

24          MR. HARRINGTON:  Very good, sir.  No

25  further questions.

VS v. Christensen * October 11, 2012          **140**

1        THE WITNESS:  The protective order is --

2        THE COURT:  Mr. Manning, there's no

3   question pending.

4        MR. HARRINGTON:  There's no question.

5        THE WITNESS:  Sorry.

6        THE COURT:  Are you okay?

7        MR. SHIELDS:  I have no further questions,

8   Your Honor.

9        THE COURT:  All right.

10        THE WITNESS:  I should have to do that

11   myself since I accomplished it.

12        THE COURT:  All right.  Mr. Manning, you

13   can step down.

14        Any other witnesses, Mr. Shields?

15        MR. SHIELDS:  Yes, Your Honor.  We call

16   our next witness, Mr. Bryan Scott.

17        UNIDENTIFIED SPEAKER:  (Inaudible.)

18        MR. SHIELDS:  Yes.  Can we excuse

19   Mr. Manning?

20        THE COURT:  Any objection?

21        MR. BOLEY:  No, Your Honor.

22        THE COURT:  All right.  Thank you,

23   Mr. Manning.  You're excused.

24        THE BAILIFF:  Please come forward to this

25   mic and raise your right hand.

VS v. Christensen * October 11, 2012          **141**

1

2                         <u>Bryan Scott</u>,

3             called as a witness, being first sworn,

4             was examined and testified as follows:

5

6             THE BAILIFF:  Please take the witness

7     stand and state your full name for the record.

8             THE WITNESS:  Bryan Michael Scott.

9

10                     <u>DIRECT EXAMINATION</u>

11     <u>BY MR. SHIELDS</u>:

12         Q.    Mr. Scott, would you give the Court some

13     brief background about your experience as an

14     attorney?

15         A.    Yeah.  I went to -- I graduated from law

16     school at UNLV, William S. Boyd School of Law in

17     2001.  After that I went to the University of

18     Washington and received an LLM in tax.  Following my

19     stint at the University of Washington, I went back to

20     Las Vegas.  I practiced -- I'm licensed to practice

21     in both Nevada and Utah.  I practiced in Las Vegas at

22     the firm called Beckley Singleton.  And after about a

23     year there I move back to Utah, I practiced at Snow

24     Christensen & Martineau for roughly eight years.  And

25     a couple of years ago one of my partners and I, Stan

VS v. Christensen * October 11, 2012          142

1   Preston, left Snow Christensen and started our own

2   firm, Preston & Scott.

3        Q.    Okay.  And what's your experience with the

4   Traverse Mountain parties?  How long have you been

5   representing them?

6        A.    We've been representing them for -- I

7   believe a little over a year now.  We got involved

8   with those parties with the foreclosure actions with

9   U.S. Bank.

10       Q.    So you've been representing the TM parties

11  in what we call the Forge litigation that's filed in

12  Utah County?

13       A.    That's correct.

14       Q.    Briefly describe for the Court the

15  difference between what I call the Judge Laycock

16  action and the Judge Taylor action.

17       A.    The Judge Laycock action -- excuse me, is

18  judge a nonjudicial foreclosure, deficiency judgment

19  on some notes that were held by U.S. Bank and that

20  were transferred to one of their affiliates, SA Group

21  Properties, and then were later purchased by Forge.

22  The Judge Taylor litigation is a judicial foreclosure

23  action, again involving notes between the TM parties

24  and those notes for judicial foreclosure on those

25  notes.

VS v. Christensen * October 11, 2012          143

1          Q.     And the property securing those notes is

2     located in Utah County?

3          A.     That's right.  It's referred to as the

4     Traverse Mountain project.

5          Q.     Okay.  And have you been counsel for the

6     TM parties since the beginning of those cases?

7          A.     Yes.

8          Q.     Okay.  And you worked closely with

9     Mr. Stan Preston on this case, right?

10         A.     Correct.

11         Q.     And we had designated Stan as a witness,

12    but he's in Hawaii today; is that correct?

13         A.     That's right.  I'd much rather swap places

14    with Mr. Preston.

15         Q.     So just briefly tell the Court who's the

16    plaintiff -- U.S. Bank is the plaintiff -- was the

17    initial plaintiff in both those actions, correct?

18         A.     Yeah.  I mean, those cases have taken --

19    you know, originally the claims were just the simple

20    foreclosure claims.  The position of it now since

21    Forge has come in has made a different scenario.  But

22    U.S. Bank was the original plaintiffs in the Judge

23    Taylor litigation.  In the Judge Laycock litigation

24    they had transferred those notes to SA Group

25    Properties.  In about May of this year we were

1   informed that the notes had been sold from U.S. Bank

2   to a company called Forge Investments Utah, LLC.

3   They filed a motion on May 15th, I believe it was, to

4   be substituted as the plaintiff in interest in both

5   of those cases.

6        Q.    So just a month before the bankruptcy, a

7   month and a few days.

8        A.    Correct.  Correct.

9        Q.    Now, has the TM parties filed a motion to

10  amend their answer to assert counterclaims,

11  cross-claims and third party complaints?

12       A.    We did.  Approximately -- you know what,

13  when we got the notice that the notes had been sold

14  and we got the information that they had been sold to

15  Forge Investments, we found out that Mr. Freeman, who

16  had been in the Toomey litigation as far as being

17  deposed and giving documents and that case, was the

18  manager of Forge Investments.  And we understood, as

19  the manager of Forge Investments, that he had been

20  involved with Mr. Christensen.  And that he

21  considered the Christensen family family to him.

