1          You were on the stand earlier.  May we

2     treat Mr. Christensen as still under oath, Your

3     Honor.

4               THE COURT:  Yeah.  Mr. Christensen, you

5     understand you're still under oath?

6               THE WITNESS:  Yes.

7               THE COURT:  Thank you.

8

9               **Stephen Christensen**,

10      called as a witness, having been previously sworn,

11           was examined and testified as follows:

12

13                   **DIRECT EXAMINATION**

14     **BY MR. BOLEY**:

15        Q.     You understand that the two jointly

16     administered bankruptcy cases before this court are

17     Chapter 11 cases, right?

18        A.     Yes.

19        Q.     And you understand that at some point

20     what's of significance to the Court and creditors is

21     a plan of reorganization?

22        A.     Yes.

23        Q.     Let's discuss and share with the Court

24     some of the plans that you've been formulating that

25     will result in a plan of reorganization in payments

VS v. Christensen * October 11, 2012          182

1    to creditors, starting first with you and Vicky's

2    personal estate.  How do you plan to fund a

3    reorganization?

4          A.    Well, we have -- we have the $300,000

5    that's owed to us as points and fees for being the

6    only guarantor on a refinance under the resolutions

7    of the company.  That's about as --

8          THE COURT:  I'm sorry, Mr. Christensen.

9    That's owed to you by who?

10          THE WITNESS:  I think it's Mountain Home

11   Development specifically, but I say the Traverse

12   Mountain companies.  But Mountain Home Development is

13   one of those companies.  I think that's the primary

14   obligor on the refinance of what we call the Satori

15   loan.  And under the resolutions I was supposed to

16   get paid ten points as the other guarantors took out

17   on the others loans and have already been paid.

18   They've already received their points and fees, but

19   they never -- the companies, Mountain Home

20   Development has refused to pay me those points and

21   fees.

22          There's also the Solitude Development

23   water shares.  I think that's more of a VS item than

24   it is if you're just asking me about Stephen and

25   Vicky.

1          Q.      (By Mr. Boley)  Just go ahead and we'll --

2          A.      Okay.

3          Q.      And you can sort through which ones are VS

4     and which ones are --

5          A.      There's an option on some water shares

6     that Solitude Investments owned.  And we've proposed

7     to dissolve that company.  It hasn't done business

8     for maybe five years or so.  And sell and liquidate

9     those water shares that aren't pledged or to be used

10    for anything, and that would bring in cash to the

11    estate, the bankruptcy proceedings.

12              There are going to be -- I'm working, as I

13    mentioned earlier, on the fees, consulting and

14    management fees.  I've been doing this for 40 years

15    and I have several developments that I believe that I

16    can get increased fees with.  And I'm working very

17    hard on doing that right now.

18              There's also the litigation that, I know

19    it sounds awful, you talk about trying to make -- I'm

20    not trying to make money off of the litigation, I'm

21    just trying to defend and protect our family.  And we

22    believe in those causes with all of our heart even

23    though they haven't had the funds to fight against

24    Traverse.  They're basically using our assets to

25    borrow money and fight us.

VS v. Christensen * October 11, 2012          184

```
 1        Q.     Let me stop you there.  I know that you've

 2    talked about claims, and obviously those were listed

 3    in the schedules.  Some of the claims we looked at in

 4    the schedules are not yet pending with any court.

 5    There were claims pending in the Judge Toomey case

 6    that we discussed.  Do you recall that?

 7        A.     Yes.

 8        Q.     Now, the Court's probably interested, as I

 9    and all the other parties are interested, how this

10    estate with very limited resources is going to take

11    claims and turn them into something other than

12    claims?

13        A.     We've been negotiating and interviewing

14    with several law firms to defend us in those claims.

15    And one firm has agreed to defendant us in the Toomey

16    case.  And --

17        Q.     Did you mean the Kennedy case?

18        A.     Excuse me.  The Kennedy case.  I'm sorry.

19    Yes.

20               And the other in -- and we're still

21    negotiating.  Some with contingency firms that are

22    very interested.  And the firm that's taking the

23    Kennedy case may also end up taking the Toomey case.

24        Q.     So in addition to that firm, have you --

25    do you have any appointments scheduled with attorneys
```

VS v. Christensen * October 11, 2012          185

1   to discuss them taking over the Toomey case?

2        A.    Yes.   I've been negotiating for some time.

3   But I have other meetings next week on Tuesday and

4   Wednesday with two firms on both of those that are

5   very interested.

6        Q.    And we spent some time this morning, we

7   looked at the layout of the Traverse Mountain

8   entities as you were discussing what those entities

9   owned and controlled.   And we tried to extrapolate

10  from that perhaps what the stock ownership or the

11  member -- the limited liability ownership that's

12  owned by these estates might be worth.   What's the

13  plan?  How do we take that stock and those membership

14  interests and realize on that to pay creditors in our

15  case?

16       A.    Well, I mentioned earlier that the Steve

17  Craig outlets is going to open.   And that -- there's

18  residual income that comes in for our shares of those

19  outlets.   It's a contracted.   I signed and put

20  together with them.   And there'll be residual income

21  for as long as that shopping center exists and we

22  have a partnership with them.

23            There is also some additional property

24  that's not part of the first phase.   We can enhance

25  that value and get increased value out of it, I

1   believe, and be able to generate more income even

2   though I'm not directly in control of those extra

3   parcels, the companies are.

4            But the -- there's also the -- on the

5   property there's several parcels that apartments

6   could be built on, high-density, single families.

7   Probably over 1,000, maybe 1,000 lots left or more

8   besides the commercial property and the factory

9   outlets.  All of that -- all of that could be used to

10  help settle my bankruptcy estate.  It's a substantial

11  amount of property and property we worked very hard

12  on.  I worked for 40 years for us to be able to get

13  to this point, the time in our life to be able to

14  develop this.  So I don't know if that answers your

15  question or not, but...

16            Q.    You've talked about one alternative use of

17  the stock is to hold it and wait for income to be

18  distributed by the companies.  You understand that's

19  not going to happen until the companies pay their

20  debts, right?

21            A.    Yes.

22            Q.    Have you explored any other alternatives

23  for the stock?

24            A.    We've talked -- I've talked to some

25  company -- or some investors about purchasing our

1   shares, even purchasing the lawsuits because of where

2   we're at, the hardship that we're going through.  And

3   there's some interest.  They're weighing out and

4   measuring and looking at the litigation and looking

5   at what they think the shares might be worth.  And

6   they haven't gotten back to me yet.

7        Q.     Are you saying that one of the problems in

8   exploring the sale of the stock is you're unable to

9   provide sufficient evidence or information to a

10  potential buyer so they can evaluate the value of the

11  stock?

12       A.     Yes.  I mean, the production of documents

13  and having the valuations and all the things that

14  haven't been shared with us in board meetings.

15  There's been transactions that have taken place that

16  have been concealed from us.  There's just so much we

17  don't know.  We're locked out and frozen out from so

18  much information, even since Judge Toomey's ruling.

19  They stopped holding board meetings.  And as far as

20  we can tell, just be doing title searches,

21  transactions are going on and taking place and

22  happening, money exchanging hands.  But we were not

23  made aware of it and don't understand and know what

24  all the values are.  And it would be -- having all of

25  the information that's needed would really be helpful

VS v. Christensen * October 11, 2012                    188

1    in determining what the assets -- what we think the

2    assets are worth.

3         Q.    Let's be specific.  Obviously I've not

4    filed a motion on your behalf for 2004 Examination

5    yet.  But what type of information could we ask from

6    the companies that you could then use, based on your

7    expertise, to determine the value of your stock

8    ownership?  What documents would we be asking for

9    that we don't now have?

10        A.    Well, it'd be -- they joint ventured --

11   Traverse Mountain companies joint ventured would a

12   company called Riverbend.  And they haven't told us

13   what's happened with regards to that.  They've

14   indicated.  I've heard rumors on the street.  We've

15   done some title searches, and it appears that they

16   sold out of that partnership without us even knowing

17   and pulled out millions of dollars.  I'm sure they're

18   using it to defend -- that's where they get all the

19   money to pay all these people to come here today and

20   fight us on this whole transaction.  But so there's

21   -- our family's --

22        Q.    So I'm sorry.  I probably wasn't very

23   clear.  I want -- because it's helpful to me and

24   perhaps the Court to understand.  We've said we don't

25   know what the stock's worth.  But let's be specific

1   on what could we ask for that if we obtained it would

2   then tell us what the stock might be worth.  What

3   would we ask for?

