UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Bankruptcy Case |
| VS FOX RIDGE, LLC, | ) No. 12-28001-JTM |
| | ) |
| and | ) Bankruptcy Case |
| | ) No. 12-28010-JTM |
| STEPHEN LAMAR CHRISTENSEN | ) |
| and VICTORIA ANN | ) Jointly Administered Under |
| CHRISTENSEN | ) Case No. 12-28001-JTM |
| | ) |
| Debtors. | ) (Chapter 11) |

\* \* \*

October 29, 2012

**ELECTRONICALLY RECORDED HEARINGS**
**MOTION TO COMPEL and MOTION TO QUASH**

Before the Honorable Joel T. Marker

\* \* \*

Transcribed by:  Rossann J. Morgan, CSR, RPR



**dm DepoMax Merit**
LITIGATION SERVICES

333 SOUTH RIO GRANDE
SALT LAKE CITY, UTAH 84101
WWW.DEPOMAXMERIT.COM

TOLL FREE 800-337-6629
PHONE 801-328-1188
FAX 801-328-1189

• A TRADITION OF QUALITY •

1                    **A P P E A R A N C E S**

2

    FOR THE TM PARTIES:        Jacob D. Lyons, Esq.
3                                    CALLISTER NEBEKER & McCULLOUGH
                                     10 East South Temple,
4                                    Suite 900
                                     Salt Lake City, Utah 84133
5                                    Telephone: (801) 530-7300

6

    FOR FORGE INVESTMENTS       John P. Harrington, Esq.
7    UT, LLC:                        HOLLAND & HART, LLP
                                     222 South Main Street,
8                                    Suite 2200
                                     Salt Lake City, Utah 84101
9                                    Telephone: (801) 799-5800

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

1  October 29, 2012

2              **P R O C E E D I N G S**

3      (Whereupon, the recording starts mid sentence.)

4              THE COURT:  -- calendar.

5              COURT CLERK:  This is in the matter of VS Fox

6  Ridge.

7              THE COURT:  Can I get appearances, please?

8              MR. HARRINGTON:  John Harrington of Holland &

9  Hart on behalf Forge Investments Utah, LLC.

10             MR. LYONS:  Jacob Lyons of Callister, Nebeker

11  & McCullough on behalf of Mountain Home Corporation.

12             THE COURT:  All right.  Well, who wants to

13  start?

14             MR. HARRINGTON:  Your Honor, I will, if the

15  Court will permit.

16             THE COURT:  Yeah, tip --

17             MR. HARRINGTON:  We have competing motions

18  here today with respect to a Motion to Compel of behalf

19  of my client and a Motion to Quash.  Your Honor, we have

20  three irrefutable facts before the Court, and then I will

21  get to the controversy that is confronting us here today.

22             The first is that the debtor alleges in its

23  schedule that they own 12.56 percent of Mountain Home.

24  Mountain Home, through Mr. Ted Heaps, his testimony

25  indicates that there was an interest, 23-percent

                                                    3

1 interest, in Traverse Mountain Commercial Ventures that
2 were sold for $4 million.

3 THE COURT: His testimony? I'm sorry.

4 MR. HARRINGTON: His testimony, Ted Heaps.
5 This was attached, Your Honor, to our reply memorandum.
6 This was testimony in National Capital Management, LLC
7 versus Robert -- Brent Robert Tanner.

8 And this appears in the pleadings -- excuse
9 me, in the transcript on page 63. Actually, it starts on
10 62, goes through 63 and 64. It states that -- the
11 question posed was, You mentioned it owned, owns or
12 owned, approximately 23 percent of that entity; is that
13 your recollection?

14 Yes.

15 I'm skipping down. I don't remember the
16 specific date that it was sold. I guess about six months
17 ago. He then also testified, We sold our interest.

18 Question. And it's your recollection that
19 all of Mountain Home developed corporation interests were
20 sold so that NCP River Bend entity?

21 Answer. Yes.

22 And for what price?

23 $4 million.

24 THE COURT: And, again, Mr. Harrington, this
25 is litigation outside of this court?

4

1             MR. HARRINGTON:  It is, Your Honor.

2             THE COURT:  And --

3             MR. HARRINGTON:  But it is sworn testimony.

4             THE COURT:  Right.

5             MR. HARRINGTON:  Right.

6             THE COURT:  And as I understand it, your

7   client is a creditor.

8             MR. HARRINGTON:  It is.  The largest

9   creditor.

10            THE COURT:  And Mr. Lyons client is a

11  creditor.  Clients are creditors; right?

12            MR. HARRINGTON:  Correct, Your Honor.

13            THE COURT:  And what you're trying to get at

14  is the debtor's interest in some of the TM entities?

15            MR. HARRINGTON:  That is correct, Your Honor.

16            THE COURT:  All right.  And tell me why the

17  debtor's not before me.