22            And so as we looked at the claims in the

23  Toomey litigation, we could see that there was

24  definitely something that we felt a long pattern of

25  work between the Christensens and Mr. Freeman to

1    purchase these notes that are the subject of the

2    foreclosure actions.  To take back the companies and

3    to foreclose on those loans and then to also go

4    against the personal guarantors of those loans, which

5    were our client.

6              So once we found out on May 15th when

7    Forge came in and filed their motion to be inserted

8    as the plaintiff -- I think it was May 24th, I want

9    to say, that we filed a motion ourselves to file an

10   amended answer to file counterclaims, cross-claims

11   and third-party complaint.

12        Q.    And did Forge oppose that motion?

13        A.    Forge did oppose that motion.

14        Q.    And did they also allege that the motion

15   lacked specificity?

16        A.    Yeah.  That was really their main

17   argument.  They said, look, you've made these RICO

18   claims.  You've made various claims, and we don't

19   have the -- you don't have -- you haven't pled them

20   with enough specificity and they're futile and they

21   should be dismissed.

22              Of course our argument to that was, well,

23   you know, we've talked about having a protective

24   order in this case, a stipulated protective order.

25   And one of the things that we had said about that

1    protective order is, look, we need to be able to use

2    the information from this Third District case --

3          Q.     The Toomey case?

4          A.     The Toomey case.  And these cases as well.

5    And so we had a provision in that stipulated

6    protective order that that would be the case.  Forge

7    is -- Forge would not agree to that.  So we had to

8    file a motion for a protective order in that case

9    where we -- where we asserted that that needed to be

10   the case, and they've opposed that motion.

11         Q.     Has that been heard by the judge yet?

12         A.     It has not.

13         Q.     So is it your expectation that the Forge

14   will be heard in the Forge litigation if Judge Toomey

15   amends the protective order?

16         A.     Say that again.  Sorry, I didn't --

17                MR. BOLEY:  That calls for speculation.

18                THE COURT:  I didn't understand the

19   question.  So let's back up and try it again.

20                MR. SHIELDS:  I'm sorry.  That was a poor

21   yes.  Let me restate it.

22                THE COURT:  All right.

23         Q.     (By Mr. Shields)  Do you expect that if

24   Judge Toomey modifies the protective order, if this

25   bankruptcy court grants relief from stay and if the

VS v. Christensen * October 11, 2012          147

1    TM parties are able to the proceed with the motion to

2    amend protective order, which Mr. Manning talked

3    about -- and you were here during Mr. Manning's

4    testimony, correct?

5         A.     Yes.

6         Q.     Okay.  If Judge Toomey grants that motion

7    and the protective order is modified such that TM

8    companies can use those documents in the Forge

9    litigation in the Fourth District court, do you

10   believe -- will Forge have an opportunity to oppose

11   the use of those documents?

12        A.     Sure.  They'll have the opportunity.  As

13   I've said, they've already filed an opposition to the

14   motion that we filed for a protective order.

15        Q.     So the characterization you're just going

16   to dump all those documents from the Toomey case

17   there is not accurate because that'll be subject to

18   Judge Taylor's review and response to your motion for

19   protective order there?

20        A.     That's correct.

21        Q.     Now, would you look at Exhibit 6.  This is

22   in the numbered exhibits.  That's already been

23   admitted.  So you just briefly describe to the Court

24   -- is that your work product?

25        A.     It is, yes.

VS v. Christensen * October 11, 2012          **148**

1         Q.      Will you tell the Court briefly what that

2    is?  How long ago did you prepare that and why?

3         A.      This has been prepared just recently.  We

4    filed an original counterclaim, cross-claim and

5    third-party complaint and filed a motion to also

6    amend the scheduling order to allow us to conduct

7    discovery based on all of the claims that were

8    asserted.  This has just been recently filed as it's

9    been discussed in this hearing earlier that this

10   encompasses the claims from the pending lawsuits.

11   The claims from -- they're all relevant, and they're

12   all tied to the same -- really the same type and sets

13   of facts.

14               So this would have claims against the

15   Christensen parties from the Toomey litigation.  It

16   also brought in claims against U.S. Bank as well as

17   the original claims that we had filed and put in

18   front of Judge Taylor and Judge Laycock in the

19   original -- our original proposed amended

20   counterclaims.

21        Q.      And have you agreed -- or has your client

22   instructed you to agree to not oppose Forge's motion

23   to consolidate?

24        A.      Yes.  We never opposed the -- Forge filed

25   a motion to consolidate.  And again, what got tricky

1    here with this was the bankruptcy.  You know, we've

2    never said that the bankruptcy stay applies to us.

3    We've never taken a position with that.  What we have

4    said is, look, we received these notices, we received

5    one from the VS Fox Ridge entity and one from the

6    individual debtors, that both claim that the

7    bankruptcy stayed the entire proceedings as to

8    debtors and codebtors.

9              So we simply just said, look, we don't

10   know if it applies or not but we filed a notice with

11   both Judge Laycock and Judge Taylor saying we don't

12   know if it applies or not but we need to get

13   clarification on this and we don't want to be filing

14   things and responding to motions and documents

15   when -- you know, we don't want to be sanctioned, we

16   don't want to violate the stay.  And so we simply

17   said we need further instruction from the bankruptcy

18   court on whether or not this applies to all the

19   parties.

20        Q.    But you will agree or not oppose the

21   pending motion to consolidate if this Court grants a

22   relief from stay to proceed with the Forge

23   litigation?

24        A.    That's correct.

25        Q.    And is the goal to get all these claims in

VS v. Christensen * October 11, 2012          150

1   one action?

2        A.     Yeah.   I mean, we think that'll be the

3   best judicially, to use the judicial resources, the

4   most efficient.   There's no need -- again, that's why

5   we took this amended protective order approach,

6   there's no need to rehash and redo these hundreds and

7   thousands of dollars worth of discovery that's

8   already been done.