4       A.    What documents?

5       Q.    Yes.

6       A.    I would ask for the closing transaction of

7   Riverbend, which we're supposed to know every little

8   detail about.

9       Q.    Okay.

10      A.    Okay.  I would want to know about that.  I

11  would want to know about most recent appraisals.  I'd

12  want to know what they've sold and what value they

13  placed on those properties with Riverbend.  And what

14  they transferred them out for and sold them to them

15  for.  I don't even know.  And our whole family owns

16  35 percent of the entire transaction.  And they're

17  sitting on the money or sitting on the transaction

18  and I don't know.  So I want all the documents.

19      Q.    So you want to see the closing documents

20  on Riverbend?

21      A.    Yeah.  And more.  I'd want -- I'd want --

22  like I said, I'd want to see appraisals.  I'd want to

23  know what's happening with regards to hard money

24  loans that they've taken on out.  Have they dispersed

25  funds to the shareholders, other shareholders but not

VS v. Christensen * October 11, 2012          190

1   me?  Have --

2        Q.     So you'd want to see what assets are

3   encumbered and what assets are unencumbered, is

4   that --

5        A.     Yes.  And the terms of the notes and the

6   agreements and the interest rates and who's getting

7   paid money and who's not getting paid.  How much are

8   the CEO and CFO and other people and the corporate

9   counsel, how much are they paying corporate counsel?

10  Corporate counsel --

11       Q.     So let me stop you there.  I'm sorry.  I

12  know the judge wants us to get done today.  And I

13  apologize.

14       A.     I'm sorry.

15       Q.     The same information that you need to

16  evaluate what you're selling as a prospective seller,

17  is that the same information that you'll need to be

18  able to provide to a prospective buyer of your stock?

19       A.     Yes.  They need to know the details of

20  what's happening there.

21       Q.     What about -- you mentioned rights of the

22  settlement agreement to repayment of a member loan.

23  How could that effect your reorganization?

24       A.     Like I showed, it's like a million-seven.

25  My son loaned them $400,000.  And he has a note.  Our

VS v. Christensen * October 11, 2012          191

1   family has member loan notes that none of them have

2   been paid back.  But there's millions that have been

3   dispersed out to corporate insiders, and it's self --

4   anyhow.  Without --

5        Q.    So 1.7 million could come in on your

6   member loan?  That was listed in your schedules; is

7   that accurate?

8        A.    Part of that's Penga, as I talked about

9   before, is the Key Bank loan.  Part of that amount

10  is.

11       Q.    So it could be used to satisfy Penga?

12       A.    Satisfy -- absolutely.  And they agreed to

13  do that in a settlement agreement.  Sherry

14  Christensen, who's my brother's widow, he passed away

15  when we were doing these -- just before we did these

16  transactions, of brain cancer.  But she is having a

17  really hard time, and she has member loans that

18  should be paid as well or could be paid.

19       Q.    Let me turn your attention a little bit.

20  Some of the liabilities, maybe the largest

21  liabilities in this case, they're guarantees.

22  They're guarantees to U.S. Bank; is that correct?

23       A.    Yes.

24       Q.    And are those loans owed principally by

25  what we've referred to as the a Traverse entities?

VS v. Christensen * October 11, 2012          192

1           A.      Yes.   The Mountain Home Development and

2    Fox Ridge Investments or Triumph Commercial

3    Investments, the name they've replaced Fox Ridge

4    with.

5           Q.      So to the extent Forge were able to

6    collect or were voluntarily paid by the Traverse

7    entities, that could reduce or extinguish your

8    potential guarantee liability?

9           A.      It could.

10          Q.      As far as your plan?

11          A.      Yes.

12          Q.      Let's talk a little bit about what's being

13   asked for today and how that's going to impact the

14   bankruptcy estate if it's granted.   Do you understand

15   what the TM parties are asking for?   What (inaudible)

16   they're asking for?

17          A.      I think I do.   They're asking to be

18   removed from the stay so they can go down and start

19   filing other actions against our family basically and

20   these other cases.   And it increases our legal costs

21   and --

22          Q.      Let me stop you there.   Let's turn to

23   Exhibit 6 in the binder with numbers.

24          A.      Okay.

25          Q.      Are you there?

VS v. Christensen * October 11, 2012          193

1          A.     Yes.

2          Q.     Now, we -- I understand other witnesses

3    have testified in the motion request that the leave

4    being requested from this court will permit the

5    filing of this counterclaim, cross-claim and

6    third-party complaint in the Taylor action.  Please

7    tell the Court whether, as of today, there's any

8    action pending against you or VS by any of these TM

9    parties in the Taylor action.

10         A.     I don't know that I completely understand.

11   I think all of the -- it looks to me like almost all

12   of these claims are in the Taylor -- well, it's been

13   a long time since I've looked at the --

14         Q.     Let me -- it's true there's not a pending

15   cross claim against you in the Taylor action?

16         A.     No.  I don't believe there is.

17         Q.     And it's true that the RICO claims that

18   would be asserted against you in the Taylor action

19   have never been asserted against you or VS in any

20   court.

21         A.     I believe that's true.

22         Q.     Now, you've been involved in several

23   lawsuits over the last couple of years; is that

24   correct?

25         A.     Yes.  In Traverse Mountain and 30, 40

VS v. Christensen * October 11, 2012          194

1   years before that.  I haven't filed maybe -- I had

2   one small case in business that I filed against

3   someone, one or two very small cases.  I think I

4   previously testified to that in the bankruptcy

5   preliminary hearings.

6        Q.    Based on your experience to date, and

7   based on your business judgment as the manager of two

8   bankruptcy estates, what would you estimate to be the

9   potential legal expense to defend the claims that are

10  listed in this Exhibit 6?

11       A.    I don't know.  We've spent over a million

12  dollars just in, I think, the Toomey case; which a

13  lot of this is just a repeat of everything that's in

14  there.  It's hard to say how much it would cost.  I

15  believe it would really -- it would be crushing for

16  us to have to be able to try and do this while we're

17  trying to do our plan or while I'm trying to pursue

18  those other claims to have this one layered in on top

19  of all that.  I don't know what the exact cost would

20  be.

21       Q.    Could the bankruptcy estate afford to hire

22  counsel to vigorously defend this action in state

23  court?

24       A.    I don't believe so.  I told you I'm

25  talking to these law firms about contingency cases

VS v. Christensen * October 11, 2012          195

1   for the -- about them defending us.  And they're open

2   to it and really reviewing it because we have spent

3   so much money that they might try and close -- do the

4   closing legal on those cases.  But this is new, and

5   I've not talked to anybody about this.  And I don't

6   know, I think this would be very difficult for us to

7   be able to do on top of those other cases.

8        Q.    And the cases you referred to, your

9   discussions with counsel, you're asking -- you're

10  exploring the possibility that a firm might, on a

11  contingency fee basis, represent you on cases where

12  you're the plaintiff?

13       A.    Yes.

14       Q.    And then they would get paid from a

15  positive recovery if you prevail?

16       A.    Yes.

17       Q.    Are you aware of any firm that's going to

18  defend you on a contingency fee basis?

19       A.    No.

20       Q.    How would things proceed differently if

21  the Court denies the motion for relief and claims

22  that are asserted against you are dealt with in this

23  bankruptcy case through the normal claims allowance

24  process, as far as expense goes?

25       A.    Well, I feel -- I'm feeling really

1    optimistic about being able to defend myself on the

2    existing claims that are in place, absent this.  And

3    I'm working really hard on a plan.  I've raised a lot

4    of money over the years with investors.  And I feel

5    really good about the prospects of what's happening

6    with the outlets and with the cash that's owed to me

7    in this bankruptcy that's not -- I haven't received a

8    penny for our family in four years.

9         Q.    I asked the question poorly.  I'm sorry,

10   Stephen.

11        A.    Yeah.  I'm sorry.

12        Q.    You're trying to answer my question.  It's

13   my fault, bad question.

14              Let me ask it this way.  I represent VS

15   Fox Ridge, LLC in this bankruptcy case; is that

16   correct?