18            MR. HARRINGTON:  Why the debtor's not before

19  you?

20            THE COURT:  Right.

21            MR. HARRINGTON:  The debtor's already

22  testified.

23            THE COURT:  I mean, it seems like you're

24  playing into their argument, whether it's true or not,

25  that your client and the debtors have some sort of

1 improper alliance.  I mean, why are you doing the
2 debtor's work?
3             MR. HARRINGTON:  Oh, I think, Your Honor,
4 through previous testimony, the debtor's limited
5 resources I think have become apparent.  The debtor has
6 also testified in this court that there had been no
7 distributions made from Mountain Home and, therefore, is
8 incapable of doing that.  And, therefore, it falls upon
9 the largest creditor to go and ferret out where the
10 debtor's assets are, not because of any particular
11 alliance or illicit relationship that they exist there,
12 is we want to be repaid and the source of repayment in
13 our claim is through the debtor.  We want to know where
14 the assets are of the debtor.  The debtor has testified
15 he owns 12 percent of Mountain Home.
16             THE COURT:  Well, did -- did you ask the
17 debtors whether they were going to try to obtain this
18 information?
19             MR. HARRINGTON:  I can't say that we have
20 specifically asked that, Your Honor, but I don't see any
21 impropriety in us of the largest creditor in seeking that
22 information.  When, in fact, it appears as if --
23             THE COURT:  Yeah, I'm not saying it was
24 improper.  What I'm saying is it plays into the hand of
25 TM parties saying that there is some sort of improper

6

```
 1  relationship.
 2              MR. HARRINGTON:  Well, Your Honor --
 3              THE COURT:  But --
 4              MR. HARRINGTON:  -- if -- if I could address
 5  that in --
 6              THE COURT:  But why isn't the debtor here?
 7              MR. HARRINGTON:  Why isn't the debtor here?
 8              THE COURT:  Right.
 9              MR. HARRINGTON:  The -- the debtor is --
10              THE COURT:  But you're -- you're saying the
11  debtors, both the individuals and the entity, they're in
12  -- unable to perform their fiduciary duties?
13              MR. HARRINGTON:  I don't know that I'm going
14  so far as to say that, but I think that their time is
15  better spent elsewhere in the formulation of the plan.
16  When they know that the largest creditor is pursuing
17  those assets, there's certainly nothing wrong with us
18  proceeding to go and get repayment.  So I don't -- I -- I
19  don't see any nefarious motives here, Your Honor.  I -- I
20  -- I see this as we want to be repaid and we will scour
21  the countryside wherever those assets may be.  And he's
22  testified, as I said, in this court, there has been no
23  repayment, no distributions to him for his 12 percent
24  interest in Mountain Home.  We want to know why.  We want
25  to know -- well, we want to know a lot of things.  What
```

7

 1  we really want to know is -- is --

 2          THE COURT:  Right.  Right.  But, again, what

 3  concerns me is, why is the debtor on the sideline in this

 4  inquiry?  If the debtors, both the individuals and the

 5  entity, are unable to perform their fiduciary duties,

 6  shouldn't I appoint a trustee to do that for them?

 7          MR. HARRINGTON:  You know -- and -- and, Your

 8  Honor, I -- I -- I do understand your question and I

 9  don't have an answer to that in -- in that regard.  We

10  have not asked the debtor or their counsel with respect

11  to that.  But as to going as to asking them, you know, we

12  should appoint a trustee, that's way beyond the scope of

13  my representation.  I'm -- I'm here merely to go and get

14  monies for my clients.

15          So I -- I -- I -- the implications on the

16  debtor, whether it be a trustee or the debtor himself,

17  makes no difference to my client.  It -- it -- it really

18  doesn't.  If the Court sees fit to appoint a trustee --

19          THE COURT:  But what you're -- what you're

20  saying is the debtor's been unable to provide this

21  information to you?

22          MR. HARRINGTON:  It doesn't appear as the

23  debtor has proceed in -- in this regard.  We don't have

24  any subterranean conversations with the debtor that --

25          THE COURT:  But you haven't asked for this

                                                        8

1  information on the debtor's assets from the debtor.

2         MR. HARRINGTON:  Save and except for what we

3  heard under oath from the debtor.  The debtor said he's

4  got nothing from Mountain Home.  I mean, he very

5  vociferously testified in -- in this court in saying, I

6  haven't gotten a dime, I've got no information, I've got

7  nothing from these people whatsoever.  I think his words

8  were that he was frozen out, in effect.  When we hear

9  that under oath, Your Honor, it -- it somewhat begs a

10  question for us to go and ask him.  That's what he has

11  said to the Court under oath.  That's -- that -- that

12  seems to be good enough for us.  And when he says he

13  can't get anything, well then, it may be up to us, which

14  we think it is, to go and ferret out that information.