9        Q.     And just briefly, not in detail, I know

10  that's a long counterclaim, third-party complaint and

11  cross-claim.   But just briefly describe for the Court

12  what the nature of the claims asserted in that

13  pleading is.

14            MR. BERRY:  Objection, Your Honor.  This

15  Exhibit Number 6 that he's now being asked to talk

16  about is something that appeared for the first time

17  attached to a late filed response.  Late filed under

18  Rule 9006-1.  Late filed as in 6:43 p.m. on October

19  the 9th.  It's something that, A, shouldn't really be

20  discussed, was late filed, and now to have him

21  explain some concept that we've had less than 30

22  hours to even see, is just preposterous.  We would

23  ask the Court to deny this line of questions.

24            THE COURT:  Overruled.  Thank you.

25            THE WITNESS:  The claims are basic breach

1   of contract claims against Steve Christensen and

2   McKay Christensen, RICO claims against the

3   Christensens and against Atlas Development, which is

4   an entity that's also managed by Mr. Freeman and

5   Forge Investments.  And Mr. Freeman conspiracy to

6   commit RICO.  There's intentional interference with

7   contract against Atlas and Forge and Mr. Freeman and

8   against McKay Christensen, Steve Christensen, breach

9   of fiduciary duties.

10             One of the things that really -- that

11  sparked this counterclaim was an individual by the

12  name of Brent Tanner came forward and assigned a

13  declaration --

14             MR. BOLEY:  I'm going to object.  I know

15  this is going to call for hearsay or this testimony

16  is going to be pure hearsay.  So before we talk about

17  what Brent Tanner said --

18             THE COURT:  There's no question pending.

19  He's just testifying.

20             MR. BOLEY:  Well, I'm objecting before he,

21  in a narrative, gives a bunch of hearsay testimony

22  from Mr. Tanner who's not here.

23             THE COURT:  All right.  Well, Mr. Scott

24  knows what hearsay is.  So I'll admonish you ahead of

25  time, let's keep it to what you know.

1               Could you ask a pending question?

2          MR. SHIELDS:  Me?

3          THE COURT:  Yeah.

4          MR. SHIELDS:  Yeah.  Okay.

5          THE COURT:  Because I kind of lost track

6     of where we're going, so.

7          MR. SHIELDS:  Yeah.

8          Q.    (By Mr. Shields)  So the counterclaim --

9     the proposed third-party complaint, counterclaim and

10    cross-claim that you -- that's a document you've

11    prepared?

12         A.    That's a document that I prepared, yes.

13         Q.    And it's not been filed yet because we

14    don't have relief from stay?

15         A.    That's right.

16         Q.    And the purpose was to provide the parties

17    who are opposing this motion for stay of relief

18    notice of the nature and type of claims that the TM

19    companies expect to assert in the Forge litigation if

20    the Court grants stay; is that correct?

21         A.    That's correct.  I mean, we've already

22    asserted most of them, like I say.  So there are some

23    new claims against U.S. Bank.  And we've added claims

24    against the Christensens that were coming over from

25    the Toomey litigation.  So like I say, it's all in

1     one place.  It's all to be heard in one spot.

2          Q.     You're familiar with Rule 11?

3          A.     I am.

4          Q.     And you're willing to sign this complaint

5     if the Court allows relief from stay under that rule?

6          A.     Absolutely.

7          Q.     Now, would you look at Exhibit A?

8               THE COURT:  Mr. Shields, what I want to

9     hear from Mr. Scott is what claims do you propose to

10    assert in this document, this pleading, that haven't

11    been raised prior to the petition date against Mr.

12    and Mrs. Christensen and VS Fox Ridge?

13               THE WITNESS:  Those would be the claims,

14    Your Honor, for the breach of contract under the

15    breach of the settlement agreement, which were claims

16    that were being brought in the Toomey litigation, as

17    well as the intentional interference.  Those three or

18    four different claims against the specific debtors.

19    Those were not -- those claims were not put in.  And

20    the reason that's important, Your Honor, is, look --

21               THE COURT:  But those are issues that

22    arose during the discovery in the Toomey matter?

23               THE WITNESS:  That's correct.

24               THE COURT:  Okay.

25               MR. SHIELDS:  Is that satisfactory?

1          THE COURT:  That's helpful to me.  Thank

2     you.

3          MR. SHIELDS:  Okay.

4          Q.    (By Mr. Shields)  Would you look briefly

5     at Exhibit 8 that's already been admitted.  Just

6     confirming that Stan Preston is your partner,

7     correct?

8          A.    Yes.

9          Q.    And have you seen this document before?

10         A.    I have, yes.

11         Q.    This is the one e-mail exchange between

12    Lavar that debtors' counsel eventually stipulated

13    could be admitted.

14              But did you have matters in the Forge

15    litigation that you wanted to proceed with but

16    because of the allegations made by the debtors'

17    attorney, Mr. Lavar Christensen, you chose not to

18    proceed?

19         A.    Yeah.  I mean, there were several.  We had

20    scheduled depositions for Mr. Lavar -- or not --

21    sorry.  Not Lavar, but Mr. Steve Christensen and

22    McKay Christensen.  The day before we were to depose

23    Steve Christensen, Mr. Boley called and talked with

24    Stan Preston and said that they -- you know, he

25    wasn't available.  They wouldn't be able to produce.

1   They didn't feel that -- they felt that the

2   bankruptcy stay precluded the deposition against --

3   that we wanted to take with Mr. Christensen.