17        A.    Yes.

18        Q.    The scope of my representation does not

19   extent to state court, correct?

20        A.    Correct.

21        Q.    Mr. Berry represents you and Vicky in this

22   bankruptcy case, correct?

23        A.    Correct.

24        Q.    Scope of his representation does not

25   extend to state court, correct?

VS v. Christensen * October 11, 2012          197

```
 1          A.     Correct.
 2          Q.     So you have counsel that can represent the
 3     estate?
 4          A.     Here.
 5          Q.     Here.
 6          A.     Yeah.
 7          Q.     Right.  You don't have counsel to
 8     represent the estate in -- before Judge Taylor?
 9          A.     No, I don't.
10          Q.     And the estate doesn't really have any way
11     to pay for it?
12          A.     No.
13          THE COURT:  I'm sorry, Mr. Boley.  I
14     thought the Christensens had counsel in the Taylor
15     and Laycock matters.
16          MR. BOLEY:  Let me address that because I
17     think there's been --
18          THE COURT:  Well, just correct me if I'm
19     wrong.
20          MR. BOLEY:  I'm not sure if Mr. Lavar
21     Christensen technically is there.  But he is not a
22     full-time litigator.
23          THE COURT:  Okay.  Well --
24          MR. BOLEY:  And really --
25          THE COURT:  Okay.  He's --
```

VS v. Christensen * October 11, 2012          198

1          MR. BOLEY:  Just between you and me, I can
2     honestly --
3          THE COURT:  Okay.  He's their counsel.
4     You --
5          MR. SHIELDS:  I object to counsel trying
6     to testify, Your Honor.
7          THE COURT:  You can go ahead and ask
8     questions to get in why he's not well-suited for
9     that.  I just, my recollection was they had counsel.
10    And you've answered that.  So go ahead.
11         Q.    (By Mr. Boley)  Mr. -- your brother is
12    Lavar Christensen?
13         A.    Yes.
14         Q.    And he is counsel of record right now in
15    these two Forge cases?
16         A.    Yes, he is.  I mean --
17         Q.    He agreed to represent you in the context
18    of which (inaudible) currently are in, which is
19    defending the deficiency action and a judicial
20    foreclosure action; is that right?
21         MR. SHIELDS:  Objection, again, Your
22    Honor.  Counsel is leading the witness.
23         THE COURT:  Yes, he is.  But we're not
24    going to get through this unless he does for a while,
25    so.

VS v. Christensen * October 11, 2012          199

1            THE WITNESS:  I think I can answer that.

2      He did it kind of on a conditional basis.  He's a

3      congressman too and so he -- January, February and

4      March he's just completely out of commission.  So it

5      was limited.  He needs help.  And he can't be lead

6      counsel during all that time that's going on.  It's

7      something that he and I've just talked about recently

8      in those cases now that they're starting up.  And so

9      it's recent, and I shared some of that with you.  So

10     I don't know that he can be lead counsel.  I think

11     that we're going to have to get someone else to be

12     the lead counsel.  And he'll try and help them, bring

13     them up to speed and help them with everything they

14     need to do as best he can.

15            Q.    So assuming that you can't afford to pay

16     someone else to come in as legal counsel, I think

17     you've already testified you can't, is Lavar, given

18     his limitations on time and experience, able to

19     adequately represent the debtors in this Taylor

20     action if these new claims are permitted to go

21     forward?  I know you don't want to say anything bad

22     about your brother.  He's your brother.

23            A.    No, it wouldn't be.  No.  I know he really

24     cares about us and wants to help us.  But he's told

25     us he needs to not be the lead counsel.  And I need

1   to hire someone else to be the lead counsel in those

2   cases and that he'd doing everything he can to help

3   us because he's just in session through the first

4   quarter of next year.

5       Q.   It's true he's told you he's not really

6   willing and he doesn't feel he's able to act as lead

7   counsel in any litigation?

8       A.   Yeah.  I mean, he's shared that with me.

9   That's why I've been talking to these contingency

10  firms and also this one firm that's agreed to take

11  Kennedy, take the Kennedy case.

12      Q.   So if we -- if the motion is granted and

13  these new claims are asserted, you'll either have to

14  come up with money to hire someone or you'll have a

15  reluctant part-time lawyer representing the estate;

16  is that fair?

17      A.   Yes.  I think that's fair.

18      Q.   You were here when Brent Manning was on

19  the witness stand, correct?

20      A.   Yes.

21      Q.   The Toomey case has been pending for over

22  three years; is that right?

23      A.   About that, yes.

24      Q.   Based on the complexity of these new

25  claims that are to be asserted in the Taylor action,

VS v. Christensen * October 11, 2012          201

1   do you anticipate that those claims could be

2   adjudicated in a state court in a shorter period of

3   time?

4          A.      Probably not.

5          Q.      Do you anticipate that it would be less

6   expensive assuming you had unlimited funds to pay for

7   counsel than the million or so dollars you spent

8   defending and prosecuting the Toomey case?

9          A.      I don't know.  It would seem to me that it

10  would be comparable.

11         MR. BOLEY:  Your Honor, can I just have a

12  moment to consult with Mr. Berry?

13         THE COURT:  Yes.

14         MR. BOLEY:  Before I tender the witness,

15  Your Honor, maybe I should check.  According to your

16  records, have we offered all of our exhibits?

17         THE COURT:  I do not have D and E and P.

18  D, E and P.

19         MR. BOLEY:  I'd offer D and E now.  I can

20  lay foundation if there's an objection.

21         MR. SHIELDS:  No objection, your Honor.

22         THE COURT:  Exhibits D and E are received.

23         **(EXHIBITS D AND E ARE RECEIVED.)**

24         MR. BOLEY:  And I tender the witness.

25         THE COURT:  All right.  So you're not

VS v. Christensen * October 11, 2012                202

1    offering P?

2              MR. BOLEY:  No.

3              THE COURT:  All right.

4              MR. BOLEY:  It was on our May offer list.

5              THE COURT:  Thank you.

6              MR. BOLEY:  I had to have one that I

7    didn't offer.

8

9                    CROSS-EXAMINATION

10   BY MR. SHIELDS:

11        Q.    Mr. Christensen, the 300,000 you mentioned

12   of the points and fees you think is owed to you by

13   Mountain Home Development?

14        A.    I can't remember which one of the

15   companies I said.  I was estimating that's who it

16   was.  Which one of the companies signed that loan, I

17   can't remember.  It could have been Fox Ridge

18   Investments or Mountain Home or both.

19        Q.    Was that resolved in the Toomey

20   litigation?

21        A.    Not that I believe, no.  I don't think it

22   was -- the Satori loan were the fees that were owed

23   to me.  I don't think that that was addressed.

24        Q.    Is that disputed?

25        A.    I believe it would be.  I just sat down

VS v. Christensen * October 11, 2012          203

1    with our attorneys and went back through.  As we went

2    through everything, we sat down and went together

3    with Dave Berry and tried to review all the files and

4    records and answer them the best we could.  But it

5    was after the resolution was passed.  If it wasn't,

6    it would have been an oversight.

7         Q.    You said you're going to -- you hope to

8    get -- you're optimistic you'll get some consulting

9    and management fees because you have 40 years

10   experience.  With whom are you negotiating to get a

11   consulting and management contract?

12        A.    I already mentioned that I'd been talking

13   to my son who has ownership in a couple of projects

14   that he's putting together.  And then I talked about

15   a family member that has some large developments

16   going.  And then the other people I'm talking --

17        Q.    Which family member?

18        A.    It's my brother-in-law.

19        Q.    What's his name?

20        A.    John King.

21        Q.    Any others?

22        A.    Not in the family.

23        Q.    How about outside the family?

24        A.    Well, I just listed them.  We have -- I'm

25   just now been, just the last three or four weeks,

VS v. Christensen * October 11, 2012          204

1   really trying to negotiate in earnest with other

2   companies.  But I don't feel like, you know, I have

3   anything that's cast in stone.  And it's stuff that

4   I'm just working on.  And I'm putting together a

5   contact list and talking to people that in the past

6   might have been interested in doing that, so.

7        Q.     You have no contracts then?

8        A.     No.

9        Q.     And you've been looking at doing this for

10  many months, haven't you?