15         So as I say, as to what the motives of the

16  debtor or what attempts they had, apparently, there is

17  some animus, quite obviously, between the debtors and

18  Mountain Home.  We really -- like I say, we don't -- it

19  -- it sounds flippant but I don't mean to be.  We don't

20  care.  All we want to do is find out where the assets are

21  and proceed to the assets and he's testified he owns 12

22  percent of it.

23         THE COURT:  But -- but you can't proceed to

24  the assets; correct?

25         MR. HARRINGTON:  Not with -- not without the

9

1  -- without the jurisdiction of court, no. We want to
2  find out where they are. That was the purpose of our
3  inquiry, is what are the assets? And -- and, Your Honor,
4  in -- in all truthfulness, Mountain Home may have a
5  reason that they have made no distributions to this. We
6  don't want to run off and do an adversary proceeding or
7  whatever. This is in the measured response, find out
8  exactly what the asset is, what the condition of it is,
9  how much money that may be there.

10         We want to find out who else has a claim to
11  it. There may be an intramural claim between
12  shareholders. There may be reasons for that, but we want
13  Mountain Home to tell us what the condition of the asset
14  is, how much it is, what other claims there are, what the
15  organizational behavior mean is. We want to find if they
16  had authority to sell these assets. In other words, what
17  information has been given to the other shareholders to
18  allow them to sell these assets? What -- what --

19         THE COURT: Well, but that -- that strays --
20  I mean, that buys right into their argument that you're
21  asking for information that you're not entitled to under
22  the guides of the 2004.

23         MR. HARRINGTON: Oh, and I'm sorry, Your
24  Honor. Why would that -- why would that stray over?
25         THE COURT: Because there you're trying to

10

```
 1  build claims against a fellow creditor.  You're not
 2  trying to find out what the debtor has.  You're trying to
 3  build claims against somebody else that you want to
 4  sue --
 5            MR. HARRINGTON:  No, that's --
 6            THE COURT:  -- that you're already engaged in
 7  litigation with; correct?
 8            MR. HARRINGTON:  Not necessarily, Your Honor.
 9  Is -- in other words, as I said, there may be reasons why
10  there haven't been distribution, why this asset -- to the
11  extent it exists -- remains there, because of other
12  claims of other shareholders and others.  We want them to
13  explain why, in fact, they have done what they've done.
14            So it is not necessarily building claims.
15  All we want to do -- now, I'm not going to be facetious
16  with the Court and say there isn't a -- a -- is it a
17  related proceeding?  You bet.  But do they overlap?  No.
18            Your Honor, let's flip over to the other side
19  in the state court.  They keep saying that, in other
20  words, what we want to do is go and file some type of
21  prejudgment writ.  That was the emphasis that they made.
22            THE COURT:  Oh, by the way, before I forget.
23  Everybody wanted to race back to state court and yet it's
24  been several weeks since we had the hearing at which I
25  granted relief to both of your clients and I haven't seen
```

```
 1  an order yet.
 2             MR. HARRINGTON:  Well --
 3             MR. LYONS:  Would -- would you like me to
 4  address that, Your Honor?
 5             THE COURT:  Yes.  And I -- and I'm --
 6             MR. HARRINGTON:  No (inaudible) --
 7             THE COURT:  I don't want to get off track.
 8             MR. LYONS:  Yes, I --
 9             THE COURT:  But before I forget, what --
10  what's happening with that order?
11             MR. LYONS:  We had sent that out in
12  accordance with the rules and we're waiting for the seven
13  days.  We've had Forge, in particular, has come back and
14  said we would like a simple adjustment, which we have
15  made.  We're waiting for any other of the parties to
16  contact us and say they have an objection to the form of
17  the order.
18             THE COURT:  So that's in progress?
19             MR. LYONS:  Yes.  And -- and I believe that
20  -- I'd have to check my calendar.  I believe that that
21  order -- that the time will have passed since we sent it
22  out either today or tomorrow.  But it -- it was sent out,
23  I believe -- I want to say the end of last week.  So with
24  the seven days, plus the three mailing, it should be
25  running -- that should be submitted to the court either
```

                                                        12

1  today or tomorrow, I believe.

2          THE COURT:  All right.  All right.  Thank

3  you.

4          Now, I'm sorry, Mr. Harrington.  Go ahead.

5          MR. HARRINGTON:  No, that's fine.  In -- in

6  -- and on that issue, we have, I think, in return mail,

7  we responded to that particular order and -- and gave

8  them -- I think the characterization is correct -- a

9  minor clerical revision.  So there's no holdup on the

10 part of Forge in that regard.

11         Returning, though, to the state court.  Is

12 somehow there is that this is a pending proceeding, that

13 somehow there is something that we could be doing in the

14 state court that would be in some way duplicative of what

15 we're asking in the bankruptcy court.  Not so.  Is in

16 this regards as to what those assets are and the court is

17 fully aware.  In the state court proceeding, that doesn't

18 become relevant until there is some type of judgment.