4           And then we also, the following day, got a

5   call from Lavar Christensen saying that he felt that

6   the bankruptcy -- because the parties were so

7   intertwined, it also would be a stay and they

8   wouldn't produce McKay Christensen.  He did say that

9   they would produce him, but he said what he would be

10  instructed to do if we were to get into any questions

11  regarding Mr. Freeman or Mr. Forge -- or the entity

12  Forge, he would instruct his client not to answer

13  those questions.

14          And he also told us that he would not be

15  producing any of the documents in the subpoena duces

16  tecum that we had served on McKay Christensen that we

17  were seeking that were relevant, again, to these

18  Forge claims and the claims we were making.

19      Q.      Okay.  Just to draw the Court's attention,

20  would you turn to page 2 of Exhibit 8.  And this is

21  the e-mail from Lavar to Stan dated June 26, 2012.

22  This is post-petition but before that that deposition

23  was scheduled, correct?

24      A.      That's correct.

25      Q.      And look at the sentence, one, two, three,

VS v. Christensen * October 11, 2012          156

1    four, five lines down.  The sentence that starts with

2    "the issues."  Would you please read that into the

3    record?

4         A.    "The issues and defenses are so integrated

5    and Stephen Christensen has been in such a superior

6    position to know the facts and issued involved in

7    this case, that McKay's role is extremely limited and

8    directly affected by the Chapter 11 bankruptcy

9    filing."

10        Q.    Was it partially based on this e-mail that

11   you decided not to proceed with the deposition of

12   McKay?

13        A.    Yeah.  This e-mail, then there was a

14   telephone conference between Stan, myself and Lavar

15   where we discussed these things further.  And so that

16   was -- I -- Stan and I drafted this e-mail back to

17   Lavar saying, look, it's pointless to hold this

18   deposition.  If you're going to instruct your client

19   not to answer questions about Forge and about the

20   various claims that -- the amended claims that we're

21   trying to make, then it will be -- you know, we don't

22   want to waste your time and our time and our clients

23   money by going ahead with this deposition.

24        Q.    And that's when bankruptcy counsel was

25   retained to get relief from the stay, to monitor the

1   bankruptcy case; is that correct?

2        A.    That's correct.

3        Q.    Would you turn to Exhibit 9.  Identify

4   that for the Court.

5        A.    Yes.  This is the -- this looks to be the

6   minute entry that was entered by Judge Taylor once we

7   had filed the notices of the bankruptcies and they

8   had been made.  This was the judge's ruling in

9   regards to whether or not they applied and how we

10   would proceed with the litigation.

11        Q.    And was this in response to briefing that

12   you filed with Judge Taylor?

13        A.    Yes.

14        Q.    What position do you take in that

15   briefing?  "You" meaning the TM companies.

16        A.    Yeah.  Again, like I said, we didn't take

17   a position of whether it applied or not.  We just

18   said --

19             MR. BOLEY:  Your Honor, the briefing is

20   part of the debtors' exhibits.  And perhaps that's a

21   better way of letting the Court know what was told to

22   Judge Taylor is to just offer those as exhibits.

23             THE COURT:  Which exhibits, I'm sorry?

24             MR. BOLEY:  Exhibits H through N, which

25   are pleadings filed by the Preston Scott firm and the

1    two judge's rulings.

2              MR. SHIELDS:  And we don't oppose those,

3    Your Honor.  I think they've been entered into

4    evidence.  I think this witness is able to testify

5    about his knowledge of what they pled and what they

6    argued.

7              MR. BOLEY:  They say what they say.

8              THE COURT:  Well, but they're sitting

9    there like a dead mouse unless somebody tells me

10   about them or draws my attention to relevant

11   information in the documents.  So I think it would be

12   helpful for Mr. Scott to tell me where the nuggets

13   are here, at least at far at their position is.

14   Okay?

15             MR. SHIELDS:  Sure, Your Honor.

16             THE COURT:  All right.  So Exhibits H

17   through N are received without objection.

18             **(EXHIBITS H, I, J, K, L, M AND N ARE**

19   **RECEIVED.)**

20             THE WITNESS:  Do we want to look at those

21   -- do you want to look at those?

22        Q.   (By Mr. Shields)  No.  Just off title --

23   if you want him -- that helps you answer the

24   question.  But I'm not saying you have to go read

25   from those pleadings.

1          A.      Yeah.  Again, we laid down the facts as to

2     what's happened as far as -- the key issue for us is,

3     look, we can't prosecute our claims, we can't defend

4     against our claims unless we have access to the

5     debtors, unless we have access to these documents.

6     And we laid out those facts.

7          Q.      By documents you mean the Toomey

8     litigation?

9          A.      Yeah.  I'm sorry.  The Toomey litigation.

10    And so we laid out those facts and then simply said,

11    look, we've received notices that these proceedings

12    are stayed and we are not willing to -- we're not

13    willing to file anything or to answer anything until

14    we get instruction from the bankruptcy court or

15    whether or not we even can.  I mean, and that's --

16    that was the purpose of those notices, to get

17    instruction.

18             And I didn't go down to the -- there was a

19    hearing in front of Judge Laycock where I believe

20    this was argued.  And she said, I agree.  And she

21    held everything that was pending in front of her,

22    pending, you know, us briefing the issue and getting

23    this in front of the Court to get a determination on

24    the scope of the stay and whether or not it applied.

25         Q.      And wasn't one of the other issues who had

1    authority to determine the scope of the stay, whether

2    that's the state court or the bankruptcy court?

3         A.    That's correct.

4         Q.    And ultimately both state court judges

5    said that should be a bankruptcy court?

6         A.    That's right.

7         Q.    Would you look on page 2 of Exhibit 9 and

8    just read that last sentence of the first full

9    paragraph starting with the "Potential debtor"?