11       A.     Not reaching out beyond where I'm at right

12  now.  I'm reaching out much further to a wider

13  circle.  But my son and I sat down and talked about

14  my role in helping him with his entitlements on these

15  projects that he's working on.

16       Q.     You certainly have been trying to get

17  these contracts since the bankruptcy.  I think you

18  testified at the first meeting you were --

19       A.     Yes.  And I have with my son.  We've been

20  able to talk about putting that together.  And we'll

21  be submitting it as part of this plan.  I anticipate

22  in the next few weeks trying to turn in the plan that

23  I'll be able to have some more specifics.  I'm

24  working really hard on trying to put that together.

25       Q.     So your son does have funds then?

VS v. Christensen * October 11, 2012          205

1        A.      He's going to be receiving funds.  These

2    loans have been approved.  His relationship with

3    these other developers are approved.

4        Q.      And he's codefendant in these actions that

5    TM company is proposing, correct?

6        A.      I'm sorry.  I couldn't hear you.

7        Q.      McKay is a codefendant in these actions of

8    the TM companies?

9        A.      Yes.

10       Q.      So could you coattail on his attorneys?

11   Could you coattail on his attorneys?  Have one

12   attorney represent both of you?

13       A.      I don't know -- what do you mean by

14   coattail?  I'm sorry.  I'm misunderstanding.

15       Q.      Use one attorney.  Two defendants use one

16   attorney.  McKay and Steve use one attorney.

17       A.      Yeah.  I believe we have in the past.

18       Q.      And you could do that again in this other

19   litigation, correct?

20              MR. BERRY:  Objection, Your Honor.  I

21   think he's asking for a legal conclusion specific to

22   bankruptcy law.  And I don't think he's qualified to

23   answer such a question.  Foundation.

24              THE COURT:  I'll overrule the objection.

25   I think all he's asking is couldn't you and your son

CITICOURT, LLC
801.532.3441

VS v. Christensen * October 11, 2012          206

1    use the same attorney.

2             MR. SHIELDS:  Yes.

3             THE WITNESS:  I think if there weren't any

4    conflicts, I think that's something -- and depending

5    on how it might affect his credit and his ability to

6    do this, it would depend.

7        Q.    (By Mr. Shields)  Okay.  Now, you said

8    you're talking about someone defending you in the

9    Kennedy case.  Who is that?

10       A.    Well, we have -- it's Barry Johnson and

11   Lavar as -- not as the lead counsel but just to help

12   him make the transition.

13       Q.    And isn't it true you commenced the Toomey

14   litigation?  You commenced the Toomey --

15       A.    Yes.  We filed a minority -- yes, we filed

16   a minority shareholder case against the companies.

17       Q.    And isn't it true that you've lost that

18   case via a summary judgment order by Judge Toomey?

19       A.    No.  She made two rulings in that case.

20       Q.    As against the TM companies you've lost,

21   right?  Howcroft is the only --

22       A.    Yeah.  I believe that's correct.  The very

23   first ruling.  The second ruling she denied the

24   motion to dismiss and the motion for summary judgment

25   and left like -- Brent Manning represented numbers 1

VS v. Christensen * October 11, 2012          207

1    and 7, which is punitive damages and many other

2    things with regards to Mr. Howcroft.

3         Q.    And you heard Mr. Manning's testimony that

4    Lavar was, I think, the third or fourth attorney in

5    that case, correct?

6         A.    Yes.  We've had financial difficulty being

7    able to pay for attorneys.

8         Q.    And is that the reason --

9         A.    Real hardship.

10        Q.    Is that the reason the other attorneys

11   would withdraw because they weren't getting paid?

12        A.    We, like I said, we paid a million

13   dollars.  But no, Todd Shaughnessy was our attorney

14   with Snell & Wilmer, and he got appointed as a judge

15   shortly after.  Mike Black was leaving the firm.  He

16   was also co-counsel but he was leaving the firm to go

17   to work for Mitchell & Barlow prior Todd Shaughnessy

18   being appointed as a judge.  And they had talked to

19   us for months before that.  I don't have an existing

20   bill with them.  And we were --

21        Q.    Did you pay them or did they write it off?

22        A.    Huh?

23        Q.    Did you pay that firm or did they write it

24   off?

25        A.    Well, they agreed -- they kept the

VS v. Christensen * October 11, 2012          208

```
 1    retainer and lowered the balance down pretty low.
 2    They knew that we had -- there was some work that
 3    they thought that we had prepaid.  And I met with
 4    Bryon Benevento and Todd Shaughnessy, and they felt
 5    like it was fair.  I didn't ask them to write it
 6    down.  But they sat down and said we think that
 7    because of Mike leaving the firm and so on and so
 8    forth, we'll -- this might be a good time.  And then
 9    shortly after that Todd found out he was going to be
10    judge, appointed to be a judge.
11         Q.    How about the Kirton McConkie attorney,
12    did he get paid?
13         A.    Yes, they got paid.  I think they're owed
14    a small amount.  And that's from Sherry.  I'm not
15    part of that, but Sherry Christensen.
16         Q.    No, in the Toomey case.  They appeared in
17    the Toomey case on your behalf as well, didn't they?
18         A.    Well, I know.  But they represented
19    Sherry.
20         Q.    Oh, not you?
21         A.    No.
22         Q.    Okay.
23         A.    And I don't know, you'd have to ask them,
24    but I think most of that was paid down, maybe not all
25    of it.
```

VS v. Christensen * October 11, 2012          209

1          Q.     Now, you talked about potential income

2    from the mall outlets and some other sources.  But

3    that is in companies you don't control, right?

4          A.     Yeah.  I don't control and I --

5          Q.     So what are you doing there?  What do you

6    spend your time doing with those companies?

7          A.     Well, I'm not quite sure what the question

8    is.

9          Q.     Well, you said if this litigation goes

10   forward you couldn't do that kind of work, get some

11   money.  And I'm just wondering what you're doing when

12   you're only a minority interest holder.  You have no

13   authority to do anything in those companies.

14         A.     I'm sorry.  I apologize.  I still don't

15   understand the question.

16         Q.     How do you expect -- if the Court denies

17   our motion and you don't have to defend yourself in

18   the Forge litigation, what do you intend to do to be

19   able to get income from the Steve Craig mall outlet?

20         A.     I'll continue to fight and do everything I

21   can to get what's rightfully our family's interest.

22   And for -- even though I'm minority interest, to be

23   able to receive the money that we're entitled to for

24   those assets and for the Traverse Mountain assets.

25         Q.     But as far as day-to-day management,

VS v. Christensen * October 11, 2012          210

1    negotiating contract, you don't do anything, do you?

2        A.    I don't do that with regards to the

3    outlets, no.

4        Q.    Or anything with the TM companies?  You've

5    been removed pursuant to the settlement agreement,

6    correct?

7        A.    Yeah.  I stepped down according to the

8    settlement agreement and agreed to have the company

9    run as a board, which it hasn't.  It hasn't run as a

10   board since -- an effective board and an honest

11   board, which is why Judge Toomey denied this summary

12   judgment and talked about what's been going on with

13   Steve Howcroft and the CEO and the CFO with regards

14   to that case.

15       Q.    Now, you heard Mr. Manning testify that

16   your statements that you hadn't been provided

17   information from the TM company was part of your

18   lawsuit in the Toomey litigation, correct?

19       A.    That I hadn't provided what?

20       Q.    No.  That the TM companies -- you, this

21   morning you testified the TM companies hadn't given

22   you information, right?

23       A.    Yeah.  They have not provided some

24   information.

25       Q.    And Mr. Manning took the stand and said,

CITICOURT, LLC
801.532.3441

1    yeah, those same claims were made in the Toomey

2    litigation.  And you lost on summary judgment,

3    correct?

4         A.    Yeah.  I think he also talked about in

5    there that because of the change of law firms -- I

6    don't remember if he went over this.  It seemed like

7    he did talk about it.  We had multiple requests for

8    production of documents for which they filed a quash.

9    They filed every motion in the world to block us,

10   summary judgment motions.  And we ran out of money

11   and couldn't get the production of documents that we

12   wanted.  We were denied.