19         So it's not as if we're duplicating what's in

20 state court.  We're asking about the asset here in the

21 bankruptcy court because one of the litigants happens to

22 have availed themselves of the bankruptcy protection.  We

23 want to know what that is and to the extent it's

24 necessary to preserve it or have those monies paid into

25 the bankruptcy estate.  So the policy, if you will, of

13

```
 1  the pending proceeding --
 2              THE COURT:  But you understand my concern
 3  about why the party would normally be asking for this
 4  information is not in front of me?
 5              MR. HARRINGTON:  Your Honor, it -- I -- I do
 6  understand.
 7              THE COURT:  I mean, once you obtain the
 8  information, what are you going to do with it?
 9              MR. HARRINGTON:  Well, we're -- to the extent
10  that it needs to be paid into the bankruptcy court as
11  creditors, we will seek relief here and ask that those
12  monies be paid into the bankruptcy estate.
13              THE COURT:  But you have no standing to seek
14  relief, that sort of relief.
15              MR. HARRINGTON:  Currently, we don't.  You're
16  right, Your Honor.  We currently do not.  We would have
17  to seek relief from this court to go ahead and do that.
18              THE COURT:  To do what?
19              MR. HARRINGTON:  Whatever those -- whatever
20  that asset is.  He's got 12 percent of a corporation that
21  we --
22              THE COURT:  But that's -- that's an asset of
23  the estate.
24              MR. HARRINGTON:  That's correct.
25              THE COURT:  And I'm -- I'm saying your client
```

14

1   has no platform from which to somehow force or recover
2   that asset for the estate.  You are not the fiduciary.
3   That's what I'm -- that's what I'm saying.
4           MR. HARRINGTON:  Yeah.
5           THE COURT:  It sounds like that the debtor
6   can't afford to even do discovery, to find out what its
7   assets are, and can't afford litigation to retrieve those
8   assets if they're due and owing.  Then why shouldn't I
9   just appoint a trustee in these cases?
10          MR. HARRINGTON:  You know, and -- and -- and
11  I don't mean to be facetious, Your Honor.  You certainly
12  can.  I mean, it's -- it -- there is no objection on our
13  part to the extent that somebody's going to step forward
14  and do that, but nobody has done that as of yet.
15          THE COURT:  All right.  And -- and there's
16  been -- outside of Mr. Christensen saying, I can't get
17  any information, you -- your client has made no formal
18  request of that information from the client -- from the
19  debtor.  Excuse me.
20          MR. HARRINGTON:  No, other than the
21  schedules.  You're right.  I mean, other than what has
22  been provided under oath under the schedules, no, we have
23  not done that.
24          THE COURT:  Okay.
25          MR. HARRINGTON:  But, again, I mean, it was a

                                                    15

 1 | sufficiency of evidence question.  He's testified he
 2 | can't get anything.  So I -- I -- Your Honor, is
 3 | oftentimes happens is even albeit not the -- the debtor,
 4 | we have the most at stake here in those monies for
 5 | repayment.  So I think that oftentimes as happens in the
 6 | bankruptcy context, the person whose ox is going to be
 7 | gored, we're -- we're the people that would like to -- to
 8 | prevent that from happening.
 9 |         So I think that all of our inquires -- now,
10 | I'm -- I'm willing to pars these out with -- with the
11 | assistance of the court, but what we've asked for is what
12 | are the assets in essence?  We've asked --
13 |         THE COURT:  Well -- and -- and I'm going to
14 | allow you to do that.  I'm probably going to force you
15 | and Mr. Lyons to sit down and go through it yourselves,
16 | rather than make me do it for you.  But let me -- let me
17 | hear from Mr. Lyons first.
18 |         MR. HARRINGTON:  Very good.
19 |         MR. LYONS:  All right.  Yeah.  Let me begin
20 | by saying --
21 |         THE COURT:  That's --
22 |         MR. LYONS:  -- I think we have --
23 |         THE COURT:  I heard Mr. Christensen testify
24 | that he can't get information from your clients.  That
25 | has concerned me from the start of the case.  He can't

1   afford it.  That may be an issue about whether I should

2   appoint a trustee, somebody who can go after this

3   information.  But at some point, your clients are going

4   to have to provide this information to somebody.  And

5   it's basic information about what interests the two

6   estates have in your clients and how to possibly value

7   those interests.

8                MR. LYONS:  Yes, Your Honor.

9                THE COURT:  So -- so tell me how we get that

10  information to Forge and to the debtors.