10        A.    "Potential debtor or claimant to an

11   interest in the property is by any measure a person

12   needed for just adjudication of the rights of all

13   parties.  In other words, indispensable within the

14   scope of Rule 19, URCP."

15        Q.    And then the next sentence as well.

16        A.    "A far more sensible approach is to defer

17   and allow the questions of the scope of the stay to

18   be raised and determined in the bankruptcy court."

19        Q.    Thank you.  Now, would you turn to

20   Exhibit 10, which is the next exhibit.  Identify that

21   for the Court.

22        A.    Exhibit 10 is Judge Laycock, her ruling

23   with regards to the stay.  She says that she's seen

24   Judge Taylor's and she accepts what Judge Taylor

25   said.  She also says she believes the debtors are

VS v. Christensen * October 11, 2012          161

1   indispensable parties.  And again says that she'll

2   wait to hear from the bankruptcy court.

3        Q.    And on page 2, the first full paragraph

4   starts with "This court agrees."  Go down to the

5   middle of that paragraph, the sentence in the fourth

6   line that starts "This court also agrees."  Please

7   read that to the end of the paragraph.

8        A.    "This court also agrees with Judge

9   Taylor's assessment of the indispensability of all

10  claimants and to the real property at issue in this

11  case.  Attempting needed discovery without all

12  parties involved would only create," -- it says

13  created but it should be -- "would only create

14  confusion and delay in this state court matter.

15  Certainly the reasonable and sensible approach is to

16  defer to the bankruptcy court and to allow that court

17  to determine the scope of the stay when the issue is

18  raised in that court."

19       Q.    Thank you.  In your opinion, are the

20  claims against the debtors and non-debtors, the

21  debtors being VS Fox Ridge, Steve and Vicky

22  Christensen, are they intertwined with the claims

23  against the other parties in the counterclaim,

24  cross-claims and third-party complaints?

25       A.    Absolutely.

VS v. Christensen * October 11, 2012          162

1        Q.     How?

2        A.     They're intertwined because, again, Forge

3   is seeking claims against all of the debtors,

4   codebtors and then the debtors here.  When it said

5   codebtors, the debtors in the foreclosure actions.

6   They're uniquely intertwined between their

7   connections between the defendants, the debtors, and

8   Forge.  It's so mingled together that there's no way,

9   unless we -- there's access to all the debtors to

10  take depositions, to conduct discovery, that our

11  clients would ever be provided the due process

12  they're entitled if they can't have access to those

13  -- to all the parties.

14       Q.     Can the TM companies fully and fairly

15  litigate their claims and defenses without having the

16  debtors as parties?

17       A.     No.

18              MR. SHIELDS:  That's all the questions.

19              MR. BOLEY:  Your Honor, are we going to

20  break for lunch before we continue?

21              THE COURT:  What would be your preference?

22              MR. BOLEY:  It'd be my -- I think it'd be

23  the debtors' preference to break now.

24              THE COURT:  All right.  Mr. Shields, is

25  that okay with you?

1          MR. SHIELDS:  That's fine with me, Your

2    Honor.

3          THE COURT:  All right.  How much time do

4    you want to take?

5          MR. BOLEY:  Forty-five to 60 minutes or --

6    as much longer as you want.

7          THE COURT:  Well, I'd like us to finish

8    today.  I think everybody would agree with that, if

9    we can.

10          MR. HARRINGTON:  Your Honor, could I just

11    -- I mean, I have some other appointments this --

12          THE COURT:  Have you got something else to

13    do?

14          MR. HARRINGTON:  I actually do.

15          THE COURT:  Yeah.

16          MR. HARRINGTON:  I don't know how long

17    they would --

18          MR. SHIELDS:  Maybe we can finish with

19    this witness and then take a lunch break.

20          THE COURT:  Well, Mr. Scott, can I ask you

21    to come back at 1:00 and finish then?

22          THE WITNESS:  Sure.  Sure.

23          THE COURT:  Okay.  Let's do that.  Thank

24    you.

25          THE BAILIFF:  All arise.

VS v. Christensen * October 11, 2012          **164**

```
 1            (Lunch break from 12:09 to 1:05 p.m.)

 2            THE BAILIFF:  All arise.  The Court

 3   resumes its session.

 4            Please be seated.

 5            THE COURT:  All right.  Mr. Berry, you had

 6   this witness?

 7            MR. BERRY:  Yes, Your Honor, if that's

 8   okay.

 9            David Berry appearing on behalf of

10   debtors, the Christensens.

11

12                   CROSS-EXAMINATION

13   BY MR. BERRY:

14       Q.    Giving the Court a little bit of a

15   roadmap, I'm first going to address the Court's

16   question as to what is new in the proposed Judge

17   Taylor counterclaim, cross-claim, third-party

18   complaint that we saw it for the first time on

19   October 9th that you testified earlier you prepared.

20       A.    That's correct.

21       Q.    And so I would like to you -- and I

22   believe you testified that there were just a couple

23   of new causes of action in there against these

24   defendants.

25       A.    The new cause of action, if I recall --
```

VS v. Christensen * October 11, 2012          165

1   again, I haven't seen the other amended counterclaim

2   for a while, or the other counterclaim for a while.

3   The claims against the Christensens individually and

4   against McKay Christensen and the claims against U.S.

5   Bank.  I believe there's probably six claims that

6   aren't -- again, I shouldn't say -- they're new

7   compared to what was in that.  They're not new claims

8   that no one's ever heard of or seen before.  Again,

9   what we did was when the debtors in this case said,

10  look, we've got litigation in all these various

11  places --

12       Q.    So let's look at Exhibit B in front of

13  you.