13        Q.    They won, right?

14        A.    In getting those.  Huh?

15        Q.    Toomey --

16        A.    Well --

17        Q.    -- granted their motion for summary?

18        A.    They've outspent me 10 to 1.  And there's

19   been times where I just -- you see it in the fact

20   that the law firms.  We've had to change firms

21   because it's been so expensive.

22        Q.    And remember, who started that lawsuit?

23        A.    Yeah.  The minority shareholder case we

24   did.  But then the fifth member, independent fifth

25   member of the board decided to sue us.  And there

1   have been other counterclaims that they've filed and

2   are continuing to file now with all this, everything

3   that's going on.

4          Q.     The notes that you claim you and your son

5   are entitled to, aren't those notes very subordinated

6   that have to be millions of dollars paid to other

7   creditors before you get (inaudible) --

8          A.     And that's the part they're withholding

9   from us.  I believe they have done things that would

10  trigger the payments of those, but they won't provide

11  the information.  And especially since Toomey made

12  her decision, it's been almost a year and a half,

13  that there's been so much that has been done or not

14  done and will not provide the information that we

15  need to have to be able to defend ourselves in this

16  case.  Not only did they block us from getting it

17  before, they quashed everything we tried to do and

18  fought us every step of the way.  A lot like I think

19  they're trying to do here.  But they just block and

20  block and block and delay and run up legal fees and

21  seek to bankrupt us.  And including not paying Penga

22  -- or Key Bank like they were supposed to under the

23  terms of the settlement agreement.  I can't handle a

24  $900,000 default on me.

25          But Ted Heap and Kinnon Sandlin, they've

VS v. Christensen * October 11, 2012          213

1    loaned the same amount of money but somehow there's

2    no problem for them in the companies.  Only me and my

3    wife are the ones that loaned that money.  We loaned

4    it, but only we are being crushed and in court going

5    through this battle.  And they're still sitting over

6    here.  Ted Heap and Kinnon Sandlin, who loaned the

7    money at the same time I did from the same bank, we

8    all agreed to loan it.  And the settlement agreement

9    said all three of us would get paid back together at

10   the same time.  And somehow Penga, their hard money

11   lender, buys my note, takes me to a sheriff's sale,

12   forecloses on me and comes after me.  And to this day

13   they have never told us, never held a board meeting,

14   never sent me a letter, no correspondence and told me

15   what's happening with their notes.  While they drive

16   home every night to their families and their houses

17   and they still haven't -- I don't know what's

18   happened to those notes and having those notes paid

19   off and having those notes taken care of.  And so, I

20   mean, that's just part of it.

21            And the legal fees that are defending it

22   and the interest rate that's burning.  And now

23   Penga's making motions in this court.  And all they

24   are is somebody that came in and bought the Key Bank

25   note so they could come after me and my family and

VS v. Christensen * October 11, 2012          214

1    take over our interest.

2         Q.    So what is your realistic plan?  What do

3    you really expect to do in this bankruptcy case?

4         A.    I'll be submitting it to the Court.  I've

5    outlined it as best I can today, I believe.

6         Q.    But the plan just talks about we were

7    negotiating, we're talking.  What is the plan?

8         A.    Well, that's what it takes -- you know,

9    this whole thing, like I said, Penga comes in and

10   buys my note but nobody else's with Key Bank and

11   comes after me to crush me.  I got caught off guard

12   and blindsided by this.  And the other -- they're

13   supposed to have a fiduciary duty, the CEO and the

14   CFO of the company, who also loaned the same amount

15   of money to the company and the companies signed

16   settlement agreements to pay us back, all three of

17   us, we would all be paid back, $2 million.

18        Q.    Okay.  We're not going to litigate that

19   case here.  Let me ask you another question.  You

20   said you've been talking to investors; is that

21   correct?

22        A.    Yeah.  What I would term to be some

23   investors.

24        Q.    And what are they going to invest in?

25        A.    Well, I --

VS v. Christensen * October 11, 2012          215

1          Q.      What are you proposing that they buy?

2          A.      I haven't made any proposals to them.  But

3    right now what from what I hear on the street,

4    because I never hear it within the company, the

5    company is trying to sell the sell center, all the

6    fiber inside the project that the company owns, just

7    trying to dump it and dissipate the assets.  There's

8    a four-acre parcel they owe free and clear and it's

9    out on the street.  And I've heard that they've

10   entered into agreements.  Whether or not they have or

11   not, they won't tell us.  They haven't held a board

12   meeting to let us know.

13         Q.      You're getting off.  The question is --

14         A.      Yes.  Because I talked to investors about

15   trying to buy those or come in and refinance those

16   loans.  They're giving away property, just dumping

17   property and trying to get out from under loans that

18   they're signed on that I'm not signed on.

19         Q.      Well, let me ask again.  The investors

20   you're talking to don't have to do with your assets,

21   they have to do with the TM company assets?

22         A.      Well, yeah.  But given the resolutions and

23   given the operating agreements and given all that's

24   happens where there's no transparency, nothing going

25   on.  The first thing I hear is when they foreclosed

CITICOURT, LLC
801.532.3441

VS v. Christensen * October 11, 2012          216

1   on a commercial piece of property, I don't even get

2   notified to go to the hearings for the commercial

3   property.  They're gone.  We just lose them in a

4   foreclosure --

5          Q.    Isn't that --

6          A.    -- to U.S. Bank.  They're gone.  U.S. Bank

7   foreclosed on the commercial pieces, gone off the

8   freeway.  We worked our lifetime to put those

9   together.  So I go off and try and sit down under

10  this resolution where it says they passed it, three

11  to two, their favor.  They passed it.  Under that

12  resolution it says I can go buy loans if they're in

13  default or if I'm a guarantor, to protect my family.

14         And Steve Howcroft testified in his own

15  deposition that said I had every right to go out and

16  do whatever I need to do to protect my family, when

17  we look his deposition in the Toomey case.  And he's

18  the fifth board member.  He said Steve absolutely has

19  a right to go off and defend his family and protect

20  himself on these loans.  And that's what I've been

21  trying to do.  I've been trying to do that so I don't

22  end up bankrupt at 63 years old.

23         Q.    And so you --

24         A.    Because some people want to take over my

25  ownership interest in a company.

1          Q.     So you think an investor is going to

2     invest in this mess?

3          A.     I'm trying.

4          Q.     You think this mess can be resolved

5     without litigation?

6          A.     I don't know.  But I'm trying.

7          Q.     So you're going to file your plan by the

8     15th according to the Court's orders?

9          A.     Yeah.  I'm going to do the best I can with

10    what limited information I have from Traverse

11    Mountain.

12         Q.     You're going to file your taxes by the

13    same date?

14         A.     I'm working on it with my accountant.

15    I've turned in the other two years, as requested.  I

16    just got the K-1s just a few weeks ago.

17         Q.     For what year?

18         A.     Gave them to -- huh?

19         Q.     For what year?

20         A.     For 2011.

21         Q.     And you'd have the other K-1s --

22         A.     Yes.  I've turned in 2000 --

23         Q.     Just a minute.  You've had the other K-1s

24    for years, haven't you?

25         A.     Yeah.  But I didn't have -- I testified

VS v. Christensen * October 11, 2012          218

1    under oath for the trustee that I didn't have enough

2    information from Traverse Mountain.  My accountant

3    didn't have enough information for us to be able to

4    file.  I felt like I needed to get more information

5    from them to be able to do it.  We've since done it,

6    and we're working on 2011.  But it's short notice to

7    try and be able to put this together.  They filed for

8    an extension until October.  And so I'm trying to put

9    those together.  I've been talking to my accountant

10   right up until the time, just days before here,

11   yesterday.

12        Q.    Bottom line, all your problems are other

13   people's fault?

14        A.    What?

15        Q.    All your problems are other people's

16   fault?

17        A.    For the first 11 years of that project I

18   didn't blame anybody for Cabela's, for the factory

19   outlets, for 8,000 homes that I zoned in and titled

20   with my brother and my family when we were in control

21   of the company.  All the entitlements and all of the

22   closing, everything that's happened, the factory

23   outlets, we got.  We brought them there.  We signed

24   them.  We put that together.  All of those projects

25   we put together.  I didn't blame anybody for

1   anything.  And I didn't --

2        Q.    How about this --

3        A.    -- try and take credit for anything.

4        Q.    How about this, is this your first --

5        A.    I'm not blaming.  Let me just tell you

6   something.  I am not.  I'm going to try and answer

7   your question.  When they take out 6, 7, 8 million,

8   pay corporate counsel, salaries, travel, legal fees

9   for millions of dollars and I got widows on my side

10  of the ledger and I can't get 50 cents from this

11  company.  They're sitting on piles, millions of

12  dollars right now that they sold out of that deal

13  with Riverbend that I mentioned, and we don't even

14  know about it.