11               MR. LYONS:  Two -- two items on that, Your

12  Honor.  Also, at that -- at that same hearing, of course,

13  the point of that evidentiary hearing wasn't whether or

14  not Mr. Christensen has received the information to which

15  he's entitled.  Had that been the case, I think we would

16  have provided different evidence than we did provide.

17               However, Mr. Manning, who also testified that

18  day under oath specifically stated that Mr. Christensen

19  had made those identical types of claims in the Toomey

20  litigation saying, I'm -- I'm entitled to information

21  that I'm not being given.  And -- and brought a claim in

22  Toomey and that that claim was ruled on and that Judge

23  Toomey found as a matter of law that Mr. Christensen had

24  been provided all the information to which he was

25  entitled under the law.

                                                    17

1            So I -- I would disagree with the

2   characterization that Mr. Christensen doesn't have any

3   information, hasn't been given any information and, in

4   fact, a court of law has found that he has been given the

5   information to which he is entitled.

6            Now, of course, time has lapsed since then

7   and -- and Mr. Christensen could argue that he's entitled

8   to more information since then that he hasn't received,

9   but I don't think that's the claim that's being made.  I

10  think that he's saying, I've never gotten the

11  information, and that's simply not the case.

12           THE COURT:  All right.  So the -- the entity

13  estate has an interest in one of your clients; correct?

14           MR. LYONS:  Actually, I -- I think the point

15  should be made that the -- the debtors have claimed an

16  interest in three diff -- I'm sorry, four different

17  entities of which Mountain Home is one.  They also claim

18  an interest in LandCom.

19           THE COURT:  When you say the debtors, let's

20  be more specific.

21           MR. LYONS:  The debtors, Steve and Victoria

22  Christensen claim interest in Mountain Home and also in

23  VS Fox Ridge, which is the other debtor.  VS Fox Ridge

24  claims an interest in --

25           THE COURT:  Let -- let's back up.

                                                      18

```
 1                    MR. LYONS:  Yes.
 2                    THE COURT:  Okay.  So you understand that the
 3   Christensens have claimed an interest in Mountain Home.
 4                    MR. LYONS:  Yes, Your Honor.
 5                    THE COURT:  And -- and what?  You said there
 6   was a (inaudible) --
 7                    MR. LYONS:  Oh, I'm sorry.  And VS Fox Ridge,
 8   who is the other debtor in this case.
 9                    THE COURT:  Correct.  Okay.  Do you -- does
10   -- do your clients dispute that the Christensens have an
11   interest in Mountain Home?
12                    MR. LYONS:  No.
13                    THE COURT:  Okay.  And with respect to that
14   interest, which they've said is about 12 percent --
15                    MR. LYONS:  Yeah, I believe --
16                    THE COURT:  -- Correct?
17                    MR. LYONS:  -- that's what the debtors have
18   represented.
19                    THE COURT:  Okay.  As interest holders, what
20   information do you acknowledge that they're entitled to?
21                    MR. LYONS:  I think we would be happy -- or I
22   believe that they are entitled, Your Honor, to
23   information relating to the -- the ownership percentage
24   that the debtors have in Mountain Home.
25                    THE COURT:  What does that mean?  Is it
```

19

1  something different than what they've claimed?

2          MR. LYONS:  I -- I don't know, Your Honor.  I

3  haven't looked at the documents.  I have no reason to

4  believe that the debtors are claiming that they own a

5  different interest than -- than what they --

6          THE COURT:  Are the debtors entitled to

7  information in the current assets and liabilities of

8  Mountain Home?

9          MR. LYONS:  I -- I believe they are entitled

10 to certain information.  I haven't -- I'm not prepared to

11 discuss the legal question of exactly what information

12 they're entitled to as a matter of law as shareholders.

13 I'm sure -- I'm certain that they are entitled to certain

14 information and to -- whatever information they're

15 entitled to, I think they should be provided.  I -- I

16 would say certainly that the information that they're

17 entitled to is probably much more narrow than what has

18 been asked for by Forge.

19         THE COURT:  So whatever information they're

20 entitled to, you agree that they can have it?

21         MR. LYONS:  Absolutely.

22         THE COURT:  Okay.  I -- I don't know what

23 that means.

24         MR. LYONS:  I -- I understand, Your Honor.  I

25 haven't -- I understand that's not particularly helpful.

1   I don't know.  I'm not as familiar with corporate law

2   perhaps as I would need to be to answer the question of

3   what information they're entitled to.  So I'd hate to say

4   that they're entitled to certain information or that

5   they're not entitled to certain information and be wrong

6   simply because I don't know.

7           THE COURT:  Okay.  Well, you're here today to

8   say Forge shouldn't get anything.

9           MR. LYONS:  Yes.

10          THE COURT:  But you're not prepared to tell

11  me what the estate should get.

12          MR. LYONS:  No, Your Honor.  No, I -- I'm

13  not.  But -- but part of it is I don't think that

14  question is before the Court.  But I would say --

15          THE COURT:  Because it is, too.  You're

16  bringing discovery dispute to me.  I'm trying to resolve

17  it.