14       A.    Do you want me to finish?

15       Q.    No.  You've gone beyond my question.

16       A.    I don't think I did, but...

17       Q.    Let's look at Exhibit B.

18       A.    B?

19       Q.    B as in baker.

20       A.    Okay.

21       Q.    And this pleading has your name on it,

22  correct?

23       A.    It does.

24       Q.    And it's entitled what?

25       A.    Motion for leave to file an amended

VS v. Christensen * October 11, 2012          166

1     answer, a counterclaim and third-party complaint and

2     for a corresponding amendment to the scheduling

3     order.

4          Q.     And what's the date of this document?

5          A.     May 24th.

6          Q.     May 24th.  Less than a month before the

7     bankruptcies in this case were filed.  So who were

8     you seeking as counsel to file counterclaims and

9     third-party complaints against in Exhibit B on May

10    24th?

11         A.     Forge and Mr. Freeman.

12         Q.     Only Forge and Mr. Freeman.

13         A.     That's correct.

14         Q.     Not against any of the debtors in these

15    bankruptcy proceedings.  None of them are named as

16    third-party or cross-claims.

17         A.     They're not named because those claims

18    were already in front of Judge Toomey, that's

19    correct.  They would have been duplicative claims in

20    different lawsuits, which could have had different

21    results.  That's why we didn't put them in the

22    original.

23         Q.     And that same answer is true if you look

24    at Exhibit A that indeed on May 24th, when you did

25    your motion to amend, you weren't suing any of the

1  debtors in this case, none of them, correct?  Exhibit

2  A, Judge Laycock.

3       A.    That's correct, yeah.

4       Q.    And if we look at the complaints you have

5  attached as your proposed amended complaints to both

6  of those proceedings, attached as, I believe,

7  Exhibits A to Exhibit A and Exhibit A to Exhibit B,

8  you're not naming any causes of action against either

9  of these debtors, right?

10      A.    Yeah.  I think I've given my explanation

11  for that, yes.

12      Q.    But when we look at Exhibit 6, every

13  single cause of action, every single cause of action

14  is pled against the Christensens, correct?

15      A.    No.  I don't believe that's correct.

16      Q.    Well, let's turn to page 64 of Exhibit 6.

17      A.    Okay.

18      Q.    Prayer for relief.  Why don't you read

19  those first five lines under prayer for relief.

20      A.    "Wherefore the TM parties pray," right

21  there?  Is that correct?

22      Q.    Yes.

23      A.    "And request that the Court enter judgment

24  against Atlas Development, Forge Investments, the

25  Christensen parties, Mr. Freeman and U.S. Bank as

1    follows:  On all causes of action for actual and

2    consequential damages to the TM parties" --

3         Q.    That includes the Christensens, does it

4    not?

5         A.    Yeah.  And all --

6         Q.    Every single cause of action --

7              THE COURT:  Mr. Berry.

8              THE WITNESS:  Wow.

9              THE COURT:  Mr. Berry, back away from the

10   podium.

11             MR. BERRY:  Yes, Your Honor.

12             THE COURT:  Okay.  Are you looking at me?

13             MR. BERRY:  Yes, Your Honor.

14             THE COURT:  Okay.  That will not be

15   tolerated.

16             MR. BERRY:  Yes, Your Honor.

17             May I approach the podium again?

18             THE COURT:  Yes.

19        Q.    (By Mr. Berry)  So indeed the only honest

20   answer before this Court is that every cause of

21   action, every single cause of action in your proposed

22   amended pleadings that you've put together or we

23   first saw on October the 9th, every single cause of

24   action is new?

25        A.    No.

VS v. Christensen * October 11, 2012          **169**

1      Q.    In the Taylor case, every single cause of

2    action is new.  Had they ever been pled before in the

3    Taylor case?

4      A.    All the claims against Forge and

5    Mr. Freeman had been pledged.  When you look at that

6    and you say all causes of action --

7      Q.    My question --

8      A.    If you look in the causes of action -- no,

9    you asked me a question.  Now I'm going to answer it.

10   If you look at the causes of action, every one of

11   them identifies who the cause is against.  So when

12   you look at claims 10 and 11, for example, that are

13   against U.S. Bank only, those aren't against the

14   Christensens.

15     Q.    All right.

16     A.    So when it says all causes of action, all

17   the cause of actions have named who the causes are

18   against, sir.

19     Q.    Indeed there were no causes of action

20   previously pled or have ever been pled in the Taylor

21   or Laycock cause of actions, ever against either of

22   these debtors, still hasn't been pled yet today,

23   other than this proposed pleading; is that correct?

24     A.    That's correct.  Yeah.  I've answered that

25   several times.

VS v. Christensen * October 11, 2012          170

1          Q.     Let's go to Exhibit F.  I'm now in my

2     roadmap going to your discussion on direct that

3     Mr. Christensen refused to testify after the filing

4     of the bankruptcy.  And if we go to page 2 of

5     Exhibit F, at the first paragraph does it not say

6     that counsel, in this case Mr. Boley, is not

7     available to attend?  It doesn't say that

8     Mr. Christensen will never attend, does it?

9          A.     No.  I didn't say that he never would

10    attend.  I said that he was not presented the day for

11    the deposition.  Mr. Boley informed us he couldn't be

12    there, he wasn't going to be there, and therefore

13    they're not going to produce him for the deposition.

14    He did -- there was discussion about, look, we might

15    be able to take this later.  We said, well, we've got

16    the discovery cutoff deadline.  He said, you know, we

17    could probably go past that.  But it's never gone

18    anywhere since then because of the bankruptcy.  So,

19    yeah, I didn't mean to insinuate that he was never

20    going to be presented.  But he was -- on the date

21    that we had him scheduled, we were told he would not

22    be presented for his deposition that date.