15       Q.    Listen.  Listen.  We don't want to --

16       A.    I don't know about them.  My family

17  doesn't even know about it.  Our assets have been

18  swept out the door.  They hold them all.  They're

19  sitting there.  They won't pay Forge or U.S. Bank or

20  Cabela's, who's suing them for $3 million.  No

21  creditors get money except their buddies, their

22  cronies and them.  And so you sit down and say I'm

23  making excuses?  I'm sorry.  I'm -- you know, I have

24  to (inaudible) paperwork and documents --

25       Q.    Let me ask you another question and I'll

1    end, okay?  Let me ask you real quick.  Is this your

2    first bankruptcy?

3         A.    No.  It's my second one.

4         Q.    Thank you.

5         A.    In 1980 during the savings and loan

6    crisis.  I had to file because the savings and loan

7    went bankrupt.  The largest savings and loan in

8    America filed bankruptcy and took our family and

9    everybody else down with them.  The RTC took over

10   everything.  And that was 1985 maybe.

11        And I'm only here because of what's

12   happening with Traverse Mountain and Penga and them

13   buying this Key Bank loan.  And I'm telling you, I'll

14   come back and testify again and again and again if I

15   can get that information and find out why Ted Heap

16   and Kinnon Sandlin, who loaned the same amount of

17   money from Key Bank -- Key Bank loaned to all three

18   of us the money.  And we paid that money, and they

19   haven't had to do anything.  The company has not

20   taken care of -- have not taken care of me but

21   somehow protected and shielded those two men and

22   their families from what happened.  And so --

23        MR. SHIELDS:  Your Honor, I have no

24   further questions.

25        THE WITNESS:  I'm sorry.

VS v. Christensen * October 11, 2012          **221**

```
 1              MR. BERRY:  Just one follow-up question,
 2   Your Honor.
 3
 4                     CROSS-EXAMINATION
 5   BY MR. BERRY:
 6        Q.    In your prior chapter --
 7              MR. SHIELDS:  Is this recross?  I thought
 8   Mr. Boley was having --
 9              THE COURT:  Mr. Shields.
10              MR. SHIELDS:  Okay.
11        Q.    (By Mr. Berry)  The question was asked
12   about a prior Chapter 11 you filed.  That was a
13   Chapter 11?
14        A.    I believe it was a Chapter 11, yes.
15        Q.    And you finished it, you got your
16   discharge?  It was consummated?
17        A.    Yes.
18        Q.    Thank you.
19              THE COURT:  Mr. Christensen, are you okay?
20              THE WITNESS:  Yeah.  I'm sorry, Your
21   Honor.
22              THE COURT:  No.  It's -- no, it's your
23   life.  It's okay.
24              THE WITNESS:  No, I know.  I'm sorry.  I
25   apologize.
```

VS v. Christensen * October 11, 2012          222

1          THE COURT:  All right.  I don't think

2    anybody else has any questions for you.  You're

3    excused.

4          THE WITNESS:  Thank you.

5          MR. BERRY:  Your Honor, if that's the

6    close of evidence then I would ask for a brief

7    recess.

8          THE COURT:  I can't hear you.

9          MR. BERRY:  If that's the close of

10   evidence, I would ask for a brief recess.

11         MR. BOLEY:  That's the end of our

12   evidence.

13         THE COURT:  All right.

14         MR. BOLEY:  Unless there's rebuttal.

15         THE COURT:  You want a few minutes before

16   you argue?

17         MR. BERRY:  Yes, please.

18         THE COURT:  I'm sorry.  You have more --

19         MR. BOLEY:  I think we need a short break

20   for a matter of personal convenience.

21         THE COURT:  Okay.  But you're done with

22   your evidence?

23         MR. BOLEY:  We are, Your Honor.

24         THE COURT:  Okay.  Thank you.

25         THE BAILIFF:  All arise.

VS v. Christensen * October 11, 2012          223

1               (Break taken from 2:13 to 2:29 p.m.)

2               THE BAILIFF:  All arise.  Court resumes

3     its session.

4               Please be seated.

5               THE COURT:  All right.  It's still six

6     three Giants, if you're wondering.

7               All right.  Mr. Shields, go ahead.

8               MR. SHIELDS:  Your Honor, I'll try not to

9     bore.  I just want to briefly review that evidence a

10    little bit.  The reason we went to such laborious

11    details on the schedule is to show, by the debtors'

12    own statements under penalty of perjury, there's

13    really not much here but litigation.  Of the hundred

14    and something million in the two estates, 95 percent

15    of it is just claims.  They're claims, the 50

16    million, the hundred, 25 million, they could be high,

17    they could be low.  This estate is essentially

18    claims.

19              As I stated in the first status

20    conference, we were hopeful that the debtor had a

21    good faith plan of reorganization, that it wasn't a

22    litigation tactic.  But we think it is a litigation

23    tactic.  Also, even the debts, if you look at the

24    debts in both estates, the bulk of the debt is Forge,

25    25 million of it is Forge.  There's a few, you know,

1    a million and a half to his son, some to his

2    neighbor.  Everything else, all the claims that my

3    clients and the other creditors, they're all unknown,

4    disputed.  Everything relates to litigation,

5    unfortunately.

6            You go to the hard income, schedule I,

7    he's only got income of $3,008 per month, social

8    security income.  He's hoping to get some contracts,

9    but he hasn't.  And he's been trying for long before

10   today.

11           Seven lawsuits that most of those he's

12   initiated and lost.  The Toomey case I think it's

13   just unbelievable relevant that he started that case.

14   Summary judgment was granted against him.  The only

15   claims left are my claims.  I want to make it very

16   clear, my client is not trying to litigate two

17   forums.  What we've done in our reply memo we

18   explained, we're willing to leave the Toomey case

19   stayed with the exception of getting the motion for

20   protective order amendment heard.  We need that to be

21   able to use the evidence in the litigation.

22           We're also stipulating that the Laycock

23   and Taylor cases can be consolidated, and Forge has

24   already moved to do that.  So all we have to do is

25   file a no opposition.  I think those will be

1    consolidated.  So there'll be one forum in which the

2    TM companies, Forge and the debtors and the other

3    parties that are not before this court can litigate

4    that matter.

5             The cross-claim, third-party complaint and

6    counterclaim is critical because the debtor had

7    accused us of trying to be unspecific, vague.  And so

8    we spent a lot of time, our cocounsel has testified,

9    spent a lot of time putting that complaint together,

10   that pleading together.  And that has the claims in

11   there.  There's no ambiguity about what we're

12   pursuing, about who we're pursuing and about the

13   theories.  They're well documented, will be filed

14   under Rule 11 if this court allows that litigation to

15   proceed.

16            I don't want to go through all the

17   exhibits that deal with who said what about the stay.

18   The bottom line is there was controversy about the

19   stay.  Fortunately the state courts, I think, made

20   the right decision and said whether or not the stay

21   applies, it ought to be determined by this court.  We

22   support that.  We're here.

23            We have filed a motion for stay of relief

24   on a conditional basis.  And that condition is if

25   Forge gets relief, then we need relief.  If it's so

VS v. Christensen * October 11, 2012          226

1    -- if the situation with the debtor is so pathetic

2    that they shouldn't have any stay of relief, then

3    don't grant anybody stay of relief.  But we think if

4    Forge is going to get stay of relief, we absolutely

5    have to get stay of relief to fully defend ourselves.

6              The two exhibits that I think are most

7    critical are the 9 and 10.  Those are the two orders

8    by Judge Taylor and Judge Laycock.  And they both

9    hold they're not going to proceed in those cases

10   without these debtors.  They used the word

11   indispensable party, quote Rule 19.  Late yesterday I

12   got the supplemental from the debtor where they're

13   attacking them saying, oh, they're not indispensable.