18          MR. LYONS:  Yes.

19          THE COURT:  And to the extent that you

20  haven't thought about issues that I'm thinking about --

21  I'm not trying to torment you on the stand -- you know,

22  at the podium, I'm trying to figure it out for you.

23          MR. LYONS:  Yes.

24          THE COURT:  Or try to help you figure it out.

25  Help me decide it.

1              MR. LYONS:  My experience is that

2    shareholders are entitled to -- to certain information.

3    I don't think they -- they always know exactly all of the

4    assets that a particular company owns, what the company's

5    doing with assets on a day-to-day basis.  Certainly

6    they're entitled to share -- to information regarding the

7    value of the -- the total assets owned by the company.

8    If there's been substantial changes, I would imagine that

9    they're entitled to things like that.

10             THE COURT:  Well, aren't they entire --

11   entitled to current books and records?

12             MR. LYONS:  I -- I believe they are to a

13   certain extent.  What that extent is, again, I couldn't

14   comment but I believe that they are.  They're entitled to

15   make that request.

16             THE COURT:  All right.  Well, you're not

17   being as helpful to me as I would have hoped.

18             MR. LYONS:  And I do -- I do apologize, Your

19   Honor.  We've -- I can represent that Mountain Home would

20   be happy to give debtors all the information to which

21   they're entitled to a shareholder --

22             THE COURT:  Yeah, but that's -- that's not

23   helpful because I've got a list in front of me here.  You

24   want to go through the list and say we can give them

25   this, that and not -- not this?

                                              22

```
 1                      MR. LYONS:  I -- I couldn't --
 2              THE COURT:  You can't --
 3              MR. LYONS:  -- now.
 4              THE COURT:  You're not prepared to do that.
 5              MR. LYONS:  I'm not, Your Honor.  I
 6   apologize.
 7              THE COURT:  Okay.  Then, unfortunately,
 8   Mr. Harrington, I'm going to take you up on your offer.
 9   As excruciating as it's going to be for us, why don't you
10   come back up to the podium.  Let's go through this line
11   by line.  Okay.  I'm looking at Exhibit A to your motion,
12   which is Docket No. 65, filed on September 6th.
13              And, Mr. Lyons, the -- the way I'm looking at
14   this is, even though it's not the debtor in possession
15   that's in front of me in either one of these cases asking
16   for this information, what I'm looking at is, if the
17   debtor had a right to the information to determine what
18   are assets of the estate and how it -- from the debtor's
19   perspective value those assets.
20              That's a good starting point in my view for
21   what Forge should be able to get.  And I'm going to order
22   your clients to provide that information and provide a
23   separate set of documents to the debtors.  All right?
24              MR. LYONS:  Yes, Your Honor.  I would say,
25   however, that the debtor has already indicated under oath
```

23

```
 1  what it believes the value of these shares to be, that
 2  they provided in their schedules of valuation.  I'm sure
 3  that they also provided their tax information to the IRS
 4  and the federal government and the state government.
 5  They've -- they've made those same kind of valuations.  I
 6  believe that most of that information, the debtor already
 7  has in --
 8              THE COURT:  Yeah.
 9              MR. LYONS:  -- its possession.
10              THE COURT:  And you had your chance, so you
11  can sit down.
12              All right.  Mr. Harrington.
13              MR. HARRINGTON:  And you're on Exhibit A of
14  what, Your Honor?
15              THE COURT:  This is your motion for the 2004
16  order.  Docket No. 65.
17              MR. HARRINGTON:  Yeah.
18              THE COURT:  The order itself, which was
19  entered as Docket No. 68, refers back to the Exhibit A to
20  the motion.  That's why I'm looking at the motion.
21              MR. HARRINGTON:  Okay.  All right, Your
22  Honor.  Yes.
23              THE COURT:  All right.  Paragraph one, All
24  organizational documents of Mountain Home.  Why do the
25  organizational documents -- what use is that in
```

                                             24

1   determining what assets the -- these estates have?

2           MR. HARRINGTON:  Well, in light of the

3   Court's comment as to formulating claims against others,

4   I think that Forge is willing to drop that organizational

5   documents.  However, what we find in that string, Your

6   Honor, is operating agreements and settlement agreements.

7   Those are of particular interest to us as to what

8   implications and finding out why Mr. Christensen hasn't

9   been paid any of these monies.  We suspect it will be

10  found in the operating agreements and settlement

11  agreements.

12          THE COURT:  All right.

13          MR. HARRINGTON:  Maybe let me take another

14  run at that.  Is, in other words, as to organizational

15  documents, is we don't need the incorporation part of

16  things.  Save and except for what we were looking for was

17  the bylaws.  And there may be something in the bylaws

18  that would prevent Mr. Christensen from getting

19  distributions.