23         Q.     In fact, the next paragraph provides for

24    some dates, correct?

25         A.     That's correct.

VS v. Christensen * October 11, 2012          **171**

1      Q.     And if we go to Exhibit G, again going to

2  availability of, in this case, Mr. McKay Christensen.

3  Does it not say that he would be willing and prepared

4  to go forward?

5      A.     Yes.  I believe that's what I said this

6  morning.  But the context there is the important

7  thing.  He was not willing to show up on the date of

8  his deposition and testify regarding Forge or the

9  thing -- or bring the documents that we had asked him

10  to bring.  Therefore, that's why that deposition --

11  we made the decision not to go forward that day.  And

12  just said that we would discuss further in the future

13  if we could get together and do that.

14      Q.     Not a refusal, just a rescheduling

15  request.  All right.

16           Going back to Exhibit 6.  So I'm trying to

17  understand what's -- isn't it true that in essence

18  you took every single allegation in the Toomey case

19  and you're attempting to move it over and litigate it

20  in two forums in front of Judge Taylor as against the

21  Christensens?

22      A.     What do you mean in two forums?  I'm not

23  sure.

24      Q.     Well, there's a pending action in front of

25  Judge Toomey, correct?

1        A.     Correct.

2        Q.     And basically you just incorporated all of

3    those causes of action into the Taylor action by your

4    proposed documents?

5        A.     Yeah.  All of those causes of action are

6    just as applicable in the Taylor litigation as they

7    are the Toomey litigation.  We've only sought -- my

8    understanding is that the relief from the stay that's

9    been sought in the Toomey litigation is just to have

10   the protective order amended so those documents -- we

11   could have access to.

12       Q.     And then you added additional causes of

13   action.

14       A.     They're the same cause of action that I

15   believe were in the Toomey case; now in the Taylor

16   case.

17       Q.     There's no conspiracy cause of action in

18   the Toomey case.

19       A.     That could be -- that's possible.

20       Q.     There's no RICO causes of action in the

21   Toomey case?

22       A.     I believe there's amended counterclaim in

23   the Toomey case.

24       Q.     So in essence, we would -- not only have

25   you added new causes of action that never existed

1    previously, you never even requested prior to the

2    filing of the cases.  But now you're trying to have

3    litigation in two forums at the same time, same

4    causes of action?

5         A.    No.  There won't be any continuation of

6    the causes of action in the Toomey case.  Those will

7    be stayed based on --

8         Q.    So you'll dismiss those in the Toomey

9    action?  Those will be dismissed leaving only the

10   remaining cause of action involving the third

11   parties, so to speak, directly?

12        A.    Well, it's not up to me to dismiss those

13   claims in the Toomey action.  But my understanding is

14   to get everything in front of one judge and one

15   forum.  That was the point of doing this --

16        Q.    That would require --

17        A.    -- Exhibit Number 6.

18        Q.    That would require a dismissal in the

19   Toomey action, correct?

20        A.    That could be possible.

21        Q.    Well, it either is or it isn't.  If not,

22   then you're pending in two different courts, right?

23        A.    I guess that's correct.

24        Q.    And you're asking this Court to let you

25   have pending actions, some duplicative, in two courts

VS v. Christensen * October 11, 2012          174

1   at the same time?

2        A.    They would all be in one action.  They

3   would not be proceeding in the other action.

4        Q.    But you're not willing here today to say

5   that you're going to dismiss all of the causes of

6   action in Toomey?

7        A.    It's not my case, sir.  I don't -- that's

8   not my call.

9        Q.    You're not aware of anyone saying they're

10  going to dismiss the causes of action in the Toomey

11  case?

12       A.    I'm not -- yeah, I'm not sure.  I don't

13  know that they would dismiss them or not.  They may

14  dismiss them without prejudice to bring them.  I

15  don't -- you'd have to ask Mr. Manning that question.

16            MR. BERRY:  May I have one moment with

17  co-counsel, Your Honor?

18            THE COURT:  Yes.

19       Q.    (By Mr. Berry)  I'm going to ask you to

20  look at Exhibit I, please.

21       A.    Okay.

22            THE COURT:  Mr. Berry, I'm sorry but

23  you've been referring to a number of exhibits that

24  you haven't offered.  So it'll be up to you to figure

25  out what you've done here.  For example, I right now

VS v. Christensen * October 11, 2012          175

1    has been received.  But I think you've referred to

2    Exhibit F, which was Mr. Boley's e-mail to

3    Mr. Scott's partner, but that wasn't offered.

4              MR. BERRY:  I would move the Court for

5    Exhibits F and G to be entered.

6              THE COURT:  G's already been received.

7              Any objection to Exhibit F, Mr. Shields?

8              MR. SHIELDS:  No, Your Honor.

9              THE COURT:  All right.  Exhibit F is

10   received.

11             **(EXHIBIT F IS RECEIVED.)**

12             MR. BERRY:  I believe Exhibit 6 was

13   previously received by the Court, Your Honor.

14             THE COURT:  It was.  And then you also

15   referred back to Exhibits A and B.  Did you want

16   those received?

17             MR. BERRY:  Yes, please, Your Honor.  I

18   would move for Exhibits A and B to be entered into

19   evidence.

20             THE COURT:  Mr. Shields?

21             MR. SHIELDS:  No objection, Your Honor.

22             THE COURT:  All right.  Exhibits A and B

23   are received.

24             **(EXHIBITS A AND B ARE RECEIVED.)**

25             THE COURT:  All right.  Sorry to interrupt

VS v. Christensen * October 11, 2012          **176**

1    you.  Go ahead.