14   They shouldn't have ruled that.  But the bankruptcy

15   court can't sit as an appellate judge for Judge

16   Taylor and Judge Laycock.  They've ruled that.  It's

17   before the Court.  If they're wrong, they can go down

18   and defend that in appeal or whatever.  But that's

19   the status of the case right now.

20             The protective order was huge because

21   there's hundreds of thousands of dollars of discovery

22   that's tied up in that litigation that would not be

23   able to be used unless we get relief from that

24   protective order.  So we're limiting our relief in

25   the Toomey case to get relief from the protective

1    order.  She could deny it.  We don't think so.  It

2    almost sounds like Forge and the other parties want

3    that protective order lifted too so they can get

4    access to those records.  That's fine.  To the extent

5    we use them in Forge, they will have access to them

6    in the Forge litigation.

7              The other reason that I think this

8    litigation has to go forward is this court cannot

9    hear those claims between non-debtors.  There are a

10   lot of non-debtors claims and cross-claims and they

11   can't be heard in the bankruptcy court.  So the idea

12   of consolidating the whole thing here is not

13   feasible.

14             This debtor really has nothing to build a

15   case around.  He has no inventory.  He has no

16   collectible accounts.  He has no employees, no sales

17   force, no product to sell.  He's basically got

18   litigation claims that have accrued over many years.

19   And as you can tell, there's frustration built up.

20   My client didn't testify because the same frustration

21   would flow out.  The impact of this litigation on his

22   ability to run the company has been profound.  We

23   need to get this litigation resolved once and for

24   all.

25             The Court has already granted relief as to

VS v. Christensen * October 11, 2012          228

1    Howcroft.  And they made those same arguments.  And

2    it sounds to me like they're making arrangements to

3    get counsel.  You know, this debtor has resources.

4    First of all, his brother is already counsel of

5    record in those cases.  And he may want the best, but

6    I may not be the best.  Not everybody gets the very

7    best counsel.  But sometimes those claims have to be

8    resolved before this reorganization claim -- this

9    reorganization case can go forward.  And we believe

10   the time is now.

11           We believe that Forge has met its burden

12   of showing cause for relief from stay.  We believe

13   the debtor has failed to negate that cause.  They

14   have some reasons.  They have some excuses.  But none

15   of them, I don't think, meet the standard of why this

16   stay should not be lifted.

17           Even if the parties aren't indispensable,

18   it's undisputed that they're inextricably linked.

19   And that is one of the standards for proceeding

20   without a debtor is if they're inextricably linked.

21   I think the case law in both Utah, the Tenth Circuit

22   and other states say if parties are inextricably

23   linked, they should be in there.  And there's no

24   doubt when you're alleging conspiracy against Forge

25   and the debtors that they're in inextricably linked.

1          The debtor argues in its opposition memo

2     that our claims are open-ended.  They're dreamed up,

3     they're extraordinary, they're multiple, they're

4     duplicative, we're just creative minds.  There's no

5     substance to them and that they're vague.  We think

6     all of those are answered by the fact of Exhibit 6,

7     which is a very specific, written-down pleading.  And

8     we don't deny we're trying to -- we've moved the

9     stuff that was going to be heard for Toomey as our

10    counterclaim.  We're going to put it over in the

11    Forge and hear it because it must be.  It has to be

12    heard by one judge if you're going to be economically

13    efficient about it.

14          We think that the prejudice to the TM

15    companies would be profound if the Court were to

16    grant Forge's motion and not grant our motion.

17    Again, if the Court thinks that the debtors'

18    situation is such they shouldn't have to defend

19    anybody, then don't grant Forge motions and we'll

20    just sit here for a few more months.  Our position is

21    that we have to grant the Forge motion.  We have to

22    grant our motion.  We have to get that litigation

23    going.  And if that results in some resolution or

24    some investors coming in or something, that will

25    result in the resolution of the case.  Sitting as it

VS v. Christensen * October 11, 2012          230

1   is is not getting this case anywhere.  We'd ask that

2   the motion be granted.

3            Unless the Court has any questions.

4            THE COURT:  Give me again, on the record,

5   the specific relief you're requesting for the three

6   different lawsuits.

7            MR. SHIELDS:  As to the Toomey case,

8   relief from stay to be able to have the hearing on

9   the motion to amend protective order be heard, ruled

10  upon and implemented.  As to the Laycock case, we

11  would agree that that could be consolidated into the

12  Taylor case.  In the Taylor case we'd ask that the

13  stay be lifted so we can fully defend ourselves

14  against Forge's claims and pursue our cross-claim,

15  counterclaims and third-party complaints.

16            We would not try to execute on anything in

17  that case.  Once we get the judgment determination

18  we'd bring it back here, just like Howcroft did.

19  Same relief.  They said we'll bring it back once the

20  matter's determined.  We're not going to try and get

21  a judgment executed on assets.  But we don't want to

22  get a judgment one way or the other.  You know, if we

23  lose, you ought to know about it.  If we win you,

24  ought to know about it.  So we bring that back to

25  Your Honor.

VS v. Christensen * October 11, 2012          231

1          Any other questions?

2          THE COURT:  No.  Thank you.

3          MR. SHIELDS:  Thank you, Your Honor.

4          THE COURT:  Mr. Berry.

5          MR. BERRY:  Your Honor, I'd like to start

6    out by addressing the Court's concern as to who has

7    the burden when that shifts, and Tenth Circuit

8    rulings.  So yes, section 362(h) on its face says

9    equity -- burden as to equity is as to the movant.

10   And all other burdens are to be borne by the

11   nonmoving party, the debtor.  The Court then

12   correctly notes, to some extent any way I would

13   agree, that the only thing that the movant in this

14   case had to show is that there was pending

15   litigation.  Now once they've shown pending

16   litigation, the burden shifts to the debtors, the

17   non-movants in this case.

18          If I just stop there before I get into the

19   Tenth Circuit rulings, what we end up with is, yes,

20   there's litigation in the Taylor case.  But no

21   litigation of any causes of action against these

22   debtors, none.  We've shown that unambiguously

23   through both testimony and Exhibits A, B and

24   comparing them with 6.  There was -- there is still,

25   currently, no litigation against these debtors in the

1    Taylor case, which is what they are really ask --

2    seeking this Court to get relief so that they can go

3    file new causes of action in the Taylor case.  None

4    existing now, zero, nada.  So I think they fail at

5    that point, at that initial hurdle the Court put in

6    front of them.  They can't show there's any

7    litigation in which they have any pending cause of

8    action in the Taylor case.

9          And this Court does not have the ability

10   or the power, nor should it, to be able to go and

11   tell the state courts where this court views things

12   should be consolidated.  We don't have that ability.

13   The movant doesn't have that ability.  They don't

14   have the power.  They don't have the ability.  They

15   seek to create new causes of action.  And by their

16   own words, consolidate causes of action into the

17   forum of their choice where it does not exist now.

18   They fail.

19          As to -- that leaves the Toomey case.  In

20   the Toomey case the only thing they're asking for is

21   leave to amend a protective order.  This Court can

22   grant leave, limited leave for them to seek change of

23   that protective order before Judge Toomey.  And

24   that's all they're asking for.  Countering their very

25   arguments that they want to consolidate, they at no

VS v. Christensen * October 11, 2012          233

1   time have ever said they are willing to dismiss their

2   causes of action in the Toomey case.  No, they want

3   to have litigation in two forums at the same time.

4   They may say, I don't choose to pursue it at this

5   point.  But that doesn't mean we don't have causes of

6   action pending before two different tribunals, being

7   duplicated and added to.

8          THE COURT:  Well, I'm pretty sure all

9   they're saying is they don't want to step off this

10  ice floe before they know the other one's safe.

11         MR. BERRY:  No.  It's gamesmanship, Your

12  Honor.  It is pure gamesmanship.  It's well beyond

13  that.  If that conclusion that the Court is surmising

14  were true, they would agree to dismissal without

15  prejudice in the Toomey case.  That would have been

16  part of the pleadings.  And I specifically asked that

17  question of counsel.  No, he has not heard that

18  they're willing to do that.  No.  And this Court

19  cannot somehow assume otherwise.  That means we're in

20  duplicative -- you may want to assume otherwise, but

21  it's not the evidence before the Court.  We have them

22  seeking to have litigation in two forums of the exact

23  same causes of action and then a lot more.