20          THE COURT:  All right.  I -- I don't see

21  that.  What I thought you were going at were, for

22  example, the Mountain Home entities sold some assets

23  within the year prior to filing, for example, that should

24  have provided distribution on the Christensens interest

25  and it didn't.

25

1               MR. HARRINGTON:  Well, it -- and that would
2   be under financial data.  You're looking at
3   organizational documents.  I think we clearly want
4   financial data.

5               THE COURT:  Well, it says operating
6   agreements and settlement agreements.

7               MR. HARRINGTON:  Yes.  Those are the two
8   things that we think that may permit there not to be a
9   distribution to the debtor.  Again, Your Honor, in all
10  sincerity is -- is -- is there has to be a reason that
11  Mountain Home isn't paying or otherwise accounting for
12  the 12 percent that he owns.  And the only other place
13  that we can look at is we need to see the financial
14  records of how much money -- how much the assets were.
15  We want a listing of assets of which he would have
16  12 percent.

17              THE COURT:  Well, let's focus on that for a
18  minute, then.

19              MR. HARRINGTON:  Okay.

20              THE COURT:  So let's pass on paragraph one.
21  Paragraph two, All documents indicating the ownership of
22  Mountain Home and the percentage of ownership of each of
23  the owners.  Now, what if -- what is information?  Now,
24  this is fairly broad.  What -- what is the interest of
25  other owners got to do with the value of the

                                                        26

1   Christensens' ownership?

2               MR. HARRINGTON:   It -- it may not, Your

3   Honor.   We're willing to limit that to the 12 percent

4   owned by Mr. Christensen or VS Fox Ridge.

5               THE COURT:   All right.   And, as I see it,

6   there are no time restrictions on any of these requests.

7               MR. HARRINGTON:   I think we can put one on

8   there, Your Honor.   We have done it from January 1, 2011

9   to the present.

10              THE COURT:   Well, that seems reasonable.

11              MR. HARRINGTON:   We thought it was.

12              THE COURT:   Paragraph three, All documents

13  relating to distributions, dividends, loans or other

14  forms of compensation received by the owners,

15  shareholders -- there again, it appears that you're

16  simply looking for ammunition against Mountain Home.

17  Direct claims by Forge rather than claims by the debtors

18  for their -- what they're owed.

19              MR. HARRINGTON:   Save and except for this,

20  Your Honor, is, in other words, if there's a dis --

21  disproportionate distribution that we can see to others,

22  we would like to be able to say why didn't

23  Mr. Christensen or VS Fox Ridge get those?

24              The only way we can determine the

25  reasonableness of the distributions, transfers and others

1  is to see the entity of it.  If somebody is getting three
2  times their amount and Mr. Christensen is getting none,
3  then we -- I think that is relevant.  It goes to the
4  property of the estate.
5            THE COURT:  All right.  Paragraph four.  All
6  right.  I understand that.  Paragraph five, Documents
7  relating to purchase proposals received or sale offers
8  made.  All right.  Paragraph six, All board minutes
9  addressing or corporate resolutions authorizing a
10 transfer, exchange or sale of any assets of Mountain
11 Home.  All right.
12           Paragraph seven, All financial data for
13 Mountain Home including audited and unaudited financial
14 statements, payroll records and salary information of the
15 officers, directors and shareholders.  Appraisals of
16 corporate assets.
17           MR. HARRINGTON:  Your Honor, if I could --
18           THE COURT:  Now, obviously, some of this
19 stuff -- that's a --
20           MR. HARRINGTON:  I think it's too hard.
21           THE COURT:  That's a -- that's a big
22 development down there.  There are competing property
23 developers in the area.  That's kind of stuff that's
24 going to cause them a lot of heartburn.  I understand
25 why.  How can you narrowly tailor that to meet your

28

1  client's expressed needs?

2          MR. HARRINGTON:  Okay.  Your Honor, first is,

3  in replying to that, Mountain Home is not an operating

4  entity at this time.  There is no operations that are

5  transpired.  So this is, in effect, a -- a company that

6  owes debt and is a place marker, if you will.

7          Now, I do think that it is probably too

8  broad.  So let's -- if we can -- obviously, I think we

9  strike payroll records.  What we were interested in

10 salary information for officers was that that would be

11 another way of making distributions to -- to the

12 exclusion of -- of Mr. Christensen.  So that's why we put

13 that.

14         What we're really interested in seeing, Your

15 Honor, and I will -- would take it upon myself to

16 reformulate this, is we want to see what the assets are

17 on the books.  We want to see any valuations --

18         THE COURT:  All right.  All right.  What I'm

19 going to do is just limit it to balance sheets at this

20 time --

21         MR. HARRINGTON:  Okay.

22         THE COURT:  -- and we'll see where that takes

23 us.  And then the three warranty deeds.