2                    MR. BERRY:  No.  Thank you for that

3    housekeeping matter, Your Honor.

4         Q.    (By Mr. Berry)  So Exhibit I, you prepared

5    that?  Your name's on it at least.

6         A.    That's correct.

7         Q.    And this is a notice of bankruptcy you

8    filed on behalf of your clients in the Judge Taylor

9    case?

10        A.    That's correct.

11        Q.    And this document was filed July 2nd?

12        A.    Yes.

13        Q.    And that actually predates the filing of

14   the notice of bankruptcy by either of these debtors

15   in that case, correct?

16        A.    I'm not sure.

17        Q.    If we look at exhibit --

18                    One moment, Your Honor.

19                    THE COURT:  Yeah.  In the Toomey matter,

20   Exhibit 3, which has been received, was -- looks like

21   it was filed on or about July 2nd.

22                    MR. BERRY:  And in the Taylor action, Your

23   Honor, I believe that's Exhibit Number 12, which is

24   the docket sheet.  Entry dated July 11th.

25                    THE COURT:  Well, I'm looking at

VS v. Christensen * October 11, 2012          177

1    Exhibit 5, Mr. Berry, which is your notice of

2    bankruptcy, which is dated July 11th.

3              MR. BERRY:  Yes, Your Honor.

4              THE COURT:  Okay.

5              MR. BERRY:  I would move for entrance of

6    Exhibit Number 5, but I think that's already been

7    accepted by the Court.

8              THE COURT:  Exhibit 5 has already been

9    received, yes.

10        Q.   (By Mr. Berry)  So on page 4 of Exhibit I,

11   the first line under Statement of Facts, does it not

12   say defendants' position -- it's the defendants'

13   position, I guess.  Defendants' position that this

14   lawsuit is stayed?

15        A.   Where are you again?  I'm sorry.

16        Q.   The first line under Statement of Facts.

17   The first -- beginning of the first sentence.

18        A.   Yeah.  I mean, stayed based on those facts

19   and the plain language is the notices that we'd

20   received from both you and Mr. Boley.

21        Q.   And on page 9, again in bold print as a

22   heading, "Lawsuit is stayed by the Christensen

23   defendants pending Chapter 11 bankruptcy."  Correct?

24        A.   That's what it says, yes.

25        Q.   I'm curious, when we get down to the next

1    paragraph on page 9, "In addition, based on the

2    Christensen defendants bankruptcy, S. Christensen," I

3    assume you mean Steve Christensen?

4          A.    Yeah.  I believe he's defined earlier.

5          Q.    "Refused to appear at a deposition in this

6    case."

7          A.    Yeah.

8          Q.    He refused?

9          A.    He refused to appear at the deposition we

10   had set.

11         Q.    Didn't we just read that Mr. Boley was

12   arranging for -- it was a scheduling issue of

13   counsel, it wasn't a refusal?

14         A.    We can go back to that e-mail.  I can show

15   you right where Mr. Boley said he won't be attending

16   based on either the stay and/or his unavailability.

17              THE COURT:  Mr. Berry, I've read the

18   e-mail as well.  You don't need to go through that

19   again.

20              MR. BERRY:  All right.  I tender the

21   witness, Your Honor.

22              THE COURT:  Mr. Shields, anything further?

23              MR. SHIELDS:  No further questions, Your

24   Honor.

25              THE COURT:  All right.  Thank you,

1   Mr. Scott.  You're excused.

2            MR. SHIELDS:  Your Honor, could I just

3   verify that all our exhibits have been admitted, 1

4   through 14.  I think they have.

5            THE COURT:  Yes.  Except for the exhibits

6   attached to 6.

7            MR. SHIELDS:  Okay.  And we didn't have

8   any -- I think that was a request by debtors'

9   counsel.  Yeah, we --

10            THE COURT:  That was the extent of their

11   stipulation and you didn't offer it --

12            MR. SHIELDS:  Okay.  I'll offer it --

13            THE COURT:  You didn't argue anything else

14   so.

15            MR. SHIELDS:  Okay.  With all those

16   exhibits in then we rest, Your Honor.

17            MR. BOLEY:  Your Honor, before the debtor

18   begins offering evidence, would the Court entertain a

19   motion for judgment as a matter of law?

20            THE COURT:  I'm going to deny it.  But if

21   you want to argue it for the record, go ahead.

22            MR. BOLEY:  I'll just proceed then.

23            THE COURT:  Yeah.  I mean, it's your

24   burden.

25            MR. BOLEY:  It's the debtors' burden?

VS v. Christensen * October 11, 2012          180

1         THE COURT:  Of course it is.  That's what

2    the statute says.  I mean, do you want me to quote it

3    to you?

4         MR. BOLEY:  Sure.

5         THE COURT:  362(g), and I'm pulling that

6    out of my back pocket, but if I'm wrong please

7    correct me.  "The party requesting such relief has

8    the burden of proof on the issue of the debtors'

9    equity and property," that's not an issue here.  "And

10   the party opposing such relief has the burden of

11   proof on all other issues."

12        The only thing Mr. Shields has to prove

13   when he comes in here on a motion for relief for

14   cause is that his client was participating in

15   litigation with the debtors pre-petition and that

16   litigation was stayed by the filing of the petition.

17   Everything else he's provided is in support of his

18   motion.  The burden is completely on the debtors to

19   prove to the Court that they're entitled to

20   maintenance of the injunction.

21        MR. BOLEY:  Understood, Your Honor.

22        THE COURT:  All right.

23        MR. BOLEY:  The debtor will prove that

24   cause does not exist.  The debtor calls Stephen

25   Christensen to the stand.