24         THE COURT:  But isn't that certainly an

25  argument to be made before Judge Taylor in a hearing

VS v. Christensen * October 11, 2012          234

1    on a motion to file the amended pleadings?

2              MR. BERRY:  No.

3              THE COURT:  I mean, certainly Judge Taylor

4    can tailor relief such that he says, well, I'll allow

5    you to amend in this case as long as you dismiss in

6    the other case.  We don't want the claims pending in

7    two places as once.

8              MR. BERRY:  No.

9              THE COURT:  It just seems to me it's

10   something that can be handled fairly easily.

11             MR. BERRY:  Number one, this Court can't

12   direct them to do that.  Number two --

13             THE COURT:  I wasn't even thinking of

14   that.

15             MR. BERRY:  Number two, this Court -- this

16   Court, I think, has a duty to make sure duplicative

17   litigation is not occurring.  So unless this Court is

18   going to enter an order, if that's what the Court was

19   contemplating, arguendo, that they get, that they

20   have or may have leave in the Taylor litigation.  It

21   should be -- that order should be contingent upon

22   them first dismissing in Toomey, at least without

23   prejudice.  Otherwise --

24             THE COURT:  But Mr. Berry, I don't have to

25   do that.  Your client already has the injunction in

VS v. Christensen * October 11, 2012          235

1   their favor.  They're not asking for relief from stay

2   to pursue the Toomey action other than as to the

3   protective order.  And the rest of the action is

4   stayed.

5            MR. BERRY:  I understand the Court saying

6   that.  But I don't understand them getting leave to

7   actually have two -- have new causes of action filed

8   in a new case.  That they get to choose a new forum.

9   And that's what this Court would be allowing them to

10  do.

11           THE COURT:  Allowing them to ask.

12           MR. BERRY:  I think it's this Court's duty

13  to not allow that to happen.  They don't have that

14  cause of action before Taylor.  They don't.  And if

15  we really go through it, things don't really transfer

16  straight across.  If you start looking at Exhibit --

17  may I grab my exhibits again, Your Honor?

18           THE COURT:  Yes.

19           MR. BERRY:  I think they're Exhibit 6 and

20  Exhibit E; E being the Toomey pending counterclaims.

21  And they are limited to four.  I'm sorry, it must be

22  exhibit -- yeah.  The first cause of action is breach

23  of contract in the Toomey action; breach of the

24  settlement agreement, page 31; interference with

25  business dealings, which is again stated as breach of

VS v. Christensen * October 11, 2012          236

1    contract by Steve Christensen and McKay Christensen;

2    third claim for relief, intentional interference with

3    the prospective economic relations, that's page 40.

4    So the summaries on 39, 40 and 42, breach of

5    fiduciary duties.  That's it.  Aiding and abetting

6    breach of fiduciary duties is number 5.  So the

7    summary is in pages 39 to 43.

8              If you compare those to what they're

9    trying to do in Exhibit 6, it doesn't really

10   transfer.  They embellished everything and added wire

11   transfers, RICO causes of action, racketeering;

12   things that should be sending up red flags all over

13   the place to this Court because they are basically

14   going for 523 nondischargeability actions.  And

15   they've never even been pled in either case before.

16   Not in Toomey.  Not in Taylor.  Not in Laycock.  They

17   are new.  And those types of things are specific to

18   this Court.  I'm sorry, Your Honor.

19              THE COURT:  RICO claims?

20              MR. BERRY:  Racketeering.  I don't know

21   what else to call it.

22              THE COURT:  When you say "this Court," are

23   you talking about me?  Specific to this Court?  I

24   miss your point.

25              MR. BERRY:  Well, I'm saying 523 actions

VS v. Christensen * October 11, 2012          237

1    are nondischarge, Your Honor.  I think -- they're

2    alleging new causes of action that they've never

3    alleged before that really have roots in section 523,

4    and they never existed prior to this Exhibit

5    Number 6.

6              THE COURT:  Okay.

7              MR. BERRY:  I don't see those in Toomey.

8    I'm sorry.  I didn't know if the Court was leaving

9    or --

10             THE COURT:  Just making a reach here.

11             MR. BERRY:  All right.  Finally, Your

12   Honor, okay, so the Toomey case, I think they're down

13   to -- I think if they want to dismiss their causes of

14   action, let them dismiss it.  Then maybe there's --

15   there may be, but I don't agree that there's grounds

16   to add new causes of action in Taylor.  But I don't

17   see it because they don't really transfer across the

18   way they did.  But Toomey, I think they've limited it

19   to, and I agree, to the protect order.  The Court may

20   well grant that.

21             But to add new causes of action in the

22   Taylor action, I'm not aware of any case that lets

23   them start suing fresh, new, in a case that they've

24   never brought an action against either of these

25   debtors prior to what they tell us they want to do

1    here today or two days ago.  There's no case law in

2    the country that says they can bring brand new, brand

3    new litigation they've never brought before.  And

4    seek leave of the court to have it done in state

5    court.  I'm not aware of it.

6              Tenth circuit, even though the Court says

7    the burden is now on the debtors, pretty much says

8    otherwise.  The statute reads on its face, the way

9    the Court read it.  But the Tenth Circuit in our

10   brief, Rouse, Curtis, others, Walker, it's really a

11   balancing test.  And really there's a presumption

12   that there could be, should be harm to the debtors.

13   It's really somewhat the opposite of the way the

14   Court characterized it when one reads Curtis, when

15   one reads Rouse.  It's assumed there's prejudice.

16   Quite frankly, otherwise there'd be no reason to have

17   an automatic stay.  It would be just on the burden of

18   the debtor to come in and say, no, we need to stop

19   these other actions.  And then that would be our

20   burden from the get-go.  But the code does the

21   opposite.  It creates the automatic stay.  That's why

22   they have to bring their motions.  And I think Curtis

23   emphasizes that.  Rouse emphasizes that.  Walker

24   emphasizes that.  It's a balancing test.

25              And they really are trying to start

VS v. Christensen * October 11, 2012          239

1   litigation.  And pretty much if they start over again

2   in Taylor, they're reopening discovery from the

3   get-go.  Taylor will have to reopen discovery from

4   the get-go, discovery already done in the Toomey

5   case.  I don't know any way to get around that

6   conclusion.  For the Court, me, or the other parties.

7   They're clearly trying to reopen discovery and start

8   over again by realleging, making those claims in a

9   new case.  Why did they pick Taylor?  Why do they get

10  to pick Taylor?  The balancing test has to fail.

11          Yes, Curtis factor number 1, would final

12  litigation in state court, at least come to a

13  conclusion?  Yes, it probably would.  Probably would

14  in almost all cases.  Question is should it be there

15  and should it be in the Taylor case?  I think that

16  answer is no.  They've never brought them there

17  before.  They're manipulating.  And they're asking

18  this Court to help them manipulate and start over

19  again.

20          Lack of any -- item number two, lack of

21  any connection with or interference with the

22  bankruptcy case.  Obviously it's interfered.  It's

23  raised a lot of costs.  They're trying to pick new

24  forums.  They're trying to somewhat impose, through

25  the way they've manipulated their motion for relief

VS v. Christensen * October 11, 2012          240

1   that, hey, they would say, Judge Toomey can't go

2   forward.  Therefore, Judge Taylor, you have to let

3   these new cases go forward.  I mean, they're

4   manipulating the Court, this Court, to some extent,

5   to pick Judge Taylor as the right forum.  And there's

6   been no evidence before this Court that they've

7   presented as to why they should pick one of those

8   three over any of the others.  They have failed.

9          Seven, I'm sure Forge will come up and

10  talk about Curtis factor number 7, whether litigation

11  in another forum would prejudice the interest of

12  other creditors, the creditors committee and other

13  interested parties.  If it's done through the proof

14  of claim process, they file an objection, we have a

15  trial on our issues before this Court.  Other parties

16  were being effected, in effect maybe diluted out by

17  their claims, can come in and say, I don't want to be

18  diluted out.  I don't want my percentage of a pot to

19  be reduced.  Because you can simply overpower them

20  with legal fees and costs.  Yes.  I think seven fails

21  for the movants in this case.  Other parties have a

22  strong argument as to why they want to be involved.

23          Judicial economy and factor number 10 from

24  Curtis, I think I've already hammered on that well

25  enough.  I think they're trying to reopen litigation