24         MR. HARRINGTON:  Yes, Your Honor.

25         THE COURT:  Tell me about them.

1          MR. HARRINGTON:   Well, the -- the warranty

2  deeds were what we see as assets being sold by Mountain

3  Home.   So what we'd like to see is how those came about.

4  We -- these are the only real property records that we

5  can ascertain where they have sold those -- those --

6  those assets.

7          So we'd like to have -- and on these ones

8  particularly, we'd like everything they've got on that.

9  How did that come about, why did they sell them, what the

10  consideration was.   That appears as if those should have

11  12 percent of it segregated from Mr. Christensen.   In

12  doing our due diligence for this -- this -- this document

13  request, that's the three that we could come up with.

14          THE COURT:   But, again, the -- the requests

15  are pretty broad.   All documents relating to.   So I -- I

16  don't know how extensive that can be.   I mean, one of

17  these deeds could relate to a transactional binder that's

18  a foot thick.

19          MR. HARRINGTON:   It -- it potentially could,

20  Your Honor.   And in that, I'd like to ask the Court for

21  direction as to how to limit that.   We just want to see

22  what-cha got paid for.

23          THE COURT:   Well, you've got -- you've got

24  the documents themselves; right?

25          MR. HARRINGTON:   Yes.   Which were attached.

                                                        30

1            THE COURT:  And who is the -- Mr. Lyons, had

2  you identified somebody at your client's who would be

3  available to answer questions?

4            MR. LYONS:  Yeah.  I mean, we -- there are

5  (inaudible) --

6            THE COURT:  Have you identified somebody?

7            MR. LYONS:  We have not.

8            THE COURT:  Okay.  So is it possible,

9  Mr. Harrington, that with these recorded copies that you

10 have, you could ask the designee to say tell us about

11 this transaction?

12           MR. HARRINGTON:  We could, Your Honor.

13           THE COURT:  And then he or she could say

14 here's what I know and that could lead to a request for

15 further documents.  They could say yes, they could say

16 no.

17           MR. HARRINGTON:  We'd be satisfied with that,

18 Your Honor.

19           THE COURT:  All right.  And, again, I'm --

20 I'm concerned about why the debtor isn't doing this, but

21 that might be an issue to come at the status conference

22 on November 6th.

23           What I'm going to do is deny their Motion to

24 Quash in part.  Grant the Motion to Compel in part.  And

25 as going through Exhibit A, I'm not going to make any --

                                                    31

I'm not going to require any production with respect to paragraph one.  None.

So with respect to paragraph two, the information requested as to the debtors percentage only. And, again, for -- unless otherwise stated for all of these documents, it's for the period that Mr. Harrington limited to, January 1st, 2011 to the present.

I'll require the production of the documents listed in paragraphs three and four.  I will not require the production of the documents in paragraph five at this time.  The documents described in paragraph six, I will order them produced.  With respect to paragraph seven, balance sheets only.

And, again, the idea is to get Forge, as a creditor, enough information to see what's going on without causing the TM parties to have to produce everything in their books and records to somebody who's suing them in a different form.  So I'm trying to balance the interest of the parties here.

And then require simply the -- you've already got the documents on paragraphs eight, nine and ten.  I won't require any additional documents at this time, but will require the designated representative of the TM parties to testify about those deeds and the circumstances surrounding it to see if there's further

32

1  information that Forge reasonably needs in its role as a

2  creditor in this case.

3            Can you fashion an order?

4            MR. HARRINGTON:  I will, Your Honor.

5            THE COURT:  All right.  Thank you for your

6  time.

7            MR. HARRINGTON:  Yep.  Thank you.

8            COURT CLERK:  All arise.

9        (Whereupon, the electronic recording ended.)

10                    *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    33

1

# C E R T I F I C A T E

2

STATE OF UTAH          )

3                      : ss.
COUNTY OF SALT LAKE)

4

5          THIS IS TO CERTIFY that the foregoing
transcript was taken down stenographically from
6 electronic recordings by me, ROSSANN J. MORGAN,
Registered Professional Reporter, Certified Shorthand
7 Reporter in and for the State of Utah.

8          That the electronically recorded proceedings,
or requested portions, were reported by me in Stenotype
9 and thereafter caused by me to be transcribed into
typewriting, and that a full, true and correct
10 transcription of said testimony so taken and transcribed
to the best of my ability from the recordings given me is
11 set forth in the foregoing pages.

12          I further certify that I am not of kin or
otherwise associated with any of the parties to said
13 cause of action, and that I am not interested in the
event thereof.

14

          WITNESS MY HAND at Salt Lake City, Utah.

15

16

17          ROSSANN J. MORGAN, CSR, RPR

18

License No.:
19 4948384-7801

20

21

22

23

24